Steven Thomas, a Minor, by his Guardian
ad Litem, Susan M. Gramling,
Plaintiff-Appellant-Petitioner,

v.

Clinton L. Mallett, Billie R. Mallett,
and Germantown Mutual Insurance Co.,
Defendants,

American Cyanamid Co., Atlantic Richfield Co.,
E.I. DuPont De Nemours and Co., NL Industries,
Inc., SCM Chemicals, Inc., Sherwin-Williams Co.,
ConAgra Grocery Products Co.,
Defendants-Respondents.

Supreme Court

*No. 2003AP1528. Oral argument February 1, 2005.
—Decided July 15, 2005.*

2005 WI 129

(Also reported in 701 N.W.2d 523.)

241

For the plaintiff-appellant-petitioner there were briefs by *Peter G. Earle* and *Law Offices of Peter Earle*, Milwaukee; and *Robert J. McConnell, Fidelma Fitzpatrick* and *Motley Rice, LLC*, Providence, RI, and oral argument by *Peter G. Earle* and *Robert J. McConnell*.

For the defendants-respondents, Atlantic Richfield Company, E.I. du Pont de Nemours & Co., Con-Agra Grocery Products Company, NL Industries, Inc., American Cyanamid Co., and Millennium Inorganic Chemicals, Inc. (f/k/a SCM Chemicals, Inc.) there was a brief by *Philip H. Curtis, Bruce R. Kelly* and *Arnold & Porter*, New York, NY, *David G. Peterson, Michael B. Apfeld*

and *Godfrey & Kahn,* Milwaukee (on behalf of Atlantic Richfield Company); *William H. King, Jr., Steven R. Williams, Joy C. Fuhr* and *McGuire Woods LLP,* Richmond, VA, *M. Christine Cowles* and *Quarles & Brady LLP,* Milwaukee (on behalf of E.I. du Pont de Nemours Co.); *James P. Fitzgerald, John J. Schirger* and *McGrath, North, Mullin & Kratz,* Omaha, NE, *Paul Benson* and *Michael Best & Friedrich,* Milwaukee (on behalf of Con-Agra Grocery Products Company); *Susan McGuire* and *Kirland & Ellis,* Washington, D.C., *Donald E. Scott, Jennifer Heisinger, Elizabeth L. Thompson* and *Bartlit Beck Herman Palenchar & Scott,* Denver, CO, *David G. Peterson, Michael B. Apfeld* and *Godfrey & Kahn,* Milwaukee (on behalf of NL Industries, Inc.); *Richard W. Mark, Elyse Echtman* and *Orrick Herrington & Sutcliffe LLP,* New York, NY, *David G. Peterson, Michael B. Apfeld* and *Godfrey & Kahn,* Milwaukee (on behalf of American Cyanamid Co.); and *Michael T. Nilan, Cortney G. Sylvester* and *Halleland Lewis Nilan Sipkins & Johnson,* Minneapolis, MN, *James R. Clark, Trevor J. Will* and *Foley & Lardner,* Milwaukee (on behalf of Millennium Inorganic Chemicals Inc. (f/k/a SCM Chemicals, Inc.) and oral argument by *Bruce Kelly* (on behalf of American Cyanamid Co., et al.).

For the Sherwin-Williams Company there was a brief by *Frank J. Daily, David B. Bartel, Jeffrey K. Spoerk, Daniel I. Hanrahan,* and *Quarles & Brady LLP,* Milwaukee; and *Paul Michael Pohl, Charles H. Moellenberg, Jennifer B. Flannery* and *Jones Day,* Pittsburgh, PA, and oral argument by *Charles H. Moellenberg, Jr.*

An amicus curiae brief was filed by *Anne Berleman Kearney, Joseph D. Kearney* and *Appellate Consulting Group,* Milwaukee, on behalf of Civil Trial Counsel of Wisconsin.

An amicus curiae brief was filed by *James A. Buchen,* Madison, on behalf of Wisconsin Manufacturers & Commerce.

An amicus curiae brief was filed by *Gerardo H. Gonzalez, Richard H. Porter, Chris J. Trebatoski* and *Gonzalez, Saggio & Harlan, L.L.P.,* Milwaukee, on behalf of the African-American Chamber of Commerce, Inc. and the Hispanic Chamber of Commerce of Wisconsin, Inc.

An amicus curiae brief was filed by *Lynn M. Novotnak* and *First, Blondis, Albrecht & Novotnak, S.C.,* Milwaukee, on behalf of Service Employees International Union-Wisconsin State Council, Wisconsin Commission on Occupational Safety and Health, Repairers of the Breach, Wisconsin Citizen Action, American Federation of Teachers, Local 212, and Sixteenth Street Community Health Center.

An amicus curiae brief was filed by *Mark S. Olson* and *Oppenheimer Wolff & Donnelly LLP,* Minneapolis, MN; *James M. Beck* and *Dechert LLP,* Philadelphia, PA; *Hugh F. Young, Jr.,* Reston, VA, on behalf of Product Liability Advisory Council, Inc.

¶ 1. LOUIS B. BUTLER, JR., J.   Steven Thomas, by his guardian ad litem, seeks review of a published court of appeals decision[1] that declined to extend the risk-contribution theory announced in *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 342 N.W.2d 37 (1984), to the defendant-respondent lead pigment manufacturers, American Cyanamid Co., Atlantic Richfield Co., ConAgra Grocery Products Co., E.I. DuPont De Nemours and Comp., NL Industries, Inc., SCM Chemicals, Inc., and Sherwin-Williams Co. (collectively "Pigment Manufac-

---

[1] *Thomas v. Mallett,* 2004 WI App 131, 275 Wis. 2d 377, 685 N.W.2d 791.

turers"). The court of appeals concluded that because Thomas had a remedy against his landlords for their negligence in failing to abate lead paint hazards in his prior residences, there was no reason to extend *Collins'* risk-contribution theory. The court of appeals also concluded that Thomas could not proceed on his claims of civil conspiracy and enterprise liability.

¶ 2. Thomas argues this court should reverse the court of appeals' decision because (1) although he received a remedy from his landlords for their negligence, Article I, Section 9 of the Wisconsin Constitution does not foreclose his seeking a remedy for the Pigment Manufacturers separate wrong for producing and promoting toxic lead pigments; (2) *Collins'* risk-contribution theory should be recognized for white lead carbonate claims; and (3) he has presented sufficient material facts to warrant a trial on his alternative theories of liability of civil conspiracy and enterprise liability.

¶ 3. We agree with Thomas that Article I, Section 9 does not insulate wrongdoers from liability simply because recovery has been obtained from an altogether different wrongdoer for an altogether different wrong. We also conclude that the white lead carbonate claims at issue in this case are factually similar enough to *Collins* to warrant extension of the risk-contribution theory. However, we do not agree that Thomas has presented sufficient material facts to warrant a trial on his civil conspiracy and enterprise liability claims. Therefore, we affirm in part and reverse in part the court of appeals' decision.[2]

---

[2] Pigment Manufacturers also argue that (1) they did not have a duty to warn; and (2) Thomas cannot prove that a failure to warn caused his injury. These arguments were not reached below, therefore we do not address them.

I

■

¶ 4.    Because this case is before us on summary judgment, we construe all facts and reasonable inferences in the light most favorable to the nonmoving party, which in this case is Thomas.[3] *See Strozinsky v. Sch. Dist. of Brown Deer,* 2000 WI 97, ¶ 32, 237 Wis. 2d 19, 614 N.W.2d 443.

¶ 5.    Thomas was born on June 23, 1990. He claims that he sustained lead poisoning by ingesting lead paint from accessible painted surfaces, paint chips, and paint flakes and dust at two different houses he lived in during the early 1990's.

¶ 6.    In August 1991, while living at 2652 North 37th Street, Milwaukee, Wisconsin, 14–month-old Thomas exhibited an early onset of childhood lead poisoning, with his blood lead levels (BPb) at 18 $\mu$g/dl. Thomas's cognitive skills were tested, which identified cognitive deficits in perceptual organization, visual motor integration, expressive language, academic and fine motor skills coupled with an attention deficit hyperactivity disorder. Eight months later, at the end of April 1992, his BPb increased to 40 $\mu$g/dl.

¶ 7.    Thomas continued to live at 2652 North 37th Street until January 1993. This house was built in 1905. City of Milwaukee Health Department documented lead-based violations at this home on July 29, 1992.

---

[3] We acknowledge that there are competing facts and inferences that could be drawn from the material facts. Because we construe the facts and all reasonable inferences in Thomas's favor, those competing facts and inferences are not relevant to our inquiry. To the extent the dissent, Wilcox, J., dissenting, relies on out-of-state cases to establish what Thomas can or cannot prove, we refer to our standard of review.

¶ 8. Thomas's next known phase of lead poisoning occurred while he was living at 2654 North 25th Street, Milwaukee, Wisconsin. That house was built in 1900. Lead-based paint violations were documented at this residence on August 12, 1993.

¶ 9. While Thomas's BPb decreased by January 1993 to 27 $\mu$g/dl, it rose to 49 $\mu$g/dl by July 1993. Thomas was admitted to Children's Hospital of Wisconsin for five days of chelation treatment.

¶ 10. From mid-August 1993 to early September 1993, Thomas's BPb rose from 13 $\mu$g/dl to 33–40 $\mu$g/dl. From August 1993 until November 1993, Thomas lived at 4736 North 37th Street, Milwaukee, Wisconsin. Thereafter, Thomas's BPb steadily declined but was still in the BPb range for lead poisoning.

¶ 11. According to Dr. John F. Rosen, a professor of pediatrics and head of the Division of Environmental Sciences at the Children's Hospital at Montefiore of the Albert Einstein College of Medicine, Thomas's cognitive deficits are a "signature or constellation of cognitive effects" that are typical of lead poisoning. In Thomas's case, Rosen states that these deficits are permanent. In addition, due to Thomas's elevated BPb over the extended period of time, Thomas will require lifetime medical monitoring-surveillance for physical disorders, as he is now at a high risk for developing future medical complications, including kidney disease, peripheral neuropathy, hypertension, and cardiovascular disease. Rosen opines that Thomas's high lead levels are exclusively derived from ingesting lead based pigments in paint.[4]

---

[4] In their summary judgment motion below, the Pigment Manufacturers did not seek summary judgment "on the issues of whether Steven Thomas can prove that he was injured by

¶ 12. Thomas subjected various paint samples from his prior residences to chemical analysis. Robert Dragen, an electron microscopist, analyzed the various paint layers contained in the samples and provided the elemental composition for each layer. According to that

lead ingestion or that his source of lead ingestion was lead paint. These issues are in dispute in this case. But it is precisely because they are in dispute that [*Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 342 N.W.2d 37 (1984)] should be held inapplicable." In their court of appeals' brief, the Pigment Manufacturers reiterated that "[t]heir motion assumed for purposes of analysis that Thomas could present a *prima facie* case demonstrating that the Manufacturers sold lead pigment without adequate warnings; it further assumed that he could present enough evidence to create a jury question on whether his claimed injuries were caused by lead."

The Pigment Manufacturers premise one of their arguments against recognizing *Collins* for lead pigment claims on the fact that lead poisoning could occur from one of any number of sources (since lead is ubiquitous). We set forth the material facts that Thomas claims prove that he ingested a lead pigment manufactured by the Pigment Manufacturers, white lead carbonate.

The dissent complains that Thomas's facts are insufficient to establish that his injuries were caused by white lead carbonate pigment. Wilcox, J., dissenting, ¶¶ 223–36. Unlike the dissent, we do not reach this issue for three reasons. First, for purposes of the Pigment Manufacturers' summary judgment motion, they assumed that Thomas could prove he ingested and was poisoned by lead paint. Thomas's claim of lead poisoning was premised on his ingestion of white lead carbonate pigment. The Pigment Manufacturers assumed that Thomas could create a jury question with regard to his lead poisoning. Second, the trial court did not pass on this issue. Third, the issue was not fully briefed or argued.

Although we do not address the merits of the issue, we note, *infra,* that Thomas bears the burden of proving that white lead carbonate caused his injuries. *See infra* IV.C.2.

248

analysis, none of the paint layers contained detectable levels of sulfur or chromium. Thus, according to Dr. Paul Mushak, a toxicologist and human health risk assessment specialist, this analysis conclusively rules out lead sulfate or lead chromate pigments. These pigments along with white lead carbonate pigments were the essential lead pigments used for residences. White lead carbonate was the principal pigment used, however. Because lead sulfate and lead chromate could be empirically excluded, Mushak opines to a reasonable degree of scientific and technological certainty that the houses contain lead paint made with white lead carbonate pigment.[5]

---

[5] Mushak also is of the opinion that:

> While lead exposure may qualitatively and potentially arise from various sources of the toxic element, the qualitative and quantitative nature of the lead source at issue in this case, lead paint, is such that (i) it dwarfs other lead sources in terms of lead concentration and intensity of lead exposure and (ii) it comprises the lead source most actively providing lead exposure and lead poisoning in the exposure settings at issue here: lead paint present in properties occupied or visited by Steven Thomas.

> Lead paint is the principal source of lead for childhood lead exposure and associated lead poisoning in high-density, urban areas with old housing that contains old lead paint with relatively high lead content and in varying states of deterioration.

> . . . .

> Lead paint exposures of urban children living in deteriorated old housing in typical central-city areas is also much more relevant to the case at issue here than lead in other media—water, air, diet, etc.

> . . . .

> One obvious reason why lead paint produces the most intense lead poisoning in children is the relatively high lead content in that medium. A 50% lead content in the early lead paints was not uncommon.

¶ 13. As noted, the houses where Thomas alleges he ingested lead paint were built in 1900 and 1905. During that period, use of lead paint for residences was common. Lead paint contained up to 50 percent lead pigment and maintained widespread use through the 1940s. The use and manufacturing of interior lead-based paints declined during the 1950s, and, in 1955, the lead industry voluntarily adopted a standard of the American National Standards Institute that limited lead content to a maximum of one percent in paints intended for children's toys, furniture, and interior surfaces. However, lead paint for interiors continued to be available until the 1970s.

¶ 14. As of December 31, 1972, lead paint for interior and exterior household use containing more than 0.5 percent lead of its total weight was banned from interstate commerce. 16 C.F.R. § 1500.17(a)(6)(i)(B) (2005). In 1978, the ban was expanded to residential use of paint containing more than 0.06 percent lead by weight. 16 C.F.R. § 1303.2(2) (2005); 16 C.F.R. § 1303.4 (2005). In 1980, Wisconsin banned the use of lead paint. Wis. Stat. § 254.12 (2003–04);[6] *Antwaun A. v. Heritage Mut. Ins. Co.,* 228 Wis. 2d 44, 61, 596 N.W.2d 456 (1999).

¶ 15. On December 4, 1996, prior to commencing the action that is the subject of this appeal, Thomas settled with Fire Insurance Exchange, the insurer for the landlord of 2652 North 37th Street, on a *Pierringer*[7] basis for $62,652.55. On September 10, 1999, Thomas commenced the underlying action against his remaining two landlords and their insurers and the Pigment Manufacturers for the injuries he received from lead

---

[6] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

[7] *Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

poisoning. As to his landlords, Thomas alleged that they negligently maintained the premises with respect to lead paint. As to the Pigment Manufacturers, Thomas alleged that they were liable for his injuries on the basis of, among other claims, strict liability, negligence, civil conspiracy, and enterprise liability.

¶ 16. On June 26, 2000, the Milwaukee County Circuit Court, Honorable Patricia D. McMahon, dismissed State Farm Insurance Co., the insurer for the landlord at 4736 North 37th Street, based on a pollution exclusion in its policy.[8] Thomas subsequently abandoned his claims against that landlord. On August 8, 2002, Thomas settled his claim with Germantown Mutual Insurance, the insurer for the landlord of 2654 North 25th Street, on a *Pierringer* basis for $261,520. Thus, the only remaining defendants were the Pigment Manufacturers.

¶ 17. Although all of the Pigment Manufacturers or their predecessors-in-interests[9] manufactured white lead carbonate at various times during the existence of

---

[8] *See Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis. 2d 106, 130, 596 N.W.2d 429 (1999) (pollution exclusion clause bars coverage for bodily injury stemming from ingestion of lead paint).

[9] As alleged in Thomas's complaint, the Pigment Manufacturers predecessors-in-interest are as follows:

[Second paragraph deleted.]

Atlantic Richfield Company is the successor-in-interest to International Smelting and Refining Company and Anaconda Lead Products Company.

E.I. DuPont De Nemours and Company has no predecessor-in-interest.

Congra Grocery Products Company is a successor-in-interest to W.P. Fuller Company, the W.P. Fuller Paint Company and WPF, Inc.

Thomas's prior residences, Thomas conceded that he cannot identify the specific pigment manufacturer that produced the white lead carbonate he ingested. The Pigment Manufacturers moved for summary judgment, arguing, as relevant here, that Thomas could not prove causation in fact or proximate cause; *Collins* should not be extended as Thomas already obtained a remedy from his landlords; *Collins* should not be extended outside the unique circumstances of diethylstilbestrol (DES); and that Thomas's civil conspiracy and enterprise liability claims were deficient. The Milwaukee County Circuit Court, Honorable Timothy G. Dugan, granted the motion.

¶ 18. The circuit court concluded that the DES fact situation in *Collins* was too different from the circumstances of Thomas's lead paint claims. First, the circuit court concluded that unlike the situation in *Collins,* where the plaintiff was remediless without the risk-contribution theory, Thomas had a remedy against the negligent landlords. Second, the circuit court noted that *Collins* concerned a nine-month window during which an expectant mother consumed DES, whereas here, since the houses Thomas lived in were constructed in 1900 and 1905, the lead paint could have been applied anytime during what was approaching a one hundred year time span. The court concluded the Pigment Manufacturers had no real defense, unlike in *Collins.* Third, the circuit court determined that DES produced a rare form of cancer, whereas lead poisoning could be caused by any number of lead products and

NL Industries, Inc. was formerly known as the National Lead Company.

SCM Chemicals is the successor-in-interest to The Glidden Company.

thus did not produce a "signature injury." Fourth, the circuit court concluded that all DES was identical, whereas there were different forms of lead pigments that were used in varying amounts by paint manufacturers. Fifth, unlike DES manufacturers, the circuit court noted that the Pigment Manufacturers were not in exclusive control of the risks involved as they did not make the finished paint product or ensure that the product was properly maintained in homes.

¶ 19. The circuit court then concluded that Thomas's civil conspiracy claim failed because he could not prove an underlying tort. Further, the circuit court determined that Thomas did not present clear evidence of an agreement between the Pigment Manufacturers to accomplish an unlawful purpose. Finally, the circuit court also determined that the enterprise liability was not available, as there was no industry standard for white lead carbonate pigment.

¶ 20. Thomas appealed, and the court of appeals affirmed. *Thomas v. Mallett,* 2004 WI App 131, ¶ 7, 275 Wis. 2d 377, 685 N.W.2d 791.

¶ 21. The court of appeals agreed with Thomas that his case had many characteristics in common with *Collins,* writing:

> As Thomas points out in his extensive submissions, and, for the purposes of this appeal, assuming their verity, this case and *Collins* share, for many of the same reasons, the inability of the plaintiff to identify those who made and sold the specific substance alleged to have caused injury. Thus, in both *Collins* and here the substances produced or sold by one company are, as material to the possibility of tracing the manufacturer or seller, essentially the same as that produced or sold by the others. . . . Additionally, both the diethylstilbestrol alleged to have caused the plaintiff's vaginal

cancer in *Collins,* and the white lead carbonate alleged to have caused Thomas's neurological disorders were made and sold by many companies long before the injury, making it impossible to trace specific manufacturers or sellers to the particular injury-causing product.

*Id.,* ¶ 4.

¶ 22. These similarities aside, however, the court of appeals read *Collins* as fashioning the risk-contribution theory for situations where a plaintiff is without any remedy whatsoever. *Id.,* ¶ 5. Because Thomas already had an existing right against his landlords, the court of appeals determined that recognizing *Collins'* risk-contribution theory for white lead carbonate was unnecessary. *Id.,* ¶ 7.

¶ 23. Regarding Thomas's civil conspiracy claim, the court of appeals agreed that he presented sufficient evidence to create a genuine issue of material fact as to whether the Pigment Manufacturers acted in concert to at least minimize the dangers of white lead carbonate. *Id.,* ¶ 9. However, the court of appeals determined that Thomas did not establish that the concerted action was a substantial factor in producing his injuries. *Id.,* ¶¶ 9–13. Specifically, the court of appeals concluded that Thomas had not shown that the conspiracy was a substantial factor that contributed to either the use of lead-based paint or its faulty maintenance. *Id.,* ¶ 13.

¶ 24. Finally, the court of appeals rejected Thomas's enterprise liability theory for two reasons: first, Thomas did not produce any evidence that white lead carbonate either was negligently made or dangerously defective if the lead paint was properly applied and maintained, *id.,* ¶ 17; and second, there was no need to

allow Thomas to sue on an enterprise liability theory as he already had a remedy at law for his injuries against the landlords, *id.,* ¶ 18.

¶ 25. Thomas seeks review.

II

¶ 26. As noted, this case is before us on summary judgment. We review summary judgments independently, applying the same methodology as the circuit courts. *Mayberry v. Volkswagen of Am., Inc.,* 2005 WI 13, ¶ 15, 278 Wis. 2d 39, 692 N.W.2d 226; *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). All reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980).

III

¶ 27. A problem facing Thomas, who alleges that he was injured by white lead carbonate pigment, is that he is unable to identify the precise producer of the white lead carbonate pigment he ingested at his prior residences due to the generic nature of the pigment, the number of producers, the lack of pertinent records, and the passage of time. *See Collins,* 116 Wis. 2d at 177. Some courts have simply denied extension of market-share liability under these circumstances and thus de-

nied lead pigment plaintiffs recovery.[10] However, the question presented is whether *Collins'* risk-contribution theory should be extended to white lead carbonate claims. We agree that it should.

¶ 28.  The following backdrop provides the relevant context for determining whether *Collins'* risk-contribution theory should be recognized for white lead carbonate claims.[11] It is by no means a complete discussion of the history of white lead carbonate, but rather is assembled pursuant to our standard of review that the facts are to be construed in the light most favorable to Thomas as the nonmoving party.[12] *See Grams,* 97 Wis. 2d at 339.

---

[10] *See, e.g., Santiago v. Sherwin Williams Co.,* 3 F.3d 546, 550–51 (1st Cir. 1993) (declining to extend market-share liability because plaintiff could not establish the market; pigment manufacturers may not have been in the market during the relevant time; plaintiff could not establish that portion of damages which is represented by the pigment manufacturers); *Brenner v. American Cyanamid Co.,* 699 N.Y.S.2d 848, 852–53 (N.Y. App. Div. 1999) (declining to extend market-share liability because plaintiffs could not establish the national market or when the paint was applied; white lead carbonate was not fungible as it was not chemically identical or uniformly mixed in paints and did not produce a signature injury; pigment manufacturers not in exclusive control of risk); *Skipworth v. Lead Industries Ass'n, Inc.,* 690 A.2d 169, 173 (Pa. 1996) (declining to extend market-share liability because plaintiff could not pinpoint when during the house's 100–year-period lead paint was applied and because uncontroverted evidence in record showed it was not fungible).

[11] This factual background is presented to illuminate the magnitude of the risk of injury created by the Pigment Manufacturers or their predecessors in interests. Creation of the risk of injury was one of the central policies relied upon by *Collins* for fashioning Wisconsin's risk-contribution theory. *See Collins,* 116 Wis. 2d at 191.

[12] As previously noted, we once again recognize that there

## A. The Problem of Lead Poisoning from Lead-Based Paints.

¶ 29.   According to the Center for Disease Control's ("CDC's") *Preventing Lead Poisoning in Young Children,* 1 (Oct. 1991) (hereinafter *"Preventing Lead Poisoning"*), it is well-recognized that given children's rapidly developing nervous systems, "[c]hildren are particularly susceptible to lead's toxic effects." *Id.* Because the human body cannot differentiate between lead and calcium, after lead has remained in the bloodstream for a few weeks, it is then absorbed into bones, where it can collect for a lifetime. EPA, *Lead In Your Home: A Parent's Reference Guide,* 4 (June 1998). Once lead enters the child's system, more lead is absorbed than would be in adults. *Preventing Lead Poisoning,* 11.

¶ 30.   Children "are more exposed to lead than older groups because their normal hand-to-mouth activities may introduce many nonfood items into their gastrointestinal tract." *Id.* The CDC noted that "[p]ica, the repeated ingestion of nonfood substances, has been implicated in cases of lead poisoning; however, a child does not have to eat paint chips to become poisoned." *Id.,* 18. It is more common for children to ingest dust and soil contaminated with lead from paint that either has flaked or chalked as it aged or has been otherwise disturbed during home maintenance or renovation. *Id.,* 18. "This lead-contaminated house dust, ingested via normal repetitive hand-to-mouth activity, is now recognized as a major contributor to the total body burden of lead in children." *Id.,* 18. Thus, "[b]ecause of the critical role of dust as an exposure pathway, children living in

are competing facts and inferences that could be drawn with respect to the Pigment Manufacturers' culpability regarding the manufacture and promotion of white lead carbonate.

sub-standard housing and in homes undergoing renovation are at particular risk for lead poisoning." *Id.,* 18.

¶ 31. The consequences of child lead poisoning are well documented. According to the CDC:

> Very severe lead exposure in children (blood lead levels ≥80 $\mu$g/dL) can cause coma, convulsions, and even death. Lower levels cause adverse effects on the central nervous system, kidney, and hematopoietic system. Blood lead levels as low as 10$\mu$g/dL, which do not cause distinctive symptoms, are associated with decreased intelligence and impaired neurobehavioral developments.

*Id.,* 9. The CDC also states that "the weight of the evidence clearly supports the hypothesis that decrements in children's cognition are evident at blood lead levels well below 25 g/dL." *Id.*

¶ 32. Although lead can originate from many different materials, such as food, soil, water, or air, lead paint is the primary culprit. The CDC concluded that "[l]ead-based paint is the most common source of high-dose lead poisoning." *Id.,* 65. "Numerous studies have established that the risk of lead poisoning is related to the presence of lead-based paint and to the condition of such paint." *Id.,* 18. As the United States Department of Health and Human Services determined in *Toxicological Profile for Lead,* 407 (July 1999):

> [T]he most common source of lead exposure for children is lead-based paint that has deteriorated into paint chips and lead dusts and that the most common sources of lead exposure for adults are occupational.

Similarly, in 1990, the Food and Drug Administration estimated that "toddlers (2–year-olds) received 16% of their total lead exposure from food . . . 1% from soil, 7% from water, and 75% from dust." *Id.* at 415.

258

¶ 33.  Lead poisoning disproportionately affects lower-income, inner-city populations. The National Health and Nutrition Examination Survey (NHANES III) (conducted from October 1991 to September 1994) indicated that BPb levels among children aged 1–5 years "were more likely to be elevated among those who were poor, non-Hispanic, black, living in large metropolitan areas, or living in older housing (with potential exposure to lead from lead-based paint)." *Id.* The differences in housing conditions and exposures to lead-containing house dust "appear to contribute to the racial differences in urban children's [BPb] levels." *Id.,* 417.

¶ 34.  Approximately 3 million tons of lead remain in an estimated 57 million occupied private housing units built before 1980. *Preventing Lead Poisoning,* 18. Of those units, 3.8 million contain children and deteriorated lead paint. *Id.* Although lead paint is typically found on kitchen and bathroom walls, it is also commonly found on doors, windows, and wood trim in pre-1950s homes. *Id.,* 19.

¶ 35.  As mentioned, the risk of lead poisoning is increased when the paint itself, or underlying surface on which it is painted, has deteriorated. *Id.* Lead paint on windows is particularly concerning "because it is abraded into dust by the repeated opening and closing of these windows." *Id.* However, even if it is intact, the risk of lead poisoning is greater if the lead paint is located on surfaces accessible to children. *Id.*

B. *Lead Paint and White Lead Carbonate Pigment.*

¶ 36.  Paint is comprised of two major components: the pigment, which provides hiding power and protects the surface, and the vehicle, which allows the pigment to

be spread and adhered to a surface. In the first part of the 20th century, there were many different types of pigment, lead and non-lead based.[13] Generally, paint manufacturers decided what pigments and amounts of pigments to use when formulating their paints. Many of the Pigment Manufacturers also produced ready-mixed lead-based paint.

¶ 37. The predominant lead pigment that was manufactured and integrated into paint was white lead carbonate. White lead carbonate was the first chemical produced commercially in this country. That pigment was initially favored because when used alone it was the most durable and easy to apply. It was also believed to be a mildewcide.[14] All of the Pigment Manufacturers, or their predecessors-in-interests, produced this pigment at varying times since the houses in which Thomas resided were constructed in 1900 and 1905.

¶ 38. White lead carbonate could be comprised of any of three different chemical compounds. Basic lead carbonate had two chemical compositions, $4PbCO_32Pb(OH)_2PbO$ and $2PbCO_3Pb(OH)_2$. Free normal lead carbonate's chemical composition was $PbCO_3$. Basic lead carbonate was the overwhelming form of lead pigment used in paint.

¶ 39. In addition to having different chemical compositions, the physical properties of white lead carbonate varied. These variances included different

---

[13] Examples of other lead pigments include basic lead sulfate, red lead, chrome yellow, blue lead, lead chromates, leaded zinc oxides, lead silicates, lead titanates, litharge and molybdate orange. Examples of non-lead pigments include lithopone, titanium dioxide, latex, water-based and alkyd resin.

[14] Painters also apparently believed that there was no substitute for white lead carbonate.

specific gravity,[15] bulking values, oil absorption, hiding power, and particle size and shape.[16] Pigment Manufacturers also distinguished between grades of lead carbonate and apparently promoted each for different purposes.

¶ 40. Thomas's toxicologist expert, Mushak, opines that the toxicological effects of white lead carbonate remain the same notwithstanding the formulary differences between the white lead carbonate pigments. Mushak states that there is little relationship between chemical diversity and the "bioavailability" of the lead, which refers to the lead uptake or lead absorption into the human body. Mushak explains that "[t]he reasons why one cannot automatically equate differences in chemical composition with differences in bioavailability is because bioavailability operates via a set of biological, biochemical and physico-chemical processes that will often render starting forms of lead in pigments indistinguishable in toxicokinetic terms."[17] Based on observational evidence (which Mushak characterizes as "the huge body of toxicological literature showing that lead

---

[15] According to the Lead Industry Association's (LIA) publication *Lead In Modern Industry,* the specific gravity for lead carbonate is 6.6, for basic lead carbonate is 6.14. Also according to that publication, the molecular weight of lead carbonate is 267.22, while the weight of basic lead carbonate $2PbCO_3Pb(OH)_2$ is 775.67 and of $4PbCO_32Pb(OH)_2PbO$ is 1774.55. According to that publication, only basic lead carbonate $4PbCO_3Pb(OH)_2PbO$ was used for paint pigment.

[16] Generally, normal lead carbonate particle size was usually larger than the basic lead carbonate particles.

[17] According to Mushak, "toxicokinetics" describes processes of uptake of lead, distribution of absorbed lead within the body, retention of some fraction of that lead, and subsequent excretion of that lead.

261

paint poisoning is pervasive and rather uniformly intense as to the severity of exposures") and laboratory evidence, Mushak concludes that there is no basis to conclude that formulary changes among white lead carbonates affect the bioavailability of the lead.

## C. Knowledge of the Toxicity of Lead Pigments

¶ 41. In 1848, Samuel L. Dana, an American doctor, translated the first complete clinical description of lead poisoning based on over 1,000 cases, written by Tanquerel des Planches of France in 1839. Planches' work obtained preeminent status and was a leading authority on the dangers of lead through at least the 1920s. That treatise recognized the dangers of repeated inhalation of small quantities of lead.

¶ 42. By the turn of the 20th century, it was well-recognized that controlling lead dust could significantly reduce lead poisoning, although the recognition was initially limited to industrial settings. European countries had acknowledged the harm of lead dust, and by 1910, Germany, England, and France were already regulating lead industries to protect their workers from lead dust and fumes. That same year, in the United States at a meeting of the Superintendents of the National Lead Company, Dr. Alice Hamilton, M.D., the founder of industrial hygiene, applauded these countries' efforts and detailed the advanced protections European workers enjoyed.[18] Given the dwindling numbers of lead poisoning in those European countries that passed regulatory legislation, Hamilton called on American industries to reform their practices to mimic

---

[18] Dr. Hamilton specialized in safety issues involving the lead industries and believed that much improvement needed to be made.

their European counterparts. Above all, she argued, the first step was to abolish, or at least reduce to the greatest extent possible, lead dust.

¶ 43. Consistent with Hamilton's assessment, National Lead reported to its stockholders in 1912 that "[i]n the manufacture of the various products of Lead, there are two sources of danger to the health of workmen therein employed; viz., the fumes arising from the smelting or melting of metallic lead, and the dust arising in the process of making white lead and lead oxides." Seven years later, in 1919, the Chairman of National Lead Company's Manufacturing Committee described that "[t]he prime object" for safely handling white lead and other lead dust was "to keep lead dust out of the nose and mouth of the worker."

¶ 44. Other than manufacturing, Hamilton also monitored trade painters. In 1913, at the International Congress of Master Painters, Hamilton suggested that painters not use white lead paints for interior work.[19] Her suggestion was not generally followed, and, in 1919, she lamented that painting was "the most notorious of the lead trades" as "painters make up the large majority of the cases of lead poisoning." Aside from smeared paint present on the painters' hands that could be carried to the mouth, Hamilton noted that paint dust, caused primarily by rubbing old or new paint with sandpaper, "is universally recognized as the most dangerous part of the painters' trade." Hamilton's concerns were not unfounded. In 1910, a bill was introduced in Congress, in the House of Representatives, that would have required "[t]hat the introduction into any state . . .

---

[19] In 1909, France banned the use of lead paint for interior or exterior painting after July 20, 1914. Also in 1909, Belgium prohibited the sale and use of dry white lead, and Austria prohibited the use of white lead for interior use in houses.

of any white lead or mixed paint containing white lead which is not labeled with a skull and crossbones and the words 'Poison; white lead' is hereby prohibited." That bill was defeated. Although protective regulatory legislation would have likely yielded beneficial results, "[t]he total prohibition of lead paint for use in interior work would do more than anything else to improve conditions in the painting trade," Hamilton stated.

¶ 45. The appreciation of the dangers lead paint posed inside the home to the residents was also emerging during this time. In July 1904, in its monthly publication *The S.W.P.*, Sherwin-Williams publicized the hazards of white lead paint. Under the bold headline, "DANGERS OF WHITE LEAD," Sherwin-Williams reported that a committee in France had been appointed to investigate the use of white lead and other lead mixtures for painting houses. Sherwin-Williams noted that one of the committee's experts indicated that lead paints were "poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors." Sherwin-Williams also noted that the expert was of the opinion "that the absolute disuse of white lead has become an imperative necessity." Nevertheless, six years later, in 1910, Sherwin-Williams began manufacturing white lead carbonate after it acquired a white lead processing plant. Moreover, in 1917, during the First World War, Sherwin-Williams advised the War Department that government specifications for 50 percent white lead carbonate paint for war helmets should be replaced with its lead-free lithopone pigment. Sherwin-Williams stated that the advantage of switching to its lithopone pigment was that the danger from lead poisoning was entirely eliminated.

¶ 46. In 1914, the director of the scientific section of the Paint Manufacturers' Association of the United

States, Henry A. Gardner, also warned of the hazards lead paint posed to residents. After detailing the efforts made to prevent workers from the hazards of lead dust in factories, Gardner asked why similar care was not being used to guard against lead dust in public buildings. Gardner observed that many tons of white leaded paint had been applied to the inside of schools and hospitals. And with white lead carbonate dust resulting from the gradual disintegration of this paint, Gardner noted that just as was the case with industrial workers, the presence of such dust in the room's atmosphere was very dangerous.

¶ 47. In 1919, the International Labour Organization held a meeting in Washington to enlist U.S. support in regulating white lead. Following this meeting was a conference in Geneva in 1921, under the auspices of the League of Nations, which was attended by 400 delegates from 40 countries.[20] That conference resulted in a recommendation that lead paint be banned altogether for interior uses.[21] Industry press reviews in the United States viewed the recommendation as a sinister plot by labor interests. The industry press reviews happily reported that there was little danger of any bans on lead paint in the United States.

¶ 48. In 1939, the National Paint Varnish and Lacquer Association (NPVLA) confidentially warned its members—which included National Lead, Sherwin Williams, Glidden, and W.P. Fuller—that white lead pig-

---

[20] [Footnote 20 deleted.]

[21] After the conference, many countries enacted bans or restrictions on white lead for interior painting, including Belgium (which then banned white lead altogether for interior use), Tunisia, Greece, Czechoslovakia, Great Britain, Hungary, Sweden, Belgium, Poland, Spain, Yugoslavia, and Cuba.

ments were toxic. This letter, marked "CONFIDEN-TIAL Not for Publication," stated:

> [T]he vital factor concerning toxic materials is to intelligently safeguard the public. People may feel safer in buying materials whose danger they know rather than materials unknown to them.
>
> . . . .
>
> The following pigments may be considered toxic if they find their way into the stomach. . . .
>
> . . . .
>
> *Lead Compounds.* White lead, red lead, litharge, lead chromates (chrome yellow, chrome green), or other lead pigments.

The letter proceeds to explain that the NPVLA expected that manufacturers would apply "every precautionary measure in manufacturing, in selling and in use where toxic materials are likely to or do enter a product." The letter noted that "children's toys, equipment, furniture, etc. are not the only consideration." It also contained the following notification of legal duties to warn of a dangerous product:

> 1. A manufacturer who puts out a dangerous article or substance without accompanying it with a warning as to its dangerous properties is ordinarily liable for any damage which results from such failure to warn.
>
> . . . .
>
> 9. The manufacturer . . . must know the qualities of his product and cannot escape liability on the ground that he did not know it to be dangerous.
>
> 10. The general rule that a manufacturer is not liable to those not in privity of contract with him does not apply when his product is imminently or inherently dangerous.

¶ 49. Nevertheless, the NPVLA fought to weaken states' proposals that required paint to contain warning labels and particularly objected to the American Medical Association's proposal that would have required lead paint to be labeled as "poisonous."

¶ 50. By 1942, the National Safety Council determined that "the most obvious method of preventing lead poisoning is to substitute for lead and its compounds other materials that are non-toxic." By the early 1920s, there were safe alternatives to white lead paint. During that time, Glidden and Sherwin-Williams produced zinc-based paints, while National Lead pioneered the development of titanium pigments. These pigments were being manufactured and marketed particularly because of the appreciation of lead's toxicity.[22]

¶ 51. As noted above, during World War I, Sherwin-Williams advised the War Department to switch its order for helmets with 50 percent lead carbonate paint to Sherwin-Williams' lead-free lithopone paint in order to eliminate the prospect of lead poisoning. Glidden promoted its lead-free paints by claiming: "Lead Paints are banned in Europe because of the danger of Lead Poisoning. [Titan-O-Zinc] is lead-free, consequently, non-poisonous. Not only is it ideal for residence painting and every other exterior surface, but the attention of the farmer is especially called to this product as it eliminates all possibility of lead poisoning of livestock characteristically known as 'cribbers.' "

¶ 52. Although various manufacturers of zinc-based paints published ads attacking lead paints as poisonous, National Lead silenced those advertisements by reaching an agreement with zinc pigment

---

[22] They were also apparently cheaper to produce.

manufacturers to refrain from attack ads sometime between 1905 and 1918. By 1928, National Lead was one of the leaders in the production of titanium pigments. After the Second World War, even though National Lead was producing lead-free paints, it advised its salespeople to push the sale of leaded paints "at every opportunity."

*D. Knowledge of Childhood Lead Poisoning*

¶ 53.  Parallel with the emerging knowledge of the dangers caused by lead in industrial and residential settings grew the awareness of childhood lead poisoning. During the mid-1800s, child lead poisoning was already linked to mouthing lead-painted toys. Australia was at the forefront of identifying and examining childhood lead poisoning. Following the first well-documented study of childhood lead poisoning from paint in 1908, Australian researchers went so far as to call for prohibiting the use of lead paint within the reach of children. They found:

> Two conditions of painted surfaces would be more than usually liable to induce poisoning, viz., (a) freshly painted or at least sticky surfaces; (b) painted surfaces which have either been exposed to the sun and air, and whose paint has lost its oil and become a dry easily detachable powder, or which though not exposed have lost some of their oil and gloss, and which when rubbed yield a powdery substance to the touch and possibly distribute it to the dust of rooms.

¶ 54.  During that same year, Australian researchers also connected paint powder stuck to children's fingers, which were then bit or sucked, with lead poisoning. Those researchers also recommended refraining from using lead paint on surfaces accessible to children.

268

¶ 55. In the early 1900s, children's particular susceptibility to lead poisoning was also gaining recognition. In Great Britain, the dangers of lead exposure to fetuses were identified, and women were later removed from working in the lead industries. In the United States, in 1908, Dr. Hamilton noted that "lead is a most potent producer of abortion, and it is very rare that a woman lead worker bears a healthy child at term." And, in 1912, researchers in the United States acknowledged that young people were more vulnerable to lead poisoning than adults. In its 1912 annual report, National Lead noted that it did not employ women in its factories, except as occasional messengers or other similar jobs, or boys.

¶ 56. In 1914, a physician from John Hopkins Hospital who was also professor at the John Hopkins Medical School, Dr. Kenneth D. Blackfan, chronicled a case of a five-year-old boy from Baltimore who died of lead poisoning from white lead paint bitten from his crib's railing. Blackfan concluded that lead poisoning in children "appears to have a special effect on the meninges and the central nervous system and that it may not infrequently be the unsuspected cause of so-called serious meningitis." In 1917, Blackfan wrote another article that detailed lead poisoning cases from a home in Baltimore. After noting that children were particularly vulnerable to lead poisoning, Blackfan forewarned that a key source of lead poisoning for children was gnawing on lead-painted objects, specifically white paint on cribs.

¶ 57. Despite this growing awareness of child lead poisoning and children's susceptibility to lead poisoning, the knowledge was not yet mainstream. For example, between 1911 and 1920, the U.S. Bureau of the Census listed only eight reported child lead poisoning fatalities.

¶ 58.   Consistent with the prior decade's little official data and literature on the extent of lead poisoning, some medical journal articles in the early 1920s described child lead poisoning as rare. However, in 1924, Dr. John C. Ruddock, M.D., wrote that child lead poisoning "may easily be overlooked, because the average physician has never had his attention called to the fact, and also because the clinical picture is usually very different from that in similar poisoning in adults." The following year, another doctor emphasized that most cases of lead poisoning in general were missed or otherwise misdiagnosed. By 1926, another physician submitted that "[l]ead poisoning is of relatively frequent occurrence in children." As one historian concluded, the growing theme during this time was the more doctors knew to look for lead poisoning, the more they found it.

¶ 59.   During the mid to late 1920s, the view that children were more susceptible to lead poisoning was almost universal. A number of articles appeared in medical journals that linked lead-based paint in particular to childhood lead poisoning. In addition to the previously identified dangers of painted crib railings (which, by 1926, was identified in 15 medical journals in the United States as a risk), windowsills, porch railings, children's furniture, and any other painted articles around the home that were within the child's reach were identified as posing risks to children. Aside from children's penchant for placing items in their mouths to chew, in 1926 researchers also recognized that absorption of lead dust, white lead carbonate dust in particular, could be rapidly absorbed by children's respiratory system. Merely sleeping in a lead-laden room, with little ventilation, was discovered to cause lead poisoning. As Dr. Ruddock warned, "A child lives in a lead world."

Through the mounting evidence, the rising sentiment was that underscoring the dangers of non-industrial sources for lead in child lead poisoning cases "cannot be too strongly emphasized."

¶ 60. Thomas's public health historians, Gerald E. Markowitz, Ph.D., and David Rosner, Ph.D. (hereinafter "Markowitz and Rosner"), opine that by the mid-1920s there was "strong and ample convergent evidence of the toxicity of lead paint" in general, and the dangers it posed to children in particular. Markowitz and Rosner conclude that given the increasing evidence, "the manufacturers of lead pigments should have ceased producing it, at the very least for interior use, before the mid-1920s."

¶ 61. As the number of medical journals increased their reporting on child lead poisoning, so too did the official data on child lead poisoning fatalities. Between 1921 and 1930, the number of child lead poisoning fatalities documented by the Bureau of the Census nearly quadrupled from the past decade, to 31.

¶ 62. The literature on childhood lead poisoning continued to grow during the 1930's. In 1930, physicians asserted that lead poisoning from ingesting paint from cribs, woodwork, or toys was "proven beyond a doubt." Some researchers reiterated early sentiments that child lead poisoning was chronic and was occurring more frequently among infants and children than had been supposed, mostly because physicians frequently did not recognize the condition. The conclusions that lead paint was the main culprit and that children were especially vulnerable to its toxicity were regularly repeated.

¶ 63. While it was discovered during the 1930s that lead caused permanent neurological disorders, by 1943, Randolph Byers, M.D., and Elizabeth Lord, Ph.D.

(hereinafter "Byers and Lord"), found that lead poisoning had effects on long-term intellectual development by retarding mental development.[23] As seen below, their findings would cause quite a stir in the lead industry. *Time* magazine summarized Byers and Lord's findings under the headline, "Paint Eaters," writing: "All but one child . . . were school failures. Only five had normal I.Q.s, and four of the five were so erratic that they could not learn easily." Building on these findings, research during the 1970s demonstrated that lead levels that did not give rise to clinical symptoms might nonetheless adversely affect psychological and intellectual development.

### E. The Pigment Manufacturers and the Lead Industries Association (LIA)[24]

¶ 64. In 1928, the rising alarms regarding the hazards of lead and the need for coordination among lead producers and manufacturers led to the formation of the Lead Industries Association (LIA). Although comprised of many lead industries, the white lead industry was the most important of the lead manufacturing industries in the LIA.

¶ 65. Virtually from its inception, the LIA was responding to what it termed "undesirable publicity regarding lead poisoning." In 1930, the LIA's Secretary, stated that "of late we have received much undeserved publicity in newspapers damaging to lead products." By

---

[23] Between 1940 and 1950, the number of children screened for lead poisoning increased fourfold, as did the number of cases of diagnosed lead poisoning.

[24] The LIA was named as a party defendant. However, the LIA subsequently filed for bankruptcy and was later dismissed as a party defendant.

1939, the LIA acknowledged that "the large amount of space given to lead by medical columnists in the daily press by the medical profession, by consumer organizations and by authors of scientific subjects has increased the amount of attention that we have had to give to [the] subject of lead toxicology in 1939." That same year, the LIA initiated its large-scale "White Lead Promotion Campaign." By 1941, the LIA complained that "[l]ead poisoning matters continue to absorb a large amount of time of the Association . . . ." In response to this negative publicity, the Secretary proposed "a program of vigorously investigating each alleged case that arises, taking any remedial steps if necessary, encouraging medical research in lead poisoning, and publishing literature showing the useful role of lead in industry." Through the end of the 1940s, the LIA determined that "the problem of lead hygiene" could be addressed by reassuring the public that lead was safe. Addressing this problem was, in the LIA's own estimation, "one of the most important activities of the Lead Industries Association as there remains an appalling amount of prejudice against the use of lead products based on fancied notions of lead toxicity."

¶ 66. According to Markowitz and Rosner, the LIA's campaign was multi-pronged: it sought to rebut any research findings or other news of lead's toxicity; it sponsored its own research to demonstrate that lead was harmless; and it refused to warn the public of lead's dangers, even in the face of overwhelming evidence from research and clinical findings that many children were dying. All the while, Markowitz and Rosner submit, the LIA promoted the use of lead paint and successfully lobbied against laws and regulations that would curb its use. Although the Pigment Manufacturers, through the LIA, were not actively hiding informa-

tion regarding the dangers of lead poisoning, particularly in children, they were very well aware of the information, and they were accumulating it.

¶ 67. One of the key voices for the LIA in critiquing the growing scientific literature on the toxicity of lead was that of Dr. Joseph Aub. Prior to the LIA, the lead industry was organized under the American Institute of Lead Manufacturers. The Institute funded medical research on the toxicity of lead at Harvard University under the direction of Aub. The LIA continued that research from 1929–45 to help rebut findings of lead poisoning. Aub's research focused on lead metabolism in adults from occupational exposures, not on child lead poisoning. However, in 1937, during an LIA sponsored confidential conference on lead poisoning for the physicians employed by its member companies (including National Lead, Sherwin-Williams, Glidden, and Anaconda/IS&R), Aub acknowledged the vulnerability of children with respect to lead poisoning.[25]

¶ 68. The LIA attached inestimable importance to Aub's research: "Without the counsel he has given this office and active assistance in some of our lead problems, we would indeed be at a serious disadvantage." Aub was called upon to rebut treating physicians' reports of lead poisoning deaths by providing alternative exculpatory explanations.

¶ 69. In contrast to Aub's downplaying lead paint's hazards, another prominent industry-sponsored

[25] At this confidential conference, there was discussion on how to defeat workers' compensation claims by clearing the blood of lead poisoning evidence. Some suggestions included injecting the worker with liver in order to "bring him up" even though "it doesn't do him any good." Another suggestion was removing the workers' teeth, so that there would be no lead line for anyone to see.

researcher, Dr. Robert Kehoe, consistently warned of the hazards lead paint posed to children, although such warnings remained largely confined to private correspondences. Kehoe's research was financed by the Ethyl Corporation, which produced tetraethyl lead for gasoline.

¶ 70.   By the 1930s, Kehoe agreed with the broader medical community that toys, cribs, furniture, as well as woodwork and any other painted surfaces in children's reach were possible sources of child lead poisoning. In 1933, Kehoe highlighted the disparate impact lead poisoning had on children and adults and stressed that "strenuous efforts must be devoted to eliminating lead from [children's] environment." In 1935, he again expressed his belief that "[t]he occurrence of lead-containing commodities and the use of lead paints on furniture, toys, and other objects, within the reach of small children is much too common to ignore."[26]

¶ 71.   In 1944, after Byers and Lord's publication on the effects of lead on long-term intellectual development, the LIA wrote to Kehoe, acknowledging that if their conclusions were correct, "we have indeed a most serious public health hazard." Kehoe responded, writing:

> I fear that you will be disappointed by my answer, for I am disposed to agree with the conclusions arrived at by the authors, and to believe that their evidence, if not

---

[26] In response, the LIA conducted its own "investigation," whereby on November 30, 1930, it sent a letter to lead companies to "ascertain if any lead paint is being used to paint or decorate cribs, children's beds or furniture." Twelve responses were received. Because the letter asked only about whether the companies used "white lead," which was apparently interpreted to mean pure white lead, five companies said that they used only enamel or lacquer. However, these were mixed paints that could contain large amounts of white lead carbonate.

entirely adequate, is worthy of very serious consideration. Perhaps my own experience prejudices me in favor of the acceptance of their findings, for I have seen cases of serious mental retardation in children that have recovered from lead poisoning of the encephalopathic type, and among my records is one case of permanent feeble mindedness which I attribute to a well defined episode of lead encephalopathy in an infant.

. . . .

You quarrel with the statement about chewing paint and say that the manufacturers don't use it on cribs and toys. That may well be true. My experience leads me to accept it as such. However, the householder repaints these articles, and often with lead-containing paints. Please note that the article makes point of the fact that the children chewed paint "off cribs, window sills or furniture," and also refers to the statement of parents that they had repainted cribs. I'm afraid it will do you no good to try to combat the significance of the history of chewing articles in relation to the problem of lead poisoning in children. The most significant feature of the history of exposure in an overwhelming proportion of the cases of lead poisoning in children is just that fact. "Pica" is at the bottom of most of these cases, and unfortunately the environment of small children is not sufficiently free of lead for their safety. Have you seen the data on lead poisoning in children in Queensland[, Australia]? These cases were largely due to chewing the paint off the railings of the porches on which the children played.

¶ 72. With reassurances from Aub, the LIA disagreed with Kehoe's assessment, stating:

[I]t has not been conclusively proven and, the case made out by Drs. Byers and Lord that there is a connection between retarded mental development in

276

> later years and lead poisoning itself, is far from proven.
> As Dr. Aub told me, he felt that children who have . . .
> the disease known as "pica" which caused them to chew
> on inedible articles, were subnormal to start with!

¶ 73. Despite assurances from the LIA that children's toys no longer contained lead paint, the U.S. Children's Bureau warned in December 1945 that "[i]t is not safe to take the word of the salesman as to whether [a paint] is harmless or not because he may not know." According to Markowitz and Rosner, "The LIA did not advocate the use of warning labels, nor did it encourage the elimination of interior use of white lead. Only these measures could have served to diminish or eliminate the problem. To the contrary, . . . the LIA and its members continued to promote lead paint for interior use." Sherwin-Williams and Glidden actually still promoted lead paint for use on toys at this time.

¶ 74. Also in December 1945, the LIA launched "The Safety and Hygiene Program" to undercut the growing medical literature regarding the toxicity of lead that it characterized as faulty. Recognizing that the lead industry "must be losing a vast amount of business each year because of the fact that lead has such unpleasant connections in the minds of so many Americans," the LIA persisted in complaining about how the lead industry "continues to be plagued unfairly by attacks made upon lead products because of their toxicity" and indicated it would "meet attacks on lead due to its toxic qualities by correcting published erroneous statements."

¶ 75. In 1946, to counter the findings of Byers and Lord, the LIA organized a conference on lead poisoning with the American Medical Association. At the conference, the LIA strongly rejected claims that lead was dangerous. The LIA Secretary rebuked a doctor's ac-

277

count of how a child's crib was traced to three cases of lead poisoning. According to the Secretary, interior white paint no longer contained lead, and thus he denied the importance of lead poisoning in children due to paint.

¶ 76. Kehoe still disagreed with the LIA Secretary's assessment, stating:

> More lead poisoning in children has occurred than we would like to think about. The number that are actually reported in medical literature have very little relationship to the number that actually occur. Lead poisoning in a child is a serious disease.

¶ 77. Moreover, Markowitz and Rosner also note that the LIA and the Pigment Manufacturers continued to promote and sell white lead paints for interior use well after the mid 1940s. In addition, in their estimation, "by this date it was abundantly clear that hundreds of children were dying of lead poisoning each year."

¶ 78. Kehoe later reviewed a report written by the LIA Secretary that iterated the benign qualities of lead, and Kehoe warned the LIA against taking this extreme position. In particular, Kehoe objected to the LIA Secretary's denial of the importance of lead poisoning in children due to lead paint, stressing that the connection between childhood lead poisoning and lead paint was sound. A few years later, in 1953, Kehoe recommended largely eliminating use of lead paints for interiors to protect children:

> [The] most effective solution of this problem . . . [is] to eliminate the use of paints . . . of more than very minor lead content for all inside decoration in the household and in the environment of young children. If this is not done voluntarily by a wise industry concerned to

handle its own business properly, it will be accomplished ineffectually and with irrelevant difficulties and disadvantages through legislation.

The LIA did not accept his proposal.

¶ 79. By the late 1940's, Markowitz and Rosner submit that warning the public of the dangers of lead was still out of the question for the LIA. In 1948, after comparisons between the toxicity of lead and zinc products were being published, the LIA formalized its informal agreement with the American Zinc Industry that prevented the Zinc Industry from advertising the toxicity of lead-based paints.

¶ 80. In 1955, the LIA characterized the problem of childhood lead poisoning as "a major 'headache' and a source of much adverse publicity." The LIA wrote:

> With us, childhood lead poisoning is common enough to constitute perhaps my major "headache," this being in part due to the very poor prognosis in many such cases, and also to the fact that the only real remedy lies in educating a relatively ineducable category of parents. It is mainly a slum problem with us, estimated by Kehoe to run into four figures annually, and [] we have no monopoly on either substandard housing or substandard mentalities in the USA. . . .

¶ 81. Shortly thereafter, the American Standards Association, a voluntary group comprised of representatives from a variety of medical, public health and industry groups (including the LIA and NPVLA), developed a standard to minimize hazards to children. This new standard provided that paint used for interiors or any surface that children might chew on should contain no more than one percent lead by weight. Prior to that time, the LIA indicated it made "[e]very effort . . . to confine the regulatory measures . . . to the field of

warning labels, which, as applied to paints, are obviously less detrimental to our interests than would be any legislation of a prohibitory nature."

¶ 82.  Two years later, in 1957, the LIA finally recognized what the literature had supported for nearly half a century:  lead paint was the major source of childhood lead poisoning. The LIA also recognized the problems of lead paint causing lead poisoning was going to be a lasting one. However, the LIA still was displacing blame. This time, the LIA suggested the blame fell on the children's parents' shoulders, as it stated:

> As the major source of trouble is the flaking of lead paint in the ancient slum dwellings of our older cities, the problem of lead poisoning in children will be with us for as long as there are slums, and because of the high death rate, the frequency of permanent brain damage in the survivors, and the intelligence level of the slum parents, it seems destined to remain as important and as difficult as any with which we have to deal.

¶ 83.  In a letter to Kehoe towards the end of 1957, the LIA similarly acknowledged the problem yet cast blame elsewhere, writing:

> Without fear of successful contravention, I can say:
>
> 1.  That the overwhelming major source of lead poisoning in children is from structural lead paints chewed from painted surfaces, picked up or off in the form of flakes, or adhering to bits of plaster and subsequently ingested.
>
> 2.  That of some, but secondary importance is lead paint mistakenly applied by ignorant parents to cribs, play pens and other juvenile furniture and subsequently chewed off and ingested.

3.  That any poisoning that there may be from lead-painted toys is of quite minor concern in comparison with the two above sources.

4.  That childhood lead poisoning is essentially a problem of slum dwellings and relatively ignorant parents.

5.  That it is almost wholly confined to the older cities of the eastern third of the country and is practically nonexistent west of Milwaukee, Chicago, St. Louis and New Orleans.

6.  That, in all too many cases, the slum child, diagnosed, hospitalized and cured, returns to the same environment and to another routine of lead paint ingestion.

7.  That the importance of the problem lies primarily, not in the number of cases, but in the likelihood of permanent brain damage and in the great difficulty of instituting really effective preventive measures.

8.  That, until we can find means to (a) get rid of our slums, and (b) educate the relatively ineducable parent, the problem will continue to plague us.

9.  And finally that, if you know the answer to those two, you are even more of a genius than I think you.

Perhaps this letter is just another instance of "carrying coals to Newcastle," but the misunderstanding of the fundamentals of this problem is so widespread, and frequently where one would least expect it, that I find myself impelled to sound off in this fashion once in so often.

281

Although less than unassuming, the lead industry at least finally acknowledged what researchers had been confirming for decades.

¶ 84.   The LIA still saw the problem as a "headache" and a public relations issue, not a public health disaster. In 1959, in its annual report, the LIA wrote:

> The toxicity of lead poses a problem that other nonferrous industries generally do not have to face. Lead poisoning, or the threat of it, hurts our business in several different ways. While it is difficult to count exactly in dollars and cents, it is taking money out of your pockets every day.
>
> In the first place, it means thousands of items of unfavorable publicity every year. This is particularly true since most cases of lead poisoning today are in children, and anything sad that happens to a child is meat for newspaper editors and is gobbled up by the public. It makes no difference that it is essentially a problem of slums, a public welfare problem. Just the same the publicity hits us where it hurts.
>
> Secondly, it means that we are often subjected to unnecessarily onerous regulations, either in the use of our product or in its labeling. This may mean either an added expense in labeling or in control equipment in your or your customers' plants. It may even mean that your product won't be used at all because your potential customer doesn't want the problems that the use of lead may involve.

¶ 85.   By 1972, the LIA now characterized the problems of childhood lead poisoning as "harrowing." The LIA recognized that childhood lead poisoning was not limited to urban slums but also reached "young children in small towns and rural areas." Further, the LIA recognized that childhood lead poisoning could not be attributed to defective children, as it had earlier

believed, because "young children . . . will often taste anything that gets into their hands."

*F. Promotion*

¶ 86.  With approximately 85 percent of all sales, National Lead dominated the white lead pigment market in 1900. Through its advertisements and promotions, National Lead promoted and reinforced the perception that no paint was as good, or as safe, as white leaded paint. Despite numerous articles showing that lead was a potent poison by the 1920s, in 1923, one of National Lead's ads declared that lead paint helps guard health by preventing a resting place for germs. Although there were warnings from the medical communities about the dangers of white lead paints in schools and hospitals, National Lead also specifically targeted those institutions from the 1920s into the 1930s. National Lead repeatedly claimed that its lead paint protected public health, as it was a deadly enemy of tuberculosis and other germs. In 1931, National Lead contended that its lead paint helped "speed patients' recovery."

¶ 87.  Between 1910 and 1925, three new major pigment manufacturers entered the market:   Sherwin-Williams, Anaconda, and Glidden. National Lead's market share fell to between 60 and 70 percent during this time. Sherwin-Williams did not manufacture white lead until 1910, when it began operating a newly constructed white lead manufacturing plant in Chicago. Although Sherwin-Williams recognized the dangers of lead paint in a 1904 publication, and cautioned the War Department about the dangers of lead poisoning from lead paint in 1917, in 1922 it advocated using lead-based paint on children's toys.

¶ 88. During the mid-1920s, Sherwin-Williams continued to recommend using white-lead based paint (paint which contained upwards of 75 percent white lead) on interior surfaces, including walls, woodwork, doors, and ceilings. From 1936 until the 1940s, Sherwin-Williams promoted use of its lead based paints on toys.

¶ 89. Although Sherwin-Williams was specifically warned in 1937 about the hazards of white lead to children, Sherwin-Williams sold white lead paint for interior use as late as the 1950s. When Sherwin-Williams ceased producing white lead carbonate in 1947, it continued to sell white lead carbonate and leaded paints by buying the product from National Lead.

¶ 90. Atlantic Richfield's predecessor, Anaconda, began producing white lead in 1919, at a time Markowitz and Rosner opine that they knew or should have known of the hazards of white lead paint. In 1940, Anaconda also recommended using white lead on interiors.

¶ 91. Markowitz and Rosner opine SCM's predecessor, Glidden, also knew or should have known of the dangers of white lead when it began producing white lead in 1925. Glidden promoted its non-leaded zinc-based paints by arguing that unlike lead paints, zinc paints were non-toxic. In 1942, Glidden asserted that its lead-based paints were ideal for nurseries and children's rooms as it provided youngsters with "a safe, pleasant place to play." Glidden also recommended lead-based paints for children's furniture. Through the late 1940s, Glidden sponsored its lead-based paint for interiors.

¶ 92. The LIA also actively promoted white lead. The LIA undertook several campaigns to push lead

products. In 1934, after identifying a relationship between the use of white lead and lumber in construction, the LIA initiated a "Forest Products—Better Paint Campaign." The campaign was funded by members, including Sherwin-Williams, W.P. Fuller, IS&R/Anaconda and National Lead.

¶ 93. In 1938, after recognizing the declining sales of white lead, the LIA began its "White Lead Promotion Campaign." The LIA characterized the campaign as follows: "This campaign by showing the importance of white lead to industry would help offset the constant threat of anti-lead legislation and propaganda." The campaign carried on until 1952. During its duration, National Lead, IS&R, W.P. Fuller, and MacGregor all contributed to the campaign. Glidden and Sherwin-Williams participated in the campaign in the post-war years. National Lead characterized the campaign as follows:

> [T]h[e] . . . campaign . . . should do more than confirm faith . . . in a time-tested material. It should furnish the incentive to support white-lead more vigorously than ever. It should help pave the way for increased profit and prestige for both painters and dealers. . . . [T]his campaign, running parallel to national Dutch Boy campaign, doubles the amount of advertising ordinarily used in presenting white-lead to the public.

¶ 94. In 1939, the LIA initiated projects with 4–H clubs to promote white lead among farmers and their children. Those projects were expanded in 1940 to include municipal, state, and county institutions, which specifically targeted schools and health departments. The campaign was successful. The LIA Secretary reported in 1940 that there was a "growing tendency of paint manufacturers to add a product to their line consisting of 100% prepared white lead paint in col-

ors .... It is also noteworthy that attacks on white lead, which was one of the reasons for undertaking our campaign, have declined greatly ...."

¶ 95. The LIA was also issuing publications to promote lead products. In 1930, the LIA commenced publishing a quarterly magazine entitled *Lead* to promote varying uses of lead. The next year, the LIA produced book entitled, *Useful Information About Lead,* which suggested that painters use high percentages of lead. "[T]he higher the better," the book stated. The book also promoted "White Lead in Paint" as going hand in hand "with improved sanitation." In the 1941 book entitled *Painting Farm Buildings and Equipment,* the LIA recommended white lead for domestic interiors, and particularly dark colored lead paints on lower walls so that children's finger marks would be less visible. Similarly in 1942, the LIA published a booklet entitled, "What to Expect From White Lead Paint," wherein the LIA promoted the use of white lead for both interior and exterior surfaces, suggesting that for interior wood, plaster and wallboard that 40 pounds of white lead be mixed with lead mixing or reducing oil to produce enough paint to cover 1,000 square feet of surface. Markowitz and Rosner submit that "[m]any LIA advertisements were directed specifically toward encouraging the use of lead paint in the interiors of 'low-cost homes.' "

¶ 96. Just four years later, in 1946, the LIA Secretary disputed whether lead poisoning was attributable to lead-based paint because he contended that paint for inside uses no longer contained lead. In 1949, the LIA republished *Painting Farm Buildings and Equipment,* and, in 1952, in *Lead in Modern Industry,* the LIA stated:

> [W]hite lead . . . has practically no undesirable qualities to nullify its advantages . . . . [T]he profitable application of white lead is not confined to exterior use. Pure white lead paints can be utilized to advantage for interior decoration, particularly in public and traditional buildings . . . .

The book further acknowledged that lead poisoning could occur from vapors, dusts, or ingestion of lead compounds. However, the book described ingestion posed the least danger, as the book asserted that most inside paints contained no lead. All the while, the LIA promoted lead paint for interiors.

¶ 97.   It was not until December 1952 that the LIA made a decision, based solely on economics no less, to discontinue its promotion of white lead in house paints. Instead, the LIA diverted those funds to promoting red lead. Until at least 1962, however, the LIA continued to distribute *Lead In Modern Industry,* which advocated the use of white lead for interiors. The LIA withdrawal from promoting white lead, Markowitz and Rosner opine, was a tacit acknowledgment of lead paints' danger to children.

¶ 98.   According to Markowitz and Rosner, the Pigment Manufacturers' marketing and ad campaigns created an enduring belief among consumers that the best paint was lead paint—as National Lead stated, "Remember, also, that the more white-lead you use, the better the paint." They further opine that "[n]otwithstanding repeated statements over the years that it no longer produced white lead paint for interior use, the industry continued to sell white lead paints that were applied on interiors."

287

¶ 99.   We begin our analysis with a discussion of *Collins*. In that case, the plaintiff developed adenocarcinoma of the vagina and benign adenosis of the vagina in 1975. *Collins,* 116 Wis. 2d at 174. While she was in utero in 1957, her mother used diethylstilbestrol (DES) to prevent miscarriage. In 1971, medical researchers established "a possible statistical link between fetal exposure to DES during pregnancy and the development many years later of adenocarcinoma of the vagina." *Id.* at 179. The plaintiff's mother could not remember where she purchased the DES or who manufactured it. *Id.* at 174. By that time, many mothers had taken DES during their pregnancies. *Id.* at 181.

¶ 100.   After the discovery of the cancer, the plaintiff had much of her reproductive system surgically removed and developed other complications. *Id.* at 174–75. She sued 12 drug companies, all of which produced or marketed DES. *Id.* at 175.

¶ 101.   The plaintiff was "unable to identify the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time." *Id.* at 177. Based on common law, the plaintiff had to prove not only duty, breach of duty, and injury, but also legal causation between a defendant's conduct and a plaintiff's injury. *Id.* at 182. This court recognized that the plaintiff had to prove a particular drug company produced or marketed the DES that her mother took while pregnant in order to recover on her claim. *Id.* Obviously, this posed an insurmountable obstacle for her. *See id.* at 177, 182.

¶ 102.   Thus, this court was faced "with a choice of either fashioning a method of recovery for the DES

case[27] which will deviate from traditional notions of tort law, or permitting possibly negligent defendants to escape liability to an innocent, injured plaintiff." *Id.* at 181. "In the interests of justice and fundamental fairness," this court chose the former. *Id.*

¶ 103. This court observed that Article I, Section 9 of the Wisconsin Constitution conferred on the court the ability to create an adequate remedy when one did not exist. *Id.* at 182 (citing *D.H. v. State,* 76 Wis. 2d 286, 294, 251 N.W.2d 196 (1977)). Similarly, this court noted that:

> [i]nherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose.

*Id.* (quoting *Bielski v. Schulze,* 16 Wis. 2d 1, 11, 114 N.W.2d 105 (1962)).[28] Thus, this court adopted the risk-contribution theory, which relaxed the plaintiff's burden of proof in establishing causation in her negligence and product liability claims, for three reasons.

¶ 104. First, "[e]ach defendant contributed to the *risk* of injury to the public and, consequently, the risk of injury to individual plaintiffs. . . . " *Id.* at 191 (emphasis

---

[27] The court also stated that the risk-contribution theory it proceeded to adopt could apply "in situations which are factually similar to the DES cases." *Collins,* 116 Wis. 2d at 191.

[28] The drug company defendants argued that only the legislature could fashion this type of remedy. This court was not persuaded, writing: "It is the function of this court to modify the existing common law if that becomes necessary to promote justice under the law." *Collins,* 116 Wis. 2d at 198 n. 12.

in original, footnote omitted). In this sense, each shared some measure of culpability in producing or marketing the drug. *Id.* at 191–92. Second, because the drug companies were in a better position to absorb the cost of the injury (through either insurance, incorporation of the damage awards, or by passing the cost along to the public as "a cost of doing business," *id.* at 192), this court concluded that "it is better to have drug companies or consumers share the cost of the injury than to place the burden solely on the innocent plaintiff." *Id.* Third, the court recognized that "the cost of damages awards will act as an incentive for drug companies to test adequately the drugs they place on the market for general medical use." *Id.*

¶ 105.    Under the risk-contribution theory as stated in *Collins,* a plaintiff need commence an action against only one defendant,[29] but the plaintiff will have to allege the following elements and prove each to the satisfaction of the trier of fact:

> [T]hat the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries; that the defendant produced or marketed the type of DES taken by the plaintiff's mother;[30] and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff.

*Id.* at 193. It was not fatal to a plaintiff's claim if he or she could not identify the type of DES taken by the

---

[29] The onus was on the defendant to implead other culpable defendants. *Collins,* 116 Wis. 2d at 194.

[30] The plaintiff was not required to prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother, but rather was simply required to show that a defendant produced the type of DES taken (by certain identifiable characteristics such as color, shape markings, size, etc.). *Id.* at 194.

mother. The *Collins* court held that "[i]n the situation where the plaintiff cannot allege and prove what type of DES the mother took, as to the third element the plaintiff need only allege and prove that the defendant drug company produced or marketed the drug DES for use in preventing miscarriages during pregnancy." *Id.* at 194.[31] If these elements could be proven, the plaintiff could recover all damages from the named defendant. *Id.*

¶ 106. This court concluded that the plaintiff could also proceed on a strict products liability theory by proving:

> (1) that the DES was defective when it left the possession or control of the drug company; (2) that it was unreasonably dangerous to the user or consumer; (3) that the defect was a cause of the plaintiff's injuries or damages; (4) that the drug company engaged in the business of producing or marketing DES or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the drug company; and (5) that the product was one which the company expected to reach the user or consumer without substantial change in the condition it was when sold.

*Id.* at 195.

¶ 107. However, this court was concerned that only those defendant drug companies that *"reasonably*

---

[31] Justice Wilcox's dissent incorrectly construes *Collins* as requiring plaintiffs to prove the type of DES taken by the mother, Wilcox, J., dissenting, ¶ 210, ignoring the fact that in *Collins,* the plaintiff need only allege and prove that the defendant drug company produced or marketed the drug if the plaintiff could not prove the type of DES the mother took. *Compare* Wilcox, J., dissenting ¶ 210, with *Collins,* 116 Wis. 2d at 194.

*could have* contributed *in some way* to the actual injury" be held accountable. *Id.* at 191 n.10 (emphasis added). Thus, after the plaintiff made a prima facie case under either negligence or strict products liability theory, a defendant could escape liability if it proved by a preponderance of evidence that the DES it produced or marketed could not have reached the plaintiff's mother. *Id.* at 197–98. A defendant could accomplish this by establishing "that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES." *Id.* at 198.

¶ 108.   Providing defendants the ability to prove their way out of liability "will result in a pool of defendants which it can reasonably be assumed could have caused the plaintiff's injuries." *Id.* This procedure, however, was imprecise, as it could mean that some of the remaining defendants may still be innocent. Nevertheless, this court accepted that possibility "as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law." *Id.* at 198.

¶ 109.   For those defendants that could not exculpate themselves, this court concluded that the application of comparative negligence "provide[d] the most equitable means to assign liability and apportion damages among the liable defendants." *Id.* at 199. In assigning liability among the defendants, this court determined that the jury may consider the following nonexhaustive list of factors:

> [W]hether the drug company conducted tests on DES for safety and efficacy in use for pregnancies; to what degree the company took a role in gaining FDA approval of DES for use in pregnancies; whether the

company had a small or large market share in the relevant area; whether the company took the lead or merely followed the lead of others in producing or marketing DES; whether the company issued warnings about the dangers of DES; whether the company produced or marketed DES after it knew or should have known of the possible hazards DES presented to the public; and whether the company took any affirmative steps to reduce the risk of injury to the public.

*Id.* at 200. Through the trial court's exercise of discretion, the jury could be permitted to consider other relevant factors to apportioning liability. *Id.*

A

¶ 110. At the outset, the parties dispute whether this court should recognize the risk-contribution theory for Thomas's claim. The Pigment Manufacturers contend that the *Collins* court was concerned with modifying the common law to ensure that the plaintiff had a remedy, for unless existing law was modified, the plaintiff in *Collins* would have had no remedy against anyone. By contrast, the Pigment Manufacturers note that Thomas had a remedy for his injuries against his landlords. Because Thomas had a remedy, the Pigment Manufacturers contend that there is no need to apply the risk-contribution theory to his case. We do not agree.

1

¶ 111. Article I, Section 9 of the Wisconsin Constitution provides:

Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain

293

justice freely, and without being obligated to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

¶ 112.  The Pigment Manufacturers would have this court conclude that because *Collins* relied on Article I, Section 9, and because in *Collins* the plaintiff was without a remedy, it follows that Article I, Section 9 applies only when a plaintiff is without a remedy. *See* Resp't Br. at 36 ("Article I, § 9 was material to the analysis in *Collins* only because the Court concluded that Therese Collins was entitled to a remedy at law for her injuries, and unless existing law were modified she would have no remedy against anyone."). According to the Pigment Manufacturers, "The Court decided *Collins* to ensure that DES claimants had a remedy, not that they could choose, among all possible classes of potential defendants from whom they would collect their remedy." Resp't Br. At 41. The Pigment Manufacturers contend that because Thomas had an "*an opportunity* for a judgment against the landlords for the full amount demanded if he had litigated his claims," Resp't Br. At 36–37, there is no justification for extending *Collins.*

¶ 113.  We do not agree with the Pigment Manufacturers' reading of *Collins,* and we do not agree that Article I, Section 9 is as frail as the Pigment Manufacturers would have us believe.

a

¶ 114.  The *Collins* court was concerned with more than just ensuring a plaintiff had *a remedy* against someone for something. Instead, the *Collins* court wrote that Article I, Section 9 had been interpreted in a manner that allowed the court to fashion an

*adequate remedy* when one did not exist. *Collins,* 116 Wis. 2d at 182. In fashioning the particulars of Wisconsin's risk-contribution theory, the court remained mindful that, in the end, the theory would provide the plaintiff with an adequate remedy should the plaintiff meet the burden of proof. *Id.* at 194, 198.

¶ 115. We have serious concerns with the Pigment Manufacturers' attempt to displace all of the blame for lead poisoning from its white lead carbonate pigment on landlords and what effect that will have on the adequacy of a plaintiff's remedy. Although this court has held that "a duty to test for lead paint arises whenever the landlord of a residential property constructed before 1978 either knows or in the use of ordinary care should know that there is peeling or chipping paint on the rental property," *Antwaun,* 228 Wis. 2d at 62, this court has also concluded that a pollution exclusion[32] in a commercial general liability insurance policy bars coverage for lead poisoning from

---

[32] The pollution exclusion in the commercial general liability insurance policy read:

This insurance does not apply to:

. . . .

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Peace,* 228 Wis. 2d at 112 n.4.

paint that has chipped, flaked, or broken down into dust or fumes. *Peace v. Northwestern Nat'l Ins. Co.,* 228 Wis. 2d 106, 130, 596 N.W.2d 429 (1999). The result of *Peace* is that many victims of lead poisoning will be deprived "of an effective remedy for their harm." *Id.* at 151 (Crooks, J., dissenting).

¶ 116.   While Thomas recovered from two of the landlords' insurers (Fire Insurance Exchange and Germantown Mutual Insurance), the settlement with Fire Insurance Exchange occurred three years before *Peace* was decided,[33] and Germantown Mutual Insurance Company apparently did not have a pollution exclusion, as it never raised one. After *Peace* was handed down, however, the insurer for State Farm successfully raised its pollution exclusion, which contained the same language considered in *Peace,* and was dismissed from the suit. It is this latter occurrence that is troublesome, as it highlights the emerging ramifications *Peace* holds for future victims of lead poisoning. Those victims may not share Thomas's chance in being able to recover something from their negligent landlords.

¶ 117.   Also troubling is the fact that landlords can immunize themselves from liability for "their acts or omissions related to lead poisoning or lead exposure of a person who resides in or has visited the dwelling or unit if, at the time that the lead poisoning or lead exposure occurred, a certificate of lead-free status or a certificate of lead-safe status was in effect for the dwelling or unit." Wis. Stat. § 254.173(2).[34] As Thomas

---

[33] Thomas settled with Fire Insurance Exchange, the insurer for the landlord of 2652 North 37th Street, on December 6, 1996.

[34] Various portions of Wis. Stat. § 254.173 are scheduled to be repealed at various times. 1999 Wis. Act 113, § 34 states:

has established on his summary judgment record, however, the dangers of lead poisoning from lead paint exist notwithstanding a "lead-safe status." This court has recognized the same. *See Peace*, 228 Wis. 2d at 130 n.16 (equating lead as a contaminant or pollutant "in the same way that a loaded pistol is a dangerous weapon, even when it is locked up in a gun case, and a mamba is a deadly poisonous snake, even when it is confined in a reptile house.").

b

¶ 118.  Further, the Pigment Manufacturers' reading of the importance of Article I, Section 9 to *Collins* is in error.

(1) IMMUNITY FROM LIABILITY FOR LEAD POISONING OR LEAD EXPOSURE. The creation of section 254.173 of the statutes first applies to lead poisoning or lead exposure that occurs on the effective date of this subsection.

1999 Wis. Act 113, § 35 states:

Effective dates. This act takes effect on the day after publication, except as follows:

(1c)  The treatment of sections 254.11 (8d), 254.154 (by SECTION 10), 254.166 (2) (c) and (e), 254.172 and 901.055 of the statutes, the creation of sections 254.166 (2) (c) 2. and 3. and 254.173 of the statutes and SECTION 34 (1) of this act take effect on the first day of the 16th month beginning after publication.

(2)  The repeal of section 254.173 (3) of the statutes and the amendment of section 254.154 (by SECTION 10b) of the statutes take effect on the first day of the 64th month beginning after publication.

(3)  The repeal of section 254.173 (title), (1) and (2) of the statutes and the repeal and recreation of section 254.154 of the statutes take effect on the first day of the 100th month beginning after publication.

¶ 119. As noted, the Pigment Manufacturers would have this court conclude that because *Collins* relied on Article I, Section 9, and because in *Collins* the plaintiff was without a remedy, it follows that Article I, Section 9 applies only when a plaintiff is without a remedy. The only "comparable justification" for extending the risk-contribution theory, the Pigment Manufacturers contend, is when a plaintiff is remediless.

¶ 120. We do not agree with the assumption of the Pigment Manufacturers' argument. They assume that Article I, Section 9 becomes operative only when a plaintiff is remediless. Stated in the contrapositive, the Pigment Manufacturers assume that when someone has a remedy, Article I, Section 9 is not relevant. The import of this argument is that where recovery has been had against one tortfeasor, all other tortfeasors are necessarily absolved.[35]

¶ 121. However, as Judge Brown concluded in his concurring opinion below:

> The plain meaning of this section is that every person is entitled to a certain remedy for "all injuries *or* wrongs which he may receive in his person." Notice that the wording is in the disjunctive. The way I read this clause, it means that even assuming only one injury, if that injury was brought about by separate wrongs against the person, that person is entitled to a remedy for each "wrong."

[35] *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.,* 2001 WI App 148, ¶ 42, 246 Wis. 2d 933, 632 N.W.2d 59 (discussing joint tortfeasors in general; "[T]he fact remains that the liability of one defendant does not preclude the liability of the others on the present facts.").

*Thomas*, 275 Wis. 2d 377, ¶ 22 (Brown, J., concurring) (emphasis in original). Judge Brown went on to write:

> I have never seen a case that insulates a wrongdoer from being exposed to a lawsuit just because there exists a remedy against another wrongdoer.

*Id.*

¶ 122.  We agree with Judge Brown's reading and sentiment. *See Ross v. Ebert,* 275 Wis. 523, 526, 82 N.W.2d 315 (1957) (the wrongs contemplated by this provision are those resulting from a party's legal right). *See also Scholberg v. Itnyre,* 264 Wis. 211, 213, 58 N.W.2d 698 (1953); *Menasha Wooden Ware Co. v. Winter,* 159 Wis. 437, 442, 150 N.W. 526 (1915). This court has previously explained that we examine three sources in determining a constitutional provision's meaning: "the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption." *State v. Hamdan,* 2003 WI 113, ¶ 64 n. 29, 264 Wis. 2d 433, 665 N.W.2d 785 (citation and quotation omitted). As Judge Brown correctly noted, the fact that Thomas may have been "wronged" by (and received a remedy from) his landlord simply has no bearing on whether Thomas has been "wronged" by one or more Pigment Manufacturers.[36]

---

[36] The early interpretations of the practices in existence at the time Article I, Section 9 was adopted are set forth below. *See* IV.A.2. *infra.*

Further, Article I, Section 9 of the Wisconsin Constitution is not a provision that would have been interpreted by the legislature. Article I, Section 9 is a substantive right to the

¶ 123. Although the right to a remedy provision does not guarantee the certainty of recovery, *Neuhaus v. Clark County,* 14 Wis. 2d 222, 229, 111 N.W.2d 180 (1961), it cannot be turned on its head such that it becomes a vehicle to defeat the plaintiff's right to recovery for wrongs committed by one simply because some recovery has already been had against another. Article I, Section 9 is not a shield against liability in this sense.

¶ 124. Thomas claims his injuries were caused by two separate wrongs: first, by the negligence of his landlords; second, by the Pigment Manufacturers for negligently manufacturing and marketing white lead carbonate as safe. While we agree with the Pigment Manufacturers that landlords are in the best position to contain the dangers of lead pigment in paint once the paint has been applied, landlords are not to blame for the fact that the lead pigment in the paint is poisonous in the first instance.

2

¶ 125. Amicus for Civil Trial Counsel of Wisconsin (Amicus Civil Trial Counsel) contends our reading of Article I, Section 9 is too simplistic. It states that "there can be no gainsaying that over the past decade or so the interpretation and application of Article I, Section 9 have caused considerable jurisprudential disharmony within the Court." *See e.g. Aicher v. Wisconsin Patients Comp. Fund,* 2000 WI 98, 237 Wis. 2d 99, 613

---

extent that it entitles a litigant to a remedy as it existed at common law. It does not create rights. The legislature may change that common law, but those changes must be reasonable to pass scrutiny under Article I, Section 9.

N.W.2d 849; *Tomczak v. Bailey,* 218 Wis. 2d 245, 578 N.W.2d 166 (1998); *Estate of Makos v. Wisconsin Masons Health Care Fund,* 211 Wis. 2d 41, 564 N.W.2d 662 (1997), *overruled by Aicher,* 237 Wis. 2d 99, ¶ 6. Amicus Civil Trial Counsel observes that these cases involved legislative undertakings that, depending on the particular faction of this court's point of view, either unacceptably or acceptably limited or precluded judicial remedies. This is the proper fit for Article I, Section 9, Amicus Civil Trial Counsel contends.

¶ 126. Amicus Civil Trial Counsel argues that the purpose and tradition of Article I, Section 9 establishes that it is to be invoked when the legislature has taken some unreasonable action.[37] Where the legislature acts reasonably, Amicus Trial Counsel submits, this court has deferred to those decisions and concluded they did not violate Article I, Section 9.[38] More to the point here,

---

[37] *See e.g. Hincks v. City of Milwaukee,* 46 Wis. 559, 566–67, 1 N.W. 230 (1879) (statute granting immunity to City of Milwaukee alone for personal injuries stemming from sidewalk work struck down as it was "an attempt on the part of the legislature to grant a privilege or immunity to the city of Milwaukee against a general rule of law, while all other municipal corporations are left subject to its operation."); *Durkee v. City of Janesville,* 28 Wis. 464, 471 (1871) (statute precluding taxation of costs in prevailing party's favor when Janesville is a party defendant in tax assessment case held unconstitutional); *Phelps v. Rooney,* 9 Wis. 55, 82 (1859) (Dixon, C.J., dissenting) ("If the legislature can take away the remedy to [an] unjustifiable and alarming extent, they can destroy it entirely, and thus this solemn constitutional declaration of the people becomes a dead letter, a mere 'glittering generality,' without substance or effect.").

[38] *See e.g. Stanhope v. Brown County,* 90 Wis. 2d 823, 844, 280 N.W.2d 711 (1979) ($25,000 limit on recovery from governmental tortfeasors was not invalid under Article I, Section 9);

Amicus Trial Counsel contends that Article I, Section 9 does not empower this court to mold the common law whenever it happens to inconvenience plaintiffs seeking a remedy for their injuries. Amicus notes that this court has previously declined to utilize Article I, Section 9 to refashion common law.[39]

*Wiener v. J. C. Penney Co.,* 65 Wis. 2d 139, 151–52, 222 N.W.2d 149 (1974) (statute's prohibition on class actions against sellers for failing to refund excess interest does not violate Article I, Section 9); *Kerner v. Employers Mut. Liability Ins. Co.,* 35 Wis. 2d 391, 151 N.W.2d 72 (1967) (worker's compensation scheme does not violate Article I, Section 9 as the employee's right to a remedy for a wrong is modified by the phrase "conformably to the laws," and the legislature has the power to regulate the remedies for wrongs); *Ocampo v. Racine,* 28 Wis. 2d 506, 512–13, 137 N.W.2d 477 (1965) (120–day notice of claim statute applied to minor did not violate Article I, Section 9 as it was not unreasonable); *Brust v. First Nat'l Bank,* 184 Wis. 15, 23, 198 N.W. 749 (1924) (statute that allowed defendant new trial in proper venue when action commenced in wrong county did not violate Article I, Section 9); *Daniels v. Racine,* 98 Wis. 649, 652, 74 N.W. 553 (1898) (law that limited the time for giving notice of injury to 15 days in cities and villages did not violate Article I, Section 9: "Since the only right of action in the case at bar was given by statute, there can be no question but that the legislature had the power to wholly take it away by statute."); *Flanders v. Merrimack,* 48 Wis. 567, 574–75, 4 N.W. 741 (1880) (statute that allowed taxpayers from Town of Merrimack option of paying void taxes for 1877 did not violate Article I, Section 9); *Dodge v. Barden,* 33 Wis. 246, 251 (1873) (statute that imposed costs as a condition of the change of venue after the affidavit is filed did not violate Article I, Section 9 as it did not compel the party to purchase justice).

[39] *See Schwenkhoff v. Farmers Mut. Auto Ins. Co.,* 6 Wis. 2d 44, 45–47, 93 N.W.2d 867 (1959) (unemancipated minor cannot maintain a negligence action against his or her parent for personal injury sustained in an automobile accident); *United States v. Klebe Tool & Die Co.,* 5 Wis. 2d 392, 398, 92 N.W.2d 868

¶ 127. Through all the disagreement, though, Amicus Trial Counsel submits that almost all members of this court, in various contexts, have cited the following proposition in discussing Article I, Section 9:

> That section, though of great importance in our jurisprudence, is primarily addressed to the right of persons to have access to the courts and to obtain justice on the basis of the law as it in fact exists. No legal rights are conferred by this portion of the Constitution.

*Mulder v. Acme-Cleveland Corp,* 95 Wis. 2d 173, 189, 290 N.W.2d 276 (1980). Against this backdrop, Amicus Trial Counsel argues that *Collins* was an aberration and its reliance on Article I, Section 9 as the foundation for its opinion was error.

¶ 128. In *Collins,* this court noted that Article I, Section 9 had been interpreted in the following manner: "When an adequate remedy or forum does not exist to resolve disputes or provide due process, the courts, under the Wisconsin Constitution, can fashion an adequate remedy." *Collins,* 116 Wis. 2d at 182 (citation and quotations omitted). Although this principle shows a parallel line of Article I, Section 9 jurisprudence, the court in *Collins* was not outstretched when it stated this principle, or at least not as outstretched as Amicus Civil Trial Counsel contends. *See D.H.,* 76 Wis. 2d at 294; *Hortonville Education Ass'n v. Hortonville Joint School Dist.,* 66 Wis. 2d 469, 497, 225 N.W.2d 658 (1975), *reversed by* 426 U.S. 482 (1976).

---

(1958) (Article I, Section 9 does not apply to relieve a party from its contractual obligations); *Firemen's Ins. Co. v. Washburn County,* 2 Wis. 2d 214, 224–26, 85 N.W.2d 840 (1957) (refusing to abrogate common law governmental immunity for negligent maintenance of highways).

¶ 129. Setting aside the wisdom of this proposition for the moment, even Amicus Civil Trial Counsel agrees that in *McCoy v. Kenosha County*, 195 Wis. 273, 277, 218 N.W. 348 (1928), this court held that the phrase "conformably to the laws" in Article I, Section 9 relates to "a recognized, long established system of laws existing in the several states adopting the constitution as well as in the prior organizations from which the states were organized." That "common law," however, is frequently refined by this court, consistent with the dynamic principle that "allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose." *Bielski,* 16 Wis. 2d at 11 (citation and quotations omitted). Thus, although the Article I, Section 9 provision itself may not create "new rights," it does allow for a remedy through the existing common law. As *Collins* allowed for the recognition of the risk-contribution theory in factually similar cases, we must assess whether this common law applies to Thomas's situation.[40] *Collins,* 116 Wis. 2d at 191.

---

[40] The dissent's lamentations on this point are peculiar.

On the one hand, it "recognize[s] the validity of the risk contribution theory . . . *under the unique facts of [Collins]."* Wilcox, J., dissenting, ¶ 179 (emphasis in dissent). However, the dissent cannot deny that *Collins* constituted a change on the concept of common law causation in certain cases. And the dissent cannot deny that in fashioning this change, *Collins* relied on Article I, Section 9 to do this.

On the other hand the dissent concludes that we have "introduce[d] confusion into our Article I, Section 9 jurisprudence by insinuating that this provision requires the court to

¶ 130. Confronting the wisdom of this "adequate remedy" proposition, Amicus Civil Trial Counsel's chief criticism is that this proposition cannot be maintained in some principled way, thereby creating uncertainty in a number of cases. Although this criticism carries facial appeal, the goal of providing certainty is not necessarily achievable, and that is not necessarily a bad thing.[41] The common law develops to adapt to the changing needs of society. This is, as it has been called, its "genius."[42] *Moran v. Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 551, 150 N.W.2d 137 (1967). Although there are those who champion rigid rules with clear delineations, the fact is that the "[c]ommon law is law subject to continuing judicial development, including abrogation."

---

fashion a recovery for Thomas because he has suffered two separate wrongs." *Id.*, ¶ 201. The dissent further implies that Article I, Section 9 cannot be used to remove common-law limitations on recovery in tort, presumably such as causation. *Id.*, ¶¶ 205–08.

Either the dissent agrees with *Collins* or it does not. It cannot both embrace *Collins* and lambaste the court for relying on Article I, Section 9 here.

[41] *See Eberhardy v. Cir. Ct. for Wood Co,* 102 Wis. 2d 539, 601, 307 N.W.2d 881 (1981) (Callow, J., dissenting) ("Unlike the legislature which deals with broad issues of social policy, courts deal with individual cases." (footnote omitted)).

[42] Notwithstanding that the common law is designed to adapt to changing needs of society, the dissent declares that "[s]imply put, the majority opinion amounts to little more than this court dictating social policy to achieve a desired result." Wilcox, J., dissenting, ¶ 181. Further, the dissent states that the "majority cannot hide the fact" that the court's decision is "results-oriented." *Id.*, n.1. This type of sensationalized judicial rhetoric is regrettably becoming all the more common, but it does nothing more than obscure the issue to be answered in the instant case.

*State v. Picote,* 2003 WI 42, 261 Wis. 2d 249, ¶ 19, 661 N.W.2d 381. Indeed, this process of continuing refinement is a vital component of judicial power. *State v. Esser,* 16 Wis. 2d 567, 581, 115 N.W.2d 505 (1962). If in the name of certainty this court simply deferred to the eras of days passed, we would "succumb to a rule that a judge should let others long dead and unaware of the problems of the age in which he [or she] lives, do his thinking for him [or her]." *Bielski,* 16 Wis. 2d at 11.

B

¶ 131.   Having determined that Article I, Section 9 is not a bar to considering whether Thomas's suit is factually similar to *Collins,* we now consider whether Thomas's suit is factually similar to that in *Collins.* This court in *Collins* authorized the expansion of the theory in other factually similar scenarios. *Collins,* 116 Wis. 2d at 191. Although this case is not identical to *Collins,* we conclude that it is factually similar such that the risk-contribution theory applies.

¶ 132.   As a prefatory note, as this court did in *Collins* with DES cases, we recognize that cases involving lead poisoning stemming from lead pigment pose difficult problems. *See id.* at 190. The entirely innocent plaintiffs may have been severely harmed by a substance they had no control over, and they may never know or be able to prove with certainty which manufacturer produced or promoted the white lead carbonate that caused the injuries. *See id.* The Pigment Manufacturers are faced with possible liability for white lead carbonate they may not have produced or marketed. *See id.* As this court did in *Collins,* we again conclude "that as between the plaintiff, who probably is not at fault, and the defendants, who may have provided the product which caused the injury, the interests

of justice and fundamental fairness demand that the latter should bear the cost of injury." *Id.* at 191.

1

¶ 133.    There is no dispute that Thomas is an innocent plaintiff who is probably not at fault and will be forced to bear a significant cost of his injuries if he is not allowed to sue the possibly negligent Pigment Manufacturers. *See id.* at 181, 191. Further, given the disturbing numbers of victims of lead poisoning from ingesting lead paint, and given that white lead carbonate was the overwhelming pigment added to that paint, it is clear from the summary judgment record that we are not dealing with an isolated or unique set of circumstances. *See id.* at 181. As far as the summary judgment record reveals, the problem of lead poisoning from white lead carbonate is real; it is widespread; and it is a public health catastrophe that is poised to linger for quite some time.

2

¶ 134.    The main policy reasons identified by *Collins* warrant extension of the risk-contribution theory here.

¶ 135.    First, the record makes clear that the Pigment Manufacturers "contributed to the *risk* of injury to the public and, consequently, the risk of injury to individual plaintiffs such as" Thomas.[43] *See id.* at 191.

---

[43] Our discussion here is limited to showing how the policies implicated in *Collins* are met in the instant case. The dissent's citation to this section as support for its supposition that we have expanded *Collins* is simply misplaced. *Compare* Wilcox, J., dissenting, ¶ 215. As seen later, we embrace *Collins'* require-

Many of the individual defendants or their predecessors-in-interest did more than simply contribute to a risk; they knew of the harm white lead carbonate pigments caused and continued production and promotion of the pigment notwithstanding that knowledge. Some manufacturers, paradoxically, even promoted their nonleaded based pigments as alternatives that were safe in that they did not pose the risk of lead poisoning. For those that did not have explicit knowledge of the harm they were engendering, given the growing medical literature in the early part of the century, Thomas's historical experts, Markowitz and Rosner, submit that by the 1920s the entire industry knew or should have known of the dangers of its products and should have ceased producing the lead pigments, including white lead carbonate. In short, we agree with Thomas that the record easily establishes the Pigment Manufacturers' culpability for, at a minimum, contributing to creating a risk of injury to the public.

¶ 136. Second, as compared to Thomas, the Pigment Manufacturers are in a better position to absorb the cost of the injury. They can insure themselves against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business. *See id.* As we concluded in *Collins,* it is better to have the Pigment Manufacturers or consumers share the cost of the injury rather than place the burden on the innocent plaintiff.[44] *See id.*

---

ment that a plaintiff must prove that the defendant pigment manufacturer "reasonably *could have* contributed *in some way* to the actual injury." *See Collins,* 116 Wis. 2d at 191 n.10 (emphasis added).

[44] The *Collins* court identified another policy reason, which was providing an incentive for drug companies to test adequately the drugs they place on the market for general medical

¶ 137. Thomas is also unable to identify the precise manufacturer of the white lead carbonate that caused his injuries due to the number of manufacturers, the passage of time, and the loss or records. *See id.* at 177. Additionally, he cannot identify which of the three types of white lead carbonate he ingested.[45] On this failure of proof,[46] the Pigment Manufacturers contend, Thomas's claim must fall. They argue that because white lead carbonate was not "fungible" or

---

use. *Collins,* 116 Wis. 2d at 192. This policy is not implicated here because lead pigment in paint has been banned for some time now. Although the *Collins* court recognized that the "sting" from damage awards might spur better research and development for the drug companies, it does not seem that this formed a pillar for the court's articulation of the risk-contribution theory. We read *Collins* as establishing that the predominant policy reasons undergirding the risk-contribution theory were that the defendants contributed to the risk of harm and that the defendants were in a better position to absorb the cost.

We also note an additional policy consideration here that was not present in *Collins:* deterring knowingly wrongful conduct that causes harm.

[45] As noted above, white lead carbonate was comprised of three different chemical formulas: $4PbCO_3 2Pb(OH)_2 PbO$, $2PbCO_3 Pb(OH)_2$, and $PbCO_3$. Also as noted above, Thomas has presented evidence that establishes, for purposes of summary judgment at least, that his lead poisoning stemmed from ingesting white lead carbonate.

[46] It seems as if everyone is in the dark on this point. The Pigment Manufacturers do not establish which type of white lead carbonate they produced or promoted. This is to be expected, but as participants in the lead pigment market, presumably they have more information or potential access to relevant information than does the plaintiff. *See Collins,* 116 Wis. 2d at 193.

manufactured from a chemically identical formula, *Collins'* risk-contribution cannot be applied here. We disagree.

a

¶ 138.    One of the proof problems the *Collins* court recognized the plaintiff had was that she was unable to identify the precise producer or marketer of the DES her mother took due to, among other things, "the generic status of some DES." *Id.* at 177. In different terms, this court stated that the plaintiff could not identify the drug company that caused her injury because "DES was, for the most part, produced in a 'generic' form which did not contain any clearly identifiable shape, color, or markings." *Id.* at 180. This court also observed that "DES was a fungible drug produced with a chemically identical formula, and often pharmacists would fill DES prescriptions from whatever stock they had on hand, whether or not a particular brand was specified in the prescription." *Id.*

¶ 139.    There is no denying that *Collins* involved a situation where a chemically identical formula allegedly caused harm. It is also true that white lead carbonate was made from three different chemical formulas. However, *Collins* did not address whether DES was fungible because of its chemical identity, because of its interchangeability due to its generic status, or because of both. The question is, does fungibility require chemical identity? We conclude that it does not.

¶ 140.    Chemical identity was a feature that DES apparently shared, and it was that chemical formula that created a possibility of causing harm. Here, although the chemical formulas for white lead carbonate

310

are not the same, Thomas's toxicologist, Mushak, opines that it is the common denominator in the formulas that counts: lead. According to Mushak, the formulary differences between white lead carbonates do not affect the bioavailability of, and hence the consequences caused by, the lead pigment.[47] Thus, the formulas for both DES and the white lead carbonate are in a sense on the same footing as being inherently hazardous. Therefore, it would be imprudent to conclude that chemical identity is a touchstone for fungibility and, in turn, for the risk-contribution theory. To prevent the triumph of form over substance, we conclude that chemical identity is not required.

b

¶ 141. But the question still remains: what does fungibility mean? It has been noted that "[w]hile 'fungibility' [has] become an obsession for courts discussing market share liability, no court has ever explained thoroughly what 'fungibility' means or why it is important." Allen Rostron, *Beyond Market Share Liability: A Theory of Proportional Share Liability for Non-*

---

[47] This point, of course, is controverted by the Pigment Manufacturers. The Pigment Manufacturers' expert witness, William Banner, M.D., Ph.D., opines that lead in different products is not biologically fungible. He asserts that the bioavailability of lead in lead-paint varies, depending on many chemical and physical factors, such as the chemical composition of the lead used as pigment, the size of the particles of pigment or other lead-bearing material, the pigment manufacturing process, and the physical and chemical properties of the paint film.

However, on summary judgment, we construe the facts in the light most favorable to the non-moving party. Further, we do not resolve factual disputes.

311

*fungible Products,* 52 UCLA L. Rev. 151, 163 (Oct. 2004) [hereafter *Beyond Market Share Liability*]. Rostron writes that a product can be fungible in at least three different senses.[48]

¶ 142.   First, a product can be "functionally interchangeable." Under this meaning, whether a product is fungible is a matter of degree and heavily dependent on the context of whatever "function" is at issue. For example, " 'for signaling New Year's Eve, a blast from an auto horn and one from a saxophone may be equivalent as noise, but few would want to dance to the former.' " *Id.* at 163–64 (quoting *Hamilton v. Accu-Tek,* 32 F. Supp. 2d 47, 51 (E.D.N.Y. 1998)). This type of fungibility is significant "because it is a reason why a product may pose unusually severe identification problems." *Id.* at 164.

¶ 143.   Second, a product can be fungible in the sense that it is "physically indistinguishable." *Id.* at 164. Because appearances can be deceiving, the degree of

---

[48] The common understanding of the word "fungible" is:  "1: of such a kind or nature that one specimen or part may be used in place of another specimen or equal part in the satisfaction of an obligation . . . 2. capable of mutual substitution: interchangeable." *Webster's Third New Int'l Dictionary* 922 (unabr. 1986). "Fungible" is similarly defined in *The American Heritage Dictionary* as meaning "interchangeable. Something that is exchangeable or substitutable." *American Heritage Dictionary* 735 (3d ed. 1992); *see also Wheeler v. Raybestos-Manhattan,* 11 Cal. Rptr. 2d 109, 111 (Cal. Ct. App. 1992) (resorting to dictionary and defining "fungible" as " '[o]f such a kind or nature that one specimen or part may be used in place of another specimen or equal part in the satisfaction of an obligation' or '[i]nterchangeable.' " (quoting *Webster's New Collegiate Dict.,* 338 (7th ed. 1969)); *Hamilton v. Accu-Tek,* 32 F. Supp. 2d 47, 51 (E.D.N.Y. 1998) (similarly resorting to dictionary definition).

physical similarity required, as with functional interchangeability, depends heavily on context: "For example, the difference between two brands of a cola drink in their original packaging will be obvious. After being poured from the can or bottle, they might be completely indistinguishable in appearance, distinguishable by taste for some consumers and not others, and easily distinguishable to chemists analyzing them in a laboratory." *Id.* at 164. As with functional interchangeability, fungibility in the sense that a product is physically indistinguishable is significant because it is also a reason why a product may pose identification problems. *Id.* at 165.

¶ 144. Third, a product can be fungible as it presents a "uniformity of risk." *Id.* at 165. Under this meaning, "[a]s a result of sharing an identical or virtually identical chemical formula, each manufacturer's product posed the same amount of risk as every other manufacturer's product. The products therefore were 'identically defective,' with none being more or less defective than the rest." *Id.* However, "whether a product poses a uniform risk can depend on the choice of the unit for which risk is measured. While each milligram of DES presented the same amount of risk, each DES pill did not, because the pills came in different dosages." *Id.* at 166. Thus, as products may contain different concentrations of the hazardous substance, there is leeway to conclude that strict chemical uniformity does not render all substances fungible. *Id.* at 166–67. Nevertheless, this was important to market-share liability as it defined "the market" by concretely establishing the risk undertaken by the manufacturers.[49]

---

[49] Under the market-share theory, Rostron agrees that the only logical understanding of fungibility is "uniformity of risk"

¶ 145. Fungibility, therefore, is not a term that is capable of being defined with categorical precision. Its character will depend on the context of the injury, its cause, and the particular obstacles encountered in linking the causation to the possibly negligent defendants. *See Hamilton,* 32 F. Supp. 2d at 51 ("It is the characteristic relevant to the matter at issue that determines whether a product is the same as and substitutable for another, and therefore, whether the two are interchangeable. . . . "). The facts presented in this case, when construed in the light most favorable to Thomas, however, establish that white lead carbonate is fungible under any of the above meanings.

¶ 146. First, white lead carbonate was functionally interchangeable. All forms of white lead carbonate were lead pigments, which constituted one of the two necessary components of paint (the other being the "vehicle"). The pigment is what provided the hiding

---

—that is, chemical uniformity presumably with similar dosages or quantities—because that of itself defined "the market." *See* Allen Rostron, *Beyond Market Share Liability: A Theory of Proportional Share Liability for Nonfungible Products,* 52 UCLA L. Rev. 151, 168 (Oct. 2004).

However, Rostron notes that Wisconsin's risk-contribution theory is not anchored to "the market" as is market-share liability. *Id.* at 170. Rostron states that the risk-contribution theory is akin to "proportional share liability," which does not necessarily require products that pose "uniform risks." *Id.* Rostron states that "[u]nlike other states requiring apportionment [of liability] to be based on market share data alone, the Wisconsin court made clear that market share data was just one among many factors to be considered." *Id.* at 170 (citing *Collins,* 116 Wis. 2d at 199–200). This approach, to Rostron, "would seem to be flexible enough to accommodate situations where products pose varying degrees of risk." *Id.*

power of the paint. Although there may be varying grades of hiding powers based on differing physical properties and concentrations of the particular pigments, those are differences of degree, not function.

¶ 147. Second, based on the summary judgment record, white lead carbonates are physically indistinguishable. As far as Thomas has been able to tell, the pigment at issue is white lead carbonate pigment. And as far as Thomas has been able to tell, there appears to be no difference between the various white lead carbonates. Although the Pigment Manufacturers contend that white lead carbonates were manufactured according to different processes, which resulted in white lead carbonates of different physical properties, these physical differences are available only on the microscopic scale. Our concern here is whether the white lead carbonates are physically indistinguishable in the context in which it is used (in paint) and to whom is using it (the consumer or injured party). We acknowledge that the physical identity in this case is markedly different from that in *Collins*. Whereas in *Collins,* the plaintiff's mother could identify certain characteristics about the particular DES pill she ingested, that type of analysis is not possible here, as pigment in paint by its nature and concentration defy more specific identification. Nevertheless, we conclude the factual circumstances of physical interchangeability that are present are still sufficiently similar to remain within *Collins'* confines.

¶ 148. Third, we have already noted that white lead carbonates were produced utilizing "virtually identical chemical formulas" such that all white lead carbonates were "identically defective." *See id.* at 165; *see also Wheeler v. Raybestos-Manhattan,* 11 Cal. Rptr. 2d 109, 111 (Cal. Ct. App. 1992) (concluding that although brake pads containing asbestos chrysotile fibers were

315

not all manufactured from one single chemical formula, "they are fungible . . . by virtue of containing roughly comparable quantities of the single asbestos fiber, chrysotile."). It is the common denominator in the various white lead carbonate formulas that matters; namely, lead.

¶ 149.  Therefore, based on the factors identified in *Collins,* we conclude that Thomas's case is factually similar to warrant extension of the risk-contribution theory.

## C

¶ 150.  The Pigment Manufacturers, however, contend that there are a number of factual dissimilarities between this case and *Collins* that should preclude recognizing the risk-contribution theory here. While there are dissimilarities between the two, we do not agree that these defeat the extension of *Collins* in this case.

### 1

¶ 151.  First, the Pigment Manufacturers note that the paint Thomas allegedly ingested could have been applied at any time between construction of the two houses in 1900 and 1905 and the ban on lead paint in 1978. This significant time span greatly exceeds the nine-month window during which a plaintiff's mother would have taken DES, the Pigment Manufacturers note. Given that *Collins* attempted to strike a balance between assuring a DES plaintiff had a remedy and providing a realistic opportunity to each DES pill manufacturer to prove that it could not have caused the plaintiff's harm (by establishing its DES could not have

reached the mother during her pregnancy), the Pigment Manufacturers contend that *Collins* should not be extended given that they have no reasonable ability to exculpate themselves.

¶ 152. We recognize that the window during which the possible injury causing white lead carbonate was placed in a house that eventually harmed Thomas is drastically larger than a nine-month window for pregnancy. However, the window will not always be potentially as large as appears in this case. Even if it routinely will be, the Pigment Manufacturers' argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long. As Thomas says, the Pigment Manufacturers "are arguing that they should not be held liable under the risk contribution doctrine because of the magnitude of their wrongful conduct."

¶ 153. *Collins* was concerned with providing possibly innocent defendants a means to exculpate themselves by establishing their product could not have caused the injury. *Collins,* 116 Wis. 2d 191 n.10. If they could not do so, this court stated that the equities "favor placing the consequences on the defendants." *Id.* at 198. Equity does not support reversing that balance simply because the Pigment Manufacturers benefited from manufacturing and marketing white lead carbonate for a significant period of time.

2

¶ 154. Next, the Pigment Manufacturers contend that the risk-contribution theory should not be extended because Thomas's lead poisoning could have been caused from many different sources. We agree that

317

the record indicates that lead poisoning can stem from the ambient air, many foods, drinking water, soil, and dust.

¶ 155. Further, the Pigment Manufacturers argue that the risk-contribution theory should not be extended because lead poisoning does not produce a "signature injury." As alternate explanations for Thomas's cognitive deficits, the Pigment Manufacturers have brought forth evidence that genetics, birth complications causing damage to the central nervous system, severe environmental deprivation, inadequate parenting, parental emotional disorders, and child abuse could all, in varying ways, cause such impairments.

¶ 156. These arguments have no bearing on whether the risk-contribution theory should be extended to white lead carbonate claims. Harm is harm, whether it be "signature" or otherwise. Even under the risk-contribution theory, the plaintiff still retains a burden of establishing causation. To establish a negligence claim under the risk-contribution theory, this court concluded that the plaintiff nonetheless needed to prove that "DES caused the plaintiff's subsequent injuries." *Collins,* 116 Wis. 2d at 193. Similarly, on a products liability claim, the *Collins* court held that the plaintiff has to prove "that the defect was a cause of the plaintiff's injuries or damages." *Id.* at 196. On whatever theory the plaintiff chooses to proceed, this causation showing must be made by a preponderance of the evidence, and ultimately "to the satisfaction of the trier of fact." *Id.* at 194. The plaintiff's burden is relaxed only with respect to establishing the specific type of DES the plaintiff's mother took, which, in this case, translates into the specific type of white lead carbonate Thomas ingested. *See id.* at 193–94.

¶ 157. While *Collins* concerned a plaintiff who had injuries of a "signature" nature, that merely means that Thomas may have a harder case to make to his jury. Further, while the Pigment Manufacturers are correct to argue that Thomas's lead poisoning could have come from any number of sources, that is an argument to be made before the jury.

3

¶ 158. Finally, the Pigment Manufacturers argue that because they were not in exclusive control of the risk their product created, the risk-contribution model should not apply to them. We again disagree.

¶ 159. This was again not a distinction relevant in *Collins*. Further, we see no reason why it should be for at least two reasons. First, as doctors were the ones who prescribed the dosage of DES, so too were the paint manufacturers that mixed the amount of white lead carbonate in the paint. However, the paint did not alter the toxicity of the white lead carbonate anymore than the pharmacist did by filling a prescription. To the contrary, at best, the paint manufacturers actually diluted the white lead carbonate's toxicity. In other words, the inherent dangerousness of the white lead carbonate pigment existed the moment the Pigment Manufacturers created it.

¶ 160. Second, the record is replete with evidence that shows the Pigment Manufacturers actually magnified the risk through their aggressive promotion of white lead carbonate, even despite the awareness of the toxicity of lead. In either case, whoever had "exclusive" control over the white lead carbonate is immaterial.

¶ 161.   Thomas has brought claims for both negligence and strict products liability. Applying the risk-contribution theory to Thomas's negligence claim, he will have to prove the following elements to the satisfaction of the trier of fact:

(1) That he ingested white lead carbonate;

(2) That the white lead carbonate caused his injuries;

(3) That the Pigment Manufacturers[50] produced or marketed the type of white lead carbonate he ingested; and

(4) That the Pigment Manufacturers' conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to Thomas.

*See id.* at 193. Because Thomas cannot prove the specific type of white lead carbonate he ingested, he need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period:   the duration of the houses' existence. *See Id.* at 194.

¶ 162.   Applying the risk-contribution theory to Thomas's strict products liability claim, Thomas will have to prove the following elements to the satisfaction of the trier of fact:

(1) That the white lead carbonate was defective when it left the possession or control of the pigment manufacturers;

---

[50] Thomas named several manufacturers and promoters of white lead carbonate. Under *Collins,* a plaintiff need only name one defendant. *Collins,* 116 Wis. 2d at 193.

(2) That it was unreasonably dangerous to the user or consumer;

(3) That the defect was a cause of Thomas's injuries or damages;

(4) That the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer; and,

(5) That the product was one which the company expected to reach the user or consumer without substantial change in the condition it was when sold.

*See id.* at 195–96.

¶ 163.   Once Thomas makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located. However, if relevant records do not exist that can substantiate either defense, "we believe that the equities of [white lead carbonate] cases favor placing the consequences on the [Pigment Manufacturers]." *Id.* at 198. In addition to these specific defenses, and unlike in the DES cases, the Pigment Manufacturers here may have ample grounds to attack and eviscerate Thomas's prima facie case, with some of those grounds including that lead poisoning could stem from any number of substances (since lead itself is ubiquitous) and that it is difficult to know whether Thomas's injuries stem from lead poisoning as they are not signature injuries.[51]

---

[51] As can be easily seen, contrary to the dissent's assertions, this court has not created "absolute[] liab[ility]" here. Wilcox, J.,

¶ 164. We continue to believe that this procedure will result in a pool of defendants which can reasonably be assumed "could have caused the plaintiff's injuries."[52] *See id.* at 198. The alarmist tone of the dissents aside, our application of *Collins* here achieves *Collins'* requirement that it be shown that the defendant pigment manufacturer "reasonably *could have* contributed *in some way* to the actual injury." *Id.* at 191 n.10 (emphasis added). The procedure is not perfect and could result in drawing in some defendants who are actually innocent, particularly given the significantly larger time span at issue in this particular case. However, *Collins* declared that "we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law." *Id.*

E

■■■■

¶ 165. The Pigment Manufacturers raise constitutional challenges to our application of the risk-contribution theory to Thomas's claims. First, they argue it violates principles governing retroactive liability by attaching new, severe, and unanticipated legal consequences to conduct previously completed. *See Eastern Enters v. Apfel,* 524 U.S. 498 (1998). Second, they argue it violates due process by establishing evi-

---

dissenting, ¶ 223. Instead, we have adopted a straight application of this court's burden shifting analysis in *Collins* and applied it to the lead carbonate claims. *See Collins,* 116 Wis. 2d at 197–98.

[52] For those defendants who cannot exculpate themselves, *Collins* concluded that comparative negligence was the proper means of assigning relative fault. *Collins,* 116 Wis. 2d at 197–200. We recognize this aspect of *Collins,* but do not address it further because it was not mentioned by any of the parties.

dentiary presumptions that are irrational or do not provide a fair opportunity for rebuttal. *See Western & Atlantic R.R. v. Henderson,* 279 U.S. 639, 642 (1929). Third, they argue that their due process right to a meaningful opportunity to present a defense is violated. *See Huntley v. North Carolina State Bd. of Educ.,* 493 F.2d 1016, 1019 (4th Cir. 1974).

¶ 166.   These constitutional issues are not ripe.[53] As this case is before us on summary judgment, and as many material facts are in dispute, we remand this case for trial.[54]

---

[53] One dissent, Prosser, J., dissenting, takes a constitutional analysis well beyond what the Pigment Manufacturers have advanced in this court. That dissent writes how our analysis violates substantive as well as procedural due process and how it also violates equal protection. Prosser, J., dissenting, ¶¶ 282–305. The dissent's detailed due process analysis surpasses the Pigment Manufacturers' argument that extension of Collins creates due process problems, and the dissent's equal protection analysis was not even raised by the Pigment Manufacturers. Although the dissent may have fashioned a more in depth constitutional argument than have the Pigment Manufacturers, we maintain that the issue is not ripe based on the competing facts presented and the posture of this case. Accordingly, we do not reach these issues.

[54] A dissent, Prosser, J., dissenting, also discusses whether a "public policy" analysis should result in limiting liability for the Pigment Manufacturers here. Prosser, J., dissenting, ¶¶ 306–14. This argument was also not advanced by the Pigment Manufacturers and thus the public policy questions have not been fully presented to this court. Accordingly, as with the constitutional arguments, we express no opinion on the dissent's analysis, except to acknowledge that this court retains the ability to limit liability based on public policy factors but rarely invokes this power before a finding of negligence has occurred. *See Alvarado v. Sersch,* 2003 WI 55, 262 Wis. 2d 74, 662 N.W.2d 350. As this court stated in *Alvarado:* "In most

V

¶ 167.  Thomas also argues that he should be able to present alternative theories of liability to the jury: specifically enterprise liability and civil conspiracy. On this point, we agree with the Pigment Manufacturers that the claims cannot be pursued.

A

¶ 168.  A civil conspiracy is "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Onderdonk v. Lamb,* 79 Wis. 2d 241, 246, 255 N.W.2d 507 (1977) (citation and quotations omitted). "At a minimum, to show a conspiracy there must be facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Augustine v. Anti-Defamation League of B'Nai B'rith,* 75 Wis. 2d 207, 216, 249 N.W.2d 547 (1977). "To state a cause of action for civil conspiracy, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts." *Onderdonk,* 79 Wis. 2d at 247.

cases, the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability. Only in those cases where the facts are simple to ascertain and the public policy questions have been fully presented may a court review public policy and preclude liability before trial." *Id.,* ¶ 18.

¶ 169. Thomas argues that the Pigment Manufacturers cooperated through the LIA to mislead the public and the government to conceal the hazards of white lead carbonate. In doing so, Thomas argues that they furthered their common tortious end of selling a product they knew was harmful to children, thereby committing civil conspiracy. We disagree.

¶ 170. In *Collins*, this court declined to recognize a civil conspiracy claim for DES manufacturers because the record showed only "parallel behavior." *Collins*, 116 Wis. 2d at 188. This court stated that "[t]here is no indication in the record that the defendants either explicitly or tacitly collaborated to gain FDA approval so that they could in turn collaborate to misrepresent the safety and efficacy of DES for use in preventing miscarriages." *Id.* Further, this court said, "this theory becomes unworkable when we consider the fact that many drug companies entered the DES market well after FDA approval. These later entrants should not be charged with participation in or knowledge of the alleged 1941 and 1947 conspiracies." *Id.*

¶ 171. As Sherwin-Williams notes, each Pigment Manufacturer had a unique story regarding its participation in the LIA. Thomas does not explain when any agreement was reached to commit tortious acts, who was involved in this agreement, and when the other parties entered into this agreement. At best, his evidence establishes that a trade organization, the LIA, aggressively promoted lead products and took, what seems to be, any measures possible to ensure that the market for lead products remained free and unencumbered.

¶ 172. Further, the Pigment Manufacturers, either individually or as successors-in-interest, all were

members of the LIA at varying times. However, "every action by a trade association is not concerted action by the association's members." *AD/SAT v. Associated Press,* 181 F.3d 216, 233–34 (2d Cir. 1999); *Edwardson v. American Family Mut. Ins. Co.,* 223 Wis. 2d 754, 762, 589 N.W.2d 436 (Ct. App. 1998) ("[M]ere knowledge, acquiescence or approval of a plan, without cooperation or agreement to cooperate, is not enough to make a person a party to a conspiracy."). We conclude that Thomas has not presented sufficient material facts to sustain his civil conspiracy claim.[55]

### B

¶ 173.   Thomas next argues that an enterprise liability theory is a viable alternative. "Under the enterprise liability theory, it is the industry-wide standard that is the cause of injury, and each defendant that participates in perpetuating and using the inadequate standard has contributed to and is liable for the plaintiff's injury." *Collins,* 116 Wis. 2d at 186. As in *Collins,* we conclude that enterprise liability is not available here.

¶ 174.   The crux of Thomas's argument is that the Pigment Manufacturers, through the LIA, effectively prevented regulatory oversight into the industry

---

[55] Alternatively, Thomas seems to be asking to be able to present the civil conspiracy claim only if he does not have a viable claim under the risk-contribution theory. Thomas writes in his brief that the "conspiracy claim is a viable alternative claim in the absence of a claim under the risk-contribution theory." Because we agree that Thomas can pursue the risk-contribution theory, we will construe Thomas as withdrawing his civil conspiracy claim.

through targeted lobbying campaigns designed to frustrate conditions and standards for the product. However, while the LIA sought to protect its industry, the record indicates that "[t]he paint industry was highly competitive, with each paint company jealously guarding the secrecy of their paint formulas." Thomas does not explain when there ever was a small concentrated "industry" here. *See Hall v. E.I. Du Pont De Nemours & Co., Inc.*, 345 F. Supp. 353, 378 (E.D.N.Y. 1972) (noting doctrine's "special applicability to industries composed of a small number of units"). Therefore, we decline Thomas's invitation to adopt the enterprise liability theory at this time.[56]

## VI

¶ 175.   In sum, we conclude that Article I, Section 9 is not a barrier for seeking to recover against one or more tortfeasors when recovery has already been had against another. We further conclude that the risk-contribution theory applies to white lead carbonate cases. Although the Pigment Manufacturers raise constitutional challenges to this conclusion, those issues are not yet ripe. We further conclude that Thomas cannot proceed on his claims for civil conspiracy and enterprise liability.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.

¶ 176.   PATIENCE DRAKE ROGGENSACK, J., did not participate.

---

[56] Alternatively, Thomas seems to argue that as long as his action can proceed against the Pigment Manufacturers on the basis of *Collins,* this court need not reach the issue of enterprise liability.

¶ 177.   JON P. WILCOX, J. (*dissenting*).   It is often said that bad facts make bad law. Today's decision epitomizes that ancient legal axiom. The end result of the majority opinion is that the defendants, lead pigment manufacturers, can be held liable for a product they may or may not have produced, which may or may not have caused the plaintiff's injuries, based on conduct that may have occurred over 100 years ago when some of the defendants were not even part of the relevant market. Even though the injury in this case is tragic, the plaintiff cannot demonstrate that he was lead poisoned as a result of white lead carbonate, much less the type of white lead carbonate produced by any of the respective defendants. More importantly, he cannot prove *when* the supposed white lead carbonate that allegedly poisoned him was manufactured or applied to the houses in which he was supposedly lead poisoned. However, none of these facts seem to matter to the majority.

¶ 178.   Subjecting the defendants in this case to liability under these circumstances amounts to an unwarranted and unprecedented relaxation of the traditional rules governing tort liability, and raises serious concerns of fundamental fairness, as the defendants will be unable to realistically exculpate themselves. The majority opinion not only creates the risk that liability may be wholly out of proportion with the culpability of each individual defendant; it raises a distinct possibility that some defendants may be held liable for an injury they did not and could not have caused. The majority seems content to run roughshod over established principles of causation and the rights of each defendant to present a defense and be judged based on its own actions. The majority's decision renders Wisconsin the

only state to apply some form of collective liability in lead paint suits under similar facts.

¶ 179. While I recognize the validity of the risk-contribution theory of recovery articulated by this court in *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), *under the unique facts of that case*, I wholly disagree with the majority's expansion of that theory to cover the present case. Because this case is factually distinguishable from *Collins* on several levels, the majority's expansion of *Collins* to this case is entirely inappropriate. Further, by applying risk-contribution theory to the facts of this case, the majority essentially adopts a version of risk-contribution theory explicitly rejected by the *Collins* court.

¶ 180. A legitimate system of law requires adherence to established legal principles, even if such adherence does not produce a result deemed desirable by the collective wisdom of four members of this court. Our common law used to require a plaintiff to prove four elements in order to recover under a theory of negligence: duty, breach, causation, and damages. Throughout the years, this court has essentially eliminated the requirement that a plaintiff prove the second element by holding that in Wisconsin, everyone owes a duty of reasonable care to the entire world. *Alvarado v. Sersch*, 2003 WI 55, ¶ 16, 262 Wis. 2d 74, 662 N.W.2d 350. Today, the majority proclaims that if a plaintiff is sympathetic enough and the "industry" of which a defendant was a part is culpable enough, a plaintiff may dispense with proof of the third element and recover against a party even though it has not been shown that the party reasonably could have contributed in some way to the plaintiff's actual injury. Simply put, the majority opinion

amounts to little more than this court dictating social policy to achieve a desired result.[1]

## I

¶ 181.  I begin by discussing the facts in this case. The majority presents the reader with over 50 pages of so-called "facts" in order to construct an intricate tapestry of malfeasance and culpability on the part of the lead paint industry as a whole. In doing so, the majority attempts to conceal what is utterly lacking in the plaintiff's proof in this case:   evidence of a reasonable connection between the conduct of each defendant and the plaintiff's injuries.[2] *See Collins,* 116 Wis. 2d at 191

---

[1] Taken as a whole, the majority opinion cannot be said to "conduct a fair and neutral evaluation of the merits of the parties' arguments in light of the state's laws and constitution." *Ferdon v. Wis. Patients Comp. Fund,* 2005 WI 125, ¶ 15, 284 Wis. 2d 573, 701 N.W.2d 440. The majority cannot hide the fact that its results-oriented decision is simply unprecedented and unsupported by Wisconsin case law or any case from another jurisdiction.

[2] Much of the majority's statement of facts implies that the defendants should have stopped manufacturing lead-based paint at one time or another and switched production to a non-lead alternative. *See* majority op., ¶¶ 41–52. However, Thomas's claims based on defective design have been dismissed and are not before the court. On July 24, 2000, the circuit court entered an order dismissing Thomas's "first and second causes of action . . . asserting claims based on strict liability and negligence, insofar as those claims are dependent upon a theory of design defect." This order has not been appealed. The claims before this court are predicated on the defendants' failure to warn of the dangers of their product. It is one thing to construe all disputed issues of material fact in a light most favorable to the nonmoving party on summary judgment; it is quite another to attempt to obscure the issues on appeal and "hide the ball" by

n.10 ("We . . . require it be shown that the defendant drug company reasonably could have contributed in some way to the actual injury."). Many of the majority's "facts" are simply irrelevant to the question of whether each individual defendant in this case can be said to have reasonably contributed to the plaintiff's actual injury.

¶ 182. Before discussing what Thomas can and cannot prove, a brief discussion of paint and the paint industry is in order.[3] All paints include two basic components: the pigment and the vehicle. Pigment, such as white lead carbonate, imparts hiding power and protects the surface area. The vehicle allows the pigment to be spread and adhere to the surface to which it is applied. The vehicle also includes a drier and thinner. The industry defendants are being sued in their capacity as producers of paint pigment, specifically, white lead carbonate.

¶ 183. White lead carbonate was used in the United States since colonial times. Over the years, white lead carbonate was produced by no less than six different processes. As such, there was no single formula for white lead carbonate and white lead carbonate could be comprised of three different chemical compounds.[4] These three compounds all differed in chemical composition, the amount of lead oxide they con-

inundating the reader with copious amounts of irrelevant factual material in order to shift the focus away from the dearth of legal authority supporting the opinion.

[3] Many of the following undisputed facts are taken from the affidavit of John A. Hetimann.

[4] "Basic lead carbonate" could be comprised of one of the following two formulas: (1) $4PbCO_3 2Pb(OH)_2 PbO$ or (2) $2PbCO_3 Pb(OH)_2$. The third formula, referred to as "normal lead carbonate," was $PbCO_3$.

331

tained, and pH value. Even with respect to a given formula, the amount of lead could vary by up to ten percent.

¶ 184.   These formulas, in addition to having different chemical compositions and different concentrations of lead oxide, also possessed significant differences in physical properties, including differences in:   specific gravity, bulking values, oil absorption, hiding power, and particle size and shape. These differences are crucial because:   "[d]epending on the hiding power of the pigment used, *the amount of lead pigment—and thus lead—could vary dramatically between batches* equally capable of covering a specified surface area." (Emphasis added.)

¶ 185.   Further, white lead carbonate was not sold generically; the market for white lead carbonate was extremely competitive. Each manufacturer possessed its own distinctive brand and label, and aggressively marketed its own version of white lead carbonate. For instance, "National Lead offered 'five different white-leads,' stating that '[e]ach of the five has its own special combination of paint-making characteristics.' " Importantly, "paints with the same label or brand could *vary significantly in lead content depending on the color or tint of the paint.*" (Emphasis added.)

¶ 186.   We also note that white lead carbonate was not a material used exclusively by the paint industry. White lead carbonate was routinely utilized in the ceramics and pottery business in the first half of the twentieth century. Thus, several major customers of firms that produced white lead carbonate were not involved in paint manufacturing.

¶ 187.   It is important to emphasize that the industry defendants are being sued in their capacity as manufacturers of white lead carbonate and not the

finished product, paint. "Until the late nineteenth century, paint manufacturers and dealers did not sell paints—they sold ingredients or 'mixings' which the purchasers then mixed to make their own paints. Prepared paints were viewed as inferior in quality, particularly because the early ready-mixed paints often used inferior ingredients."

¶ 188.   Thus, "painters in the early decades of the 1900s often had their own individual formulas or methods for mixing the paint that they thought was best, depending on what a specific job required." "Paint manufacturers, of which there were over 200 in the Milwaukee area alone between 1910 and 1971, decided which pigment types, combinations and amounts to use." "Large purchasers also sometimes had their own unique specifications." As such, in addition to the varying formulas and brands of pigments, "the *relative amounts and concentrations of the pigments varied* in different paint formulations." (Emphasis added.)

¶ 189.   Further, lead paint contained lead from sources other than the pigment, as some painters used lead "as a drier or catalyst rather than as a pigment." "Paint formulation was, and still is, a highly individual undertaking." In short, "there was no one type of 'white lead paint.' "

¶ 190.   We note that the record also indicates that the manufacturing market for white lead carbonate, in addition to being competitive, was quite fluid. Rather than generically referring to the "industry" as a whole, as does the majority, we examine each defendant's role in the production of white lead carbonate, as the plaintiff in this case is suing individual defendants and not an "industry."

¶ 191.   Sherwin-Williams began the production of white lead carbonate in 1910 when it opened a plant in

Chicago. In the 1930s, Sherwin-Williams shifted its emphasis to lithopone products. By 1937, almost none of Sherwin-Williams' interior paints contained white lead pigments. Sherwin-Williams ceased production of white lead carbonate by June of 1947.

¶ 192.    Atlantic Richfield is successor in interest to Anaconda Lead Products Company (ALPC) and International Smelting and Refining Company (IS&R). ALPC began operating in Chicago in 1919 and began selling lead pigment, including white lead carbonate, in 1920. In 1936, ALPC was dissolved and acquired by IS&R. IS&R operated the Chicago plant until 1946. Its production of white lead carbonate during the war was greatly reduced, and it was required to stop making white lead carbonate for months at a time. IS&R sold the Chicago facility to the Eagle-Picher Company in 1946. IS&R merged with ALPC in 1973, which was then acquired by Atlantic Richfield in 1977.

¶ 193.    The DuPont Company began manufacturing paint and paint pigments in 1917. DuPont manufactured and sold white lead carbonate from 1917 to 1924, although it did not sell white lead pigment to any other manufacturer. From 1917 onward, DuPont sold non-lead paint that competed with white lead pigments, including lithopone and titanium dioxide. DuPont did not have a retail store in Milwaukee and "never sold an interior trade sales paint that contained white lead pigment."

¶ 194.    The SCM Corporation is successor in interest to The Glidden Company (Old Glidden). Old Glidden was incorporated in 1917 and merged with SCM in 1967. SCM was subsequently acquired by another company and sold to a British company. Old Glidden purchased the Euston Company in Scranton, Pennsylvania, and began production of white lead carbonate in

1924. Old Glidden produced white lead carbonate until 1958, when it sold the Euston facility. During the 1920s and 1930s, Old Glidden was the world's largest supplier of lithopone and a large manufacturer of titanium dioxide. Although Old Glidden was a member of the Lead Industries Association from 1924 until 1958, it did not participate in the White Lead Promotion Campaign.[5]

¶ 195.  American Cyanamid is being sued based on its own production of white lead carbonate after 1971.

¶ 196.  The dates the aforementioned companies were involved in the production of white lead carbonate is particularly significant given the time frame at issue in this case. The two residences where Thomas allegedly ingested lead paint, supposedly containing white lead carbonate, were built in 1900 and 1905, respectively. Majority op., ¶¶ 7–8. Lead paint was banned by Wisconsin in 1980. *See* § 657u, ch. 221, Laws of 1979 (creating Wis. Stat. § 151.01 (1980)). Thus, many of the defendants in this case were not participants in the white lead carbonate market for significant periods during this time frame. None of the above companies were manufacturing white lead carbonate when the houses in which Thomas resided were built. Almost all of the above companies had ceased production of white lead carbonate by 1950, approximately 30 years before the use of lead paint was banned in Wisconsin. These facts are of critical importance when considered in context of the other facts in this case.

[5] We note that the record establishes that defendant ConAgra was never a member of the Lead Industries Association.

¶ 197. In his amended complaint, Thomas admitted that he "is unable to identify the specific manufacturer, supplier and/or distributor of the Lead present in the residences in which he was exposed." Moreover, Thomas admitted in his response to the defendants' interrogatories that he has no knowledge of when lead-based paint was applied to the houses where he allegedly ingested the paint, what brand of paint was applied, or who applied the paint. Thomas admits that one of the residences contained "18 distinct layers of paint of which 16 contained lead pigment. Only the first and eighth layers did not contain lead." Pet'r Reply Br. at 9. As will be demonstrated below, these facts are of critical importance and render this case completely distinguishable from *Collins*.

## II

¶ 198. In addition to downplaying the significant facts of this case, the majority mischaracterizes the arguments of the defendants and engages in an unnecessary discussion of Article I, Section 9 of the Wisconsin Constitution. The majority states that with regard to Article I, Section 9, "[t]he import of [the Pigment Manufacturers' argument] is that where recovery has been had against one tortfeasor, all other tortfeasors are necessarily absolved." Majority op., ¶ 120. Further, the majority states that "[w]e have serious concerns with the Pigment Manufacturers' attempt to displace all of the blame for lead poisoning from its white lead carbonate pigment on landlords and what effect that will have on the adequacy of the plaintiff's remedy." Majority op., ¶ 115. This is a seemingly inaccurate characterization of the defendants' argument regarding Article I, Section 9, and serves only as a straw man for

the majority to knock down and open the door to its expansive reading of Article I, Section 9.

¶ 199.   Part of the rationale of the *Collins* court for adopting its variant of market share liability was that the plaintiff would be left without a remedy absent some theory of collective liability. *See Collins,* 116 Wis. 2d at 182. The defendants in this case, contrary to the majority's characterization, do not argue that Article I, Section 9 *absolves* them from liability. Rather, they argue "[t]he 'Right to Remedy' Clause of the Wisconsin Constitution *Does Not Require* Extension of *Collins*." Resp't Br. at 34 (emphasis added).

> Article I, § 9 was material to the analysis in *Collins* only because the Court concluded that Therese Collins was entitled to a remedy at law for her injuries, and unless existing law were modified she would have no remedy against anyone. *This case does not present comparable justification for modifying existing law, because Thomas had a remedy for his injuries against the landlords.*

Resp. Br. at 36 (emphasis added). Nowhere do the defendants argue that this constitutional provision is "a vehicle to defeat the plaintiff's right to recovery for wrongs committed by one simply because some recovery has already been had against another." Majority op., ¶ 123.

¶ 200.   The defendants simply contend that because the plaintiff in this case has had a remedy against the landlords, *Collins'* rationale concerning Article I, Section 9 does not apply, and thus, there is no comparable justification for this court to fashion a remedy to allow Thomas to recover. The defendants do not argue that they should be "absolved" from liability because Thomas has recovered from his landlords. They merely state that because he has had such a recovery, the

rationale of *Collins* does not apply, and Thomas should have to proceed under the normal rules of causation in tort law. Seeking to be judged under the normal tort rules of liability hardly equates to asking this court to use a constitutional provision to shield parties from liability.

¶ 201. Rather than take the defendant's arguments at face value, the majority continues its pattern of rushing to judgment and labeling the defendants in this case as wrongdoers by mischaracterizing their argument to the level of absurdity. In doing so, it unnecessarily introduces confusion into our Article I, Section 9 jurisprudence by insinuating that this provision requires the court to fashion a recovery for Thomas because he has suffered two separate wrongs.

¶ 202. Article I, Section 9 of the Wisconsin Constitution provides:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

¶ 203. The majority ignores that in *Aicher v. Wisconsin Patients Compensation Fund*, 2000 WI 98, ¶ 43, 237 Wis. 2d 99, 613 N.W.2d 849, this court recognized that although *"[i]t is possible to mine the pronouncements of Wisconsin courts for evidence that art. I, § 9 creates rights, or that it authorizes courts to fashion rights[,] . . . this court has stated that art. I., § 9 confers no legal rights."* (citing *Roberta Jo W. v. Leroy W.*, 218 Wis. 2d 225, 238, 578 N.W.2d 185 (1998); *Tomczak v. Bailey*, 218 Wis. 2d 245, 262, 578 N.W.2d 166 (1998); *Makos v. Wis. Masons Health Care Fund*, 211

Wis. 2d 41, 79, 564 N.W.2d 662 (1997)(Bradley, J., dissenting); *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 189–90, 290 N.W.2d 276 (1980)(emphasis added)).[6] "Rather, art. I, § 9 applies only when a prospective litigant seeks a remedy for an already existing right." *Id.* In other words, "[t]he right-to-remedy clause thus preserves the right 'to obtain justice on the basis of the law as it in fact exists.' " *Id.* (quoting *Mulder*, 95 Wis. 2d at 189).

¶ 204.    This understanding of Article I, Section 9, as expressed in *Aicher*, comports with how the provision has been understood since the time of Wisconsin's statehood. In *McCoy v. Kenosha County*, 195 Wis. 273, 276, 218 N.W. 348 (1928), this court rejected the plaintiff's contention that through Article I, Section 9 "there is secured by our state constitution to persons such as the plaintiff infant and the plaintiff parent, absolute rights to recover against any one causing by negligence such respective injuries." Further, we rejected the contention that this provision of our constitution

> was a gift of, a creation of, or a recognition of rights to a certain remedy for all injuries or wrongs to one's person, property, or character *instead of being merely a solemn assurance that, conformably to the laws, a person should have his remedy for such wrongs or injuries as were, at the time of its adoption, recognized by the common law*, or should thereafter be recognized, as permitting recovery in actions at law or proceedings in equity.

*Id.* at 276–77 (emphasis added).

---

[6] To the extent the discussion of Article I, Section 9 in *Aicher v. Wisconsin Patients Compensation Fund*, 2000 WI 98, ¶ 43, 237 Wis. 2d 99, 613 N.W.2d 849, is contrary to the discussion of that provision in *Collins*, *Aicher* is the more recent case and therefore should control.

¶ 205.   The court further recognized that Article I, Section 9 was not intended to remove the common-law limitations on recovery in tort:

> To hold, as now argued by appellants, that there is shown the desire by the founders of this common-wealth, through the adoption of its constitution, to sweep away all the old doctrines and previously recognized limitations upon the so-called natural rights of the individual, as such limitations had been found in the old world and in this country, prior to its adoption, would indeed effect quite a revolution in our present concepts of the rights and obligations of individuals to each other . . . .

*Id.* at 277. In other words, to interpret Article I, Section 9 in such a manner so as to guarantee a right of recovery anytime a plaintiff cannot satisfy the elements of his cause of action would essentially open the door for the abolition of all limitations on tort recovery.

¶ 206.   Thus, Article I, Section 9 does not compel the court to allow recovery in any particular case or require a court to disregard traditional common-law limits on recovery in tort:

> We started off in our legislative and judicial history with a very definite attitude that neither this particular article nor any other of our constitution had any such a sweeping away of and radical departure from many common-law principles and rules, many important ones of which . . . were more or less denials of or limitations upon what would be within the broad and general field embraced in the term "natural and proclaimed rights of the individual to life, liberty, and security in person, property, and character"—such, for instance, as the defense of absolute or conditional privilege in slander or libel; instances of injury to feelings alone; wrongs between parent and child; mere threats; the defenses in

actions for malicious prosecution; the doctrines of contributory negligence in personal injury actions as well as in master and servant cases . . . . In all of the above situations, however severe the injuries might actually have been to person, property, or character, organized society had for a long time and has continued to refuse to recognize rights to legal redress.

*Id.* at 278.

¶ 207. The phrase "conformably to the laws" in Article I, Section 9 relates only "to a recognized, long established system of laws existing in the several states adopting the constitution . . . ." *Id.* at 277. In other words, the phrase refers to the law *as it exists,* rather than "an abstract justice as conceived of by the judge . . . ." *Dep't of Agric. v. McCarthy,* 238 Wis. 258, 270, 299 N.W. 58 (1941). Simply put, this court has repeatedly recognized that Article I, Section 9 was never intended to allow this court to jettison the common-law limitations on recovery anytime a particular plaintiff was unable to satisfy those requirements. Interpreting Article I, Section 9 in so broad a fashion would render our legal system standardless and convert it into an ad hoc system of liability where the rules are subject to change in every case.

¶ 208. As will be more fully discussed below, by invoking Article I, Section 9 to expand *Collins* well beyond the unique circumstances of that case, the majority has "effect[ed] quite a revolution in our present concepts of the rights and obligations of individuals to each other[,]" *McCoy,* 195 Wis. at 277, and embarked on a "radical departure from many common-law principles and rules" that serve as limitations upon a plaintiff's right to recover in tort. *Id.* at 278.

## III

¶ 209. The majority concludes that the risk-contribution theory of liability adopted in *Collins* should be extended to lead pigment manufacturers, majority op. ¶ 3; however, there are several substantial factual distinctions between this case and *Collins* that render application of this theory completely inappropriate. These distinctions include: 1) a much longer time frame for when the product alleged to have caused injury may have been manufactured and distributed; 2) the plaintiff's inability to prove what product he ingested; 3) the lack of a signature injury associated with the product alleged to have caused injury; 4) the defendants' lack of exclusive control over the risk posed by the product; 5) a raw material utilized in an unintended fashion rather than a finished product utilized for its intended purpose; and 6) the lack of fungibility between variants of the product alleged to have caused injury. Because of these factual distinctions, applying *Collins* to the facts of this case results in a de facto adoption of a theory explicitly rejected by *Collins* and an unjustified and unprecedented departure from traditional tort law principles of causation.

¶ 210. The *Collins* court created a unique theory of liability for plaintiffs who were injured as a result of exposure to the drug DES in utero. *Collins,* 116 Wis. 2d at 177. Essentially, the theory articulated in *Collins* relaxed the plaintiff's burden of proof in regard to causation; as such, it allowed DES plaintiffs to proceed with an underlying tort claim when they could not prove that any particular defendant's tortious conduct was the proximate cause of their injury. *See id.* at 193–94. Instead, the plaintiff was required to "establish by a preponderance of the evidence that a defendant produced or marketed the *type* (e.g., color, shape, mark-

ings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother." *Id.* at 194.[7] However, even under the relaxed causation standards it announced, the *Collins* court still required that the plaintiff prove "that the defendant drug company reasonably could have contributed in some way to the actual injury." *Collins,* 116 Wis. 2d at 191 n.10. By applying *Collins* to the facts of this case, the majority virtually eliminates this essential requirement. In light of the substantial factual distinctions set forth below, it simply cannot be said that the defendants in this case could have reasonably contributed to Thomas's injuries. The majority can "embrace" this requirement from *Collins* all it wants, majority op., ¶ 135 n.43, but, in the end, the majority never explains how Thomas can prove, under *any* interpretation of the facts, that the white lead carbonate manufacturers could have reasonably contributed to his injury. By applying risk-contribution theory to this case, it is clear that the majority opinion greatly expands *Collins* beyond its intended scope and will result in absolute liability for manufacturers of raw materials by creating an irrebuttable presumption of causation.

---

[7] I recognize that the *Collins* court also stated that where the plaintiff could not prove what type of DES the plaintiff's mother ingested, "the plaintiff need only allege and prove that the defendant drug company produced or marketed the drug DES for use in preventing miscarriages during pregnancy." *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 193–94, 342 N.W.2d 37 (1984). However, the court also *explicitly* rejected a theory that would have based liability solely on the fact that the defendants manufactured the drug in question, stating: "[W]e do not agree that this is a sufficient basis in itself for liability." *Id.* at 191 n.10. As the court explained: "We still require it be shown that the defendant drug company reasonably could have contributed in some way to the actual injury." *Id.*

¶ 211.  The *Collins* court relaxed the plaintiff's burden of proof because she was "unable to identify the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time." *Id.* at 177. In particular, the DES plaintiff could not specifically locate the manufacturer of the particular DES drug ingested by her mother because DES was produced in generic form and DES variants were fungible and possessed a chemically identical formula. *Id.* at 180. "[O]ften pharmacists would fill DES prescriptions from whatever stock they had on hand, whether or not a particular brand was specified in the prescription." *Id.* Furthermore, "as many as three hundred drug companies produced or marketed DES during the twenty-four years DES was on the market, with different companies entering and leaving the market throughout this period," and these companies may not have kept or been able to locate the pertinent records at to what type of DES they produced. *Id.*

¶ 212.  Due to this unique factual situation, the *Collins* court "chose to adapt, rather than adopt, the market share theory[,]" first approved by the California Supreme Court in *Sindell v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980). 2 David G. Owen et al., *Madden & Owen on Products Liability* § 24:7, at 665 (3d ed. 2000) [hereinafter *Madden & Owen*].[8] The *Collins* court formulated a slightly altered theory of market share

---

[8] "The *Sindell* [*v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980),] approach of market share liability has been recognized favorably in some jurisdictions [but] only for DES cases. Most jurisdictions have rejected it in all cases, including those involving DES." 2 David G. Owen et al., *Madden & Owen on Products Liability* § 24:7, at 661 (3d ed. 2000) [hereinafter *Madden & Owen*] (citing *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324 (Ill.

liability, called the risk-contribution theory. *Collins,* 116 Wis. 2d at 191 n.10.

¶ 213. Importantly, the *Collins* court explicitly rejected a broader theory of risk contribution that would have held manufacturers of DES liable without regard to whether they produced the product during the nine months the mothers were exposed to it. *See Collins,* 116 Wis. 2d at 191 n.10. This theory, proposed by Professor Glen O. Robinson, contended that "the plaintiff's damages should be apportioned 'among all defendants that created unreasonable risks according to the magnitude of the risks they created.' " *Id.* (quoting Glen O. Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases,* 68 Va. L. Rev. 713, 755 (1982)). The *Collins* court, although adopting a form of risk-contribution theory, rejected Professor Robinson's broad theory of liability:

> Although we find Robinson's "risk contribution" theory sound to the extent it recognizes that all DES drug companies contributed in some measure to the risk of injury, *we do not agree that this is a sufficient basis in itself for liability. We still require it be shown that the defendant drug company reasonably could have contributed in some way to the actual injury.*

*Id.* (emphasis added). In other words, *Collins* held that it

---

1990); *Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67 (Iowa 1986); *Sutowski v. Eli Lilly & Co.,* 696 N.W.2d 187 (Ohio 1998); *Morton v. Abbott Labs.,* 538 F. Supp. 593 (M.D. Fla. 1982); *Ryan v. Eli Lilly & Co.,* 514 F. Supp. 1004 (D.S.C. 1981)). *See also* Richard E. Kaye, Annotation, *"Concert of Activity," "Alternate Liability," "Enterprise Liability," or Similar Theory as Basis for Imposing Liability Upon One or More Manufacturers of Defective Uniform Product, in Absence of Identification of Manufacturer of Precise Unit or Batch Causing Injury,* 63 A.L.R. 5th 195, 225–239, 260–74 (1998) (collecting cases).

is not enough for the plaintiff to prove that the defendant contributed to the *creation of the risk* to the general public; the plaintiff must further prove that the defendant reasonably could have contributed to the *actual injury*.[9]

¶ 214. The majority has completely disregarded this limiting language of *Collins* in its analysis of Thomas's case. *See* majority op., ¶ 135 ("[T]he record easily establishes the Pigment Manufacturers' culpability for, at a minimum, contributing to creating a risk of injury to the public."). In so doing, the majority has expanded the *Collins* theory far beyond its original intent, and its opinion is tantamount to applying the theory of risk contribution that *Collins* explicitly rejected.[10]

---

[9] "Notably, in *Collins,* the Wisconsin Supreme Court explained that it would not adopt a risk contribution theory which would have imposed liability solely upon the DES defendants' participation in the creation of the risk of injury . . . ." *Hymowitz v. Eli Lilly and Co.,* 539 N.E.2d 1069, 1082 (N.Y. 1989) (Mollen, J., concurring).

[10] Numerous courts in various jurisdictions have disagreed with the reasoning of *Collins,* 116 Wis. 2d 166. *See, e.g., Smith,* 560 N.E.2d at 333–34 (Ill. 1990); *Mulcahy,* 386 N.W.2d 67; *Hymowitz,* 539 N.E.2d at 1077–78; *Gullotta v. Eli Lilly and Co.,* No. Civ. H-82–400 1985, WL 502793 (D. Conn. May 9, 1985) (rejecting *Collins* because the actual DES producer may not have been named as a defendant, [] the defendants have no greater knowledge concerning the identity of the manufacturer who produced the DES ingested by the plaintiff's mother and [] there has been no showing of negligent conduct by each defendant towards the plaintiff); *Zafft v. Eli Lilly Co.,* 676 S.W.2d 241 (Mo. 1984); 63 Am. Jur. 2d *Products Liability* 194 (1996) (noting that the opportunity to adopt the risk contribution theory has been declined on the grounds that the theory has the potential of producing injustices through delayed recoveries and inconsistent results).

¶ 215. The *Collins* court noted that its "method of recovery could apply in situations which are factually similar to the DES cases." *Id.* at 191. However, there are several substantial factual distinctions between this case and *Collins* that make the majority's extension of *Collins* a drastic departure from both the original theory of liability articulated by this court and the great weight of authority in other jurisdictions. *See Brenner v. American Cyanamid Co.*, 263 A.D.2d 165, 169 (N.Y. App. Div. 1999) (citing the following cases that have also "refused to apply the market share theory to lead poisoning cases[:]" *Jefferson v. Lead Indus. Ass'n*, 930 F. Supp. 241 (E.D. La. 1996), *aff'd.* 106 F.3d 1245 (5th Cir. 1997); *Santiago v. Sherwin Williams Co.*, 3 F.3d 546 (1st Cir. 1993); *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112 (3d Cir. 1993); *Hurt v. Philadelphia Hous. Auth.*, 806 F. Supp. 515 (E.D. Pa. 1992); *Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169 (Pa. 1997)). *See also,* Richard E. Kaye, Annotation, *"Concert of Activity," "Alternate Liability," "Enterprise Liability," or Similar Theory as Basis for Imposing Liability Upon One or More Manufacturers of Defective Uniform Product, in Absence of Identification of Manufacturer of Precise Unit or Batch Causing Injury,* 63 A.L.R. 5th 195, 269–74 (1998) (collecting cases). To invoke risk-contribution theory under a case so factually distinct from *Collins* is not simply a "straight application" of *Collins,* majority op., ¶ 163 n.51; rather, in light of the following substantial factual distinctions, the majority opinion clearly *extends Collins* beyond the facts of that case.

¶ 216. The first major distinction between *Collins* and this case is that the time frame of *Collins* was dramatically narrower than the time frame in this case. *Collins* involved a limited nine-month time frame be-

347

tween conception and birth when the plaintiff's mother took the DES that caused her injury. *Collins,* 116 Wis. 2d at 174. The plaintiff knew when her mother ingested the drug and thus when the product was sold. *See id.* Additionally, DES was produced and marketed for 24 years. *See id.* at 179.

¶ 217.   In contrast, this case concerns a substantially greater time frame of 75 to 80 years. This time frame runs from the years the two houses at issue were built—1900 and 1905—to the year Wisconsin banned the use of lead paint—1980. Each defendant participated in the white lead carbonate market during different periods of time. However, Thomas has no idea when the alleged injury-causing paint may have been applied to the interior of the two houses in which he lived from 1990 to 1994. The plaintiff's inability to pinpoint a workable timeframe during which the injury causing paint was applied is further exacerbated by the fact that one of the houses contained 18 distinct layers of paint, some of which did not even contain lead.

¶ 218.   As one learned products liability treatise aptly notes: "The greater the span of time within which the potentially injury-causing product was sold, the less suited market share liability will be." *Madden & Owen* § 24:7, at 663. Likewise, the Pennsylvania Supreme Court, in a factually similar case, noted:

> The difficulty in applying market share liability where such an expansive relevant time period as one hundred years is at issue is that entities who could not have been the producers of the lead paint which injured [the plaintiff] would almost assuredly be held liable. Over the one hundred year period at issue, several of the pigment manufacturers entered and left the lead paint market. *Thus, application of the market share theory to this situation would virtually ensure that*

*certain pigment manufacturers would be held liable where they could not have been a potential tortfeasor[.]*

*Skipworth,* 690 A.2d at 173 (emphasis added).

¶ 219.  In *Santiago,* 3 F.3d at 550, the First Circuit refused to apply market share theory of liability in a lead paint case, in part, because of "plaintiff's inability to pinpoint with any degree of precision the time the injury-causing paint was applied to the house." The plaintiff brought an action for various claims against the "manufacturer[s] and marketer[s of] all, or virtually all, of the white lead used in the lead paints sold in the United States between 1917 and 1970." *Id.* at 547. She alleged that she had ingested lead paint applied to the interior of her house at various times over this 53–year period. *Id.* The First Circuit affirmed the district court's grant of summary judgment to the defendants, reasoning in part:

> [S]everal of the defendants were not in the white lead pigment market at all for significant portions of the period between 1917 and 1970, and therefore may well not have been market suppliers at the time the injury-causing paint was applied to the walls of the plaintiff's home. This, of course, raises a substantial possibility that these defendants not only could be held liable for more harm than they actually caused, but also could be held liable when they did not, in fact, cause any harm to plaintiff at all.

*Id.* at 551.

¶ 220.  The reasoning of *Skipworth* and *Santiago* is equally applicable to this case. As noted in Section I, many of the defendants in this case were not participants in the white lead carbonate market for significant periods of time from 1900 to 1980. For instance, Sherwin-Williams only produced white lead carbonate

for a period of 37 years and American Cyanamid did not produce lead pigment until after 1971. Significantly, DuPont manufactured white lead carbonate for a total of *seven years.*

¶ 221.  If the paint Thomas ingested was applied before the 1920s, several of the defendants in this case could not have possibly produced the lead pigment that allegedly caused his injuries. Likewise, several defendants would have complete defenses if the paint Thomas ingested was applied in the latter portion of the twentieth century. However, Thomas has no idea when the paint he ingested was applied to his residences. The defendants are in no better position than Thomas to acquire this information. Liability for a company like DuPont, which produced the allegedly offending product for a mere fraction of the relevant time frame, can be based only on pure speculation and conjecture that its product caused Thomas's injury.

¶ 222.  Thomas's inability to identify a narrow time frame to apply the *Collins* risk-contribution theory is dispositive because without a definitive time frame, the defendants will be unable to prove that they did not produce the injury-causing product in question. *Collins* specifically allowed a defendant to exculpate itself by proving "that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES." *Collins,* 116 Wis. 2d at 198. Here, the plaintiff cannot limit the applicable time frame to any reasonable or workable period for the defendants. In essence, the majority creates an irrebuttable presumption of causation in this case and extends *Collins* to a point where every paint pigment manufacturer that produced white lead carbonate at one time or another is absolutely liable because there is no realistic opportunity for these

manufacturers to prove that they did not make the product that injured the plaintiff.[11] In the words of *Collins,* Thomas cannot demonstrate that the paint manufacturers "reasonably could have contributed in some way to the actual injury." *Id.* at 191 n.10. The majority's opinion is so extreme that it essentially revives the broad risk-contribution theory that *Collins* expressly rejected. *See id.*

¶ 223. A second vital distinction between this case and *Collins* is that Thomas cannot prove that he ingested white lead carbonate.[12] One of the prerequisites to the utilization of the *Collins* risk-contribution theory was proof "that the plaintiff's mother took DES." *Collins,* 116 Wis. 2d at 193. This fact alone should preclude extension of *Collins* because Thomas cannot demonstrate to a reasonable degree of scientific certainty what product allegedly caused his injury. Thomas is not suing lead paint manufacturers; instead, the defendants are being sued for manufacturing raw mate-

[11] *See Hymowitz,* 539 N.E.2d at 1082 (noting that none of the jurisdictions that adopted various theories of collective liability for DES cases adopted a theory wherein the defendants were unable to exculpate themselves, *"thereby recognizing that to preclude exculpation would directly and unnecessarily contravene common-law tort principles of causation"*) (emphasis added) (Mollen, J., concurring).

[12] Contrary to the assertions of the majority opinion, majority op., ¶ 11 n.4, this issue was explicitly addressed by the defendants in their submissions to this court. Resp'ts Br. at 27–29. It is Thomas who has not addressed this issue. Further, contrary to the assertion of the majority, majority op., ¶ 11 n.4, regardless of whether the circuit court ruled on this issue, it is our duty to sustain the circuit court's decision if it was correct and an alternate theory or reasoning not adopted by the circuit court supports its decision. *Liberty Trucking Co. v. DILHR,* 57 Wis. 2d 331, 342, 204 N.W.2d 457 (1973).

351

rials, white lead carbonate pigments, later incorporated into paints. While some defendants also produced lead paint, those that did are only being sued in their capacity as manufactures of this component product. In this case, Thomas simply cannot prove that white lead carbonate, as opposed to some other type of white lead pigment, or other leaded ingredient of paint, caused his injuries. While he may be able to prove that he ingested lead paint, he has not presented proof sufficient to overcome summary judgment that his injuries are attributable to the product for which the defendants are being sued for producing.

¶ 224.  Ultimately, all Thomas can prove is that he has symptoms of lead poisoning and that white lead carbonate was used in some types of white lead paint. Although the defendants conceded, for purposes of their summary judgment motion, that Thomas "can prove that he was injured by lead ingestion [and] that his source of lead ingestion was lead paint[,]" they *never* conceded that Thomas's injuries were caused by white lead carbonate pigment.[13] To the contrary, they clearly argued that Thomas "cannot prove that he ingested white lead carbonate and not some other form of lead pigment." Again, I emphasize that the defendants are being sued in their capacity as producers of white lead carbonate and not simply manufacturers of lead paint. The majority conveniently ignores Thomas's own admissions regarding his lack of proof with regard to the type of lead product that caused his injuries. For example, in their second set of interrogatories, the defendants inquired:

---

[13] Thus, the majority is simply wrong to imply that the defendants conceded Thomas can prove he was injured by white lead carbonate. *See* majority op., ¶ 11 n.4.

> State whether you can identify by chemical for-
> mula, name, or composition the particular type or types
> of lead pigment (e.g., white lead carbonate) contained
> in the paint in that building or other property, and if
> you are able to do so, identify each particular type or
> types of lead pigment present in that building or other
> property.

Thomas answered: "No." The defendants further in-
quired:

> State whether you know the chemical formula,
> name, or composition of the particular type or types of
> lead pigment (e.g., white lead carbonate) contained in
> the paint Steven Thomas is claimed to have ingested or
> inhaled at that building or other property, and if you do
> know, specify each type or types of lead pigment you
> claim he ingested.

Thomas answered: "No."

¶ 225.  The majority relies on the testimony of two
of the plaintiff's experts:  Robert Dragen, an electron
microscopist who analyzed paint samples from
Thomas's residences; and Dr. Mushak, a toxicologist.
Majority op., ¶ 12. According to the majority, this
testimony is sufficient to create an issue of fact as to
whether Thomas ingested white lead carbonate because
Mr. Dragen's analysis found no trace of sulfur or chro-
mium in the paint samples and lead sulfate, chromate,
and carbonate "were the essential lead pigments used
for residences." Majority op., ¶ 12. The majority notes
Dr. Mushak testified that based on this evidence and a
process of elimination analysis, the houses where Tho-
mas lived contained white lead carbonate. *Id.*

¶ 226.  Reliance on this testimony is problematic
for several reasons. First, Mr. Dragen did not "render
any kind of opinion regarding any chemical compounds

in the paints [he] analyzed[.]" Second, Mr. Dragen was not able to offer any opinions as to when the paint he analyzed was applied. *Id.*

¶ 227.  Dr. Mushak's testimony is also highly problematic. Dr. Mushak's supplementary affidavit concluded, based on Mr. Dragen's analysis, that white lead carbonate was "the only likely" lead pigment Thomas ingested. This conclusion was based on the following reasoning:  "the absence of detectable sulfur and chromium (0.05%) conclusively rules out any use of lead sulfate or lead chromate as lead pigments in these layers and further rules in basic lead carbonate." This reasoning was based on the assumption that white lead carbonate "was the overwhelming form of lead in [interior painting] pigments."

¶ 228.  However, this final assumption was based on testimony concerning the market share of various white lead pigments that one Dr. Lawrence White provided in *Brenner*, 263 A.D.2d 165. However, the court in *Brenner* rejected this form of analysis noting:  "Plaintiffs' own expert agreed that white lead carbonate accounts for only approximately 80% of the lead in all lead pigments used for interior paints between 1926 and 1955. The remaining 20% of the lead pigments found in interior paints may have been manufactured by defendants not named in this litigation." *Id.* at 171.

¶ 229.  Significantly, the record reflects that a variety of leaded pigments were used in interior painting. These included:  "basic lead carbonate[,] basic lead sulfate, . . . red lead, lead chromates, leaded zinc oxides, lead silicates, lead titanates, [and] litharge . . . ." Further, as previously noted, some painters utilized mixtures of paint that contained lead-free pigment but contained leaded dyers or thinners. Thus, the possible

sources of lead in the paint Mr. Dragen analyzed were not limited to lead carbonate, sulfate, or chromate.

¶ 230.   Dr. Mushak also conceded that Dr. White's market studies were limited only to the years *1937–1945*. Here, the relevant time period is from the time the houses in which Thomas lived were constructed—1900 and 1905—until lead paint was banned—1980—roughly 80 years. Finally, when pressed at his deposition, Dr. Mushak admitted that he could not say "whether or not any of the lead that was in Steven Thomas was caused by some other form of lead other than white lead carbonate[.]" As he explained:   "All I can go with is if ninety-nine percent of typical interior paints were basic lead carbonates and Steven Thomas shows up eating interior lead paint . . . I would say that . . . he probably ingested basic lead carbonate."

¶ 231.   Numerous courts have held that this type of process of elimination theory of causation using generalized statistics is not sufficient as a matter of law to create an issue of fact as to what type of product caused the plaintiff's injury, especially when the analysis fails to account for other possible sources of the injury. "[G]eneral statistics do not establish causation in a specific case." *Doe v. United States,* 976 F.2d 1071, 1087 (7th Cir. 1992). In *Jandrt v. Jerome Foods, Inc.,* 227 Wis. 2d 531, 566–67, 597 N.W.2d 744 (1999), this court accepted the circuit court's conclusion that a similar process of elimination theory of causation "left" exposure to certain chemicals as the actual cause of an injury " 'simply wrong as a matter of science and logic.' "

¶ 232.   Similarly, in *Smith v. Rapid Transit, Inc.,* 58 N.E.2d 754 (Mass. 1945), the Supreme Judicial Court of Massachusetts held that the plaintiff had failed to create a jury question as to the ownership of

the bus that injured her by relying on the fact that the defendant operated the only bus franchise on the street in question:

> While the defendant had the sole franchise for operating a bus on Main Street, Winthrop, this did not preclude private or chartered buses from using this street; the bus in question could very well have been one operated by someone other than the defendant. . . . [I]t is 'not enough that mathematically the chances somewhat favor a proposition to be proved; for example, the fact that colored automobiles made in the current year outnumber black ones would not warrant a finding that an undescribed automobile of the current year is colored and not black, nor would the fact that only a minority of men die of cancer warrant a finding that a particular man did not die of cancer.' *The most that can be said of the evidence in the instant case is that perhaps the mathematical chances somewhat favor the proposition* that a bus of the defendant caused the accident.

*Id.* at 755 (quoted source omitted)(emphasis added).

¶ 233. In *Diversey Corp. v. Diversey Corp.*, 742 So.2d 1250, 1254 (Ala. 1999), the court ruled that "because [the plaintiff's expert] could not testify that a specific product caused [the plaintiff's] injuries, his testimony was mere conjecture and therefore not sufficient to create a genuine issue of material fact." Likewise, here, Mr. Dragen's analysis did not find evidence of white lead carbonate; it merely excluded two other types of lead pigments. As noted, the record indicates that there were other lead pigments in production for use in interior painting other than carbonates, sulfates, chromates, including lead silicate, lead titanates, and litharge. Furthermore, the record indicates that individual painters often added leaded thinners or dyers to non-leaded pigments. Thomas's expert's statistical pro-

cess of elimination simply fails to account for these other alternative sources of lead in paint. As such, it is mere speculation or conjecture to contend that white lead carbonate caused Thomas's injuries. *Id.* (" ' "Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." ' ") (quoting *Southern Ry. Co. v. Dickeson,* 100 So. 665, 669 (Ala. 1924) (quoted source omitted)).

¶ 234.    Similarly, in *Guenther v. Armstrong Rubber Co.,* 406 F.2d 1315, 1318 (3d Cir. 1969), the court held that proof that the defendant made up to 80 percent of the tires sold in the store where the plaintiff worked and was injured was not sufficient to establish that the defendant made the tire that harmed the plaintiff. The court ruled:    "[T]here was no justification for allowing plaintiff's case on that so-called probability hypothesis to go to the jury. The latter's verdict would at best be a guess. It could not be reasonably supported." *Id. See also* 63 Am. Jur. 2d *Products Liability* § 50 (1996) ("A verdict with respect to proximate causation may not be based on mere theory, conjecture, speculation, or surmise. Thus, *where the evidence reveals several possible causes of the accident, it is improper to allow the jury to guess which cause might have been the proximate cause.*")(emphasis added).

¶ 235.    Thus, the fact that Thomas's expert was able to exclude two types of pigment from the paint samples provided to him is simply not legally sufficient to establish that white lead carbonate was the cause of Thomas's injuries, as there were other lead pigments and ingredients used in interior paint that could have caused Thomas's injuries and Dr. Mushak testified that

357

he could not say whether the lead found in Thomas was from some form of lead other than white lead carbonate. Thomas's experts did not find any scientific evidence that the paint at his residences contained white lead carbonate, and Thomas himself admitted that he is unable to identify white lead carbonate as the cause of his injuries in his answers to the defendants' interrogatories.

¶ 236. As such, unlike *Collins,* where the plaintiff could not establish the identity of the manufacturer of the drug her mother had taken, here, Thomas cannot prove the identity of the manufacturer *or* the identity of the product. That Thomas cannot prove he was injured by white lead carbonate is not a trivial point; the defendants are being sued in their capacity as producers of white lead carbonate. *Collins* itself required proof "that DES caused the plaintiff's subsequent injuries." *Collins,* 116 Wis. 2d at 193. To hold multiple defendants liable for a product they all produced when the plaintiff cannot identify which one of them produced the specific product that injured him is one thing; it is quite another to hold multiple defendants liable for a product they all produced when the plaintiff cannot even establish that product caused his injuries.

¶ 237. In addition, another related distinction exists between this case and *Collins.* Unlike DES, white lead carbonate does not produce a "signature injury." DES plaintiffs suffered from a specific, rare form of cancer strongly associated with maternal ingestion of DES. *Collins,* 116 Wis. 2d at 179. In other words, "the plaintiffs' injuries were uniquely traceable to a single product[.]" Randy S. Parlee, *Overcoming the Identification Burden in DES Litigation: The Market Share Liability Theory,* 65 Marq. L. Rev. 609, 635 (1982).

¶ 238. In contrast, there is no such signature injury in lead poisoning cases. Thomas's injuries could have occurred as a result of the ingestion of lead from a wide variety of sources. *See Brenner*, 263 A.D.2d at 173 ("Plaintiffs allege that [the child] sustained injuries to his central nervous system, including difficulties with concentration, abstract thinking, and comprehension. But [his] injuries could have been caused by some source other than lead, or even by a source of lead other than lead-based paint.").

¶ 239. Contrary to the majority's assertion, majority op. ¶¶ 155–57, this lack of a signature injury should be dispositive because as noted, the second prerequisite for utilization of the *Collins* risk-contribution theory was that the plaintiff had to prove "that DES caused the plaintiff's subsequent injuries." *Collins*, 116 Wis. 2d at 193. In this case, Thomas simply cannot prove that white lead carbonate, as opposed to another lead pigment or another source of lead in paint, caused his injuries.

¶ 240. Even assuming, arguendo, that Thomas can prove he was injured by white lead carbonate, other important distinctions exist between this case and *Collins*. For instance, unlike *Collins*, this case does not involve a finished product over which the defendants had exclusive control that was utilized for its intended purpose. In *Collins*, the manufacturers sought FDA approval of DES and marketed the drug directly to consumers. *See id.* at 191. Except for differing doses, the DES did not change between the time of manufacture and consumption. As such, the manufacturers had exclusive control over the risk their product posed to the public. In contrast, the "differing formulae of lead paint has a direct bearing on how much damage a lead paint manufacturer's product would cause." *Skipworth*, 690 A.2d at 173. As the *Brenner* court noted:

[T]he manufacturers of white lead carbonate did not have exclusive control of the risk. The paint manufacturers, rather than the lead pigment manufactures, decided which pigments to use and in what quantities. In addition, owners and landlords of residences had control of some of the risk posed by lead-based paint, which becomes hazardous when it peels and flakes and is then ingested or the dust inhaled. Owners and landlords could control such risk by proper maintenance of their property. Furthermore, manufacturers of DES intended that their product be ingested by pregnant women to prevent miscarriages. In contrast, white lead carbonate or lead-based paint is not intended for ingestion and obviously was not marketed for such a use.

*Brenner,* 263 A.D.2d at 172–73.

¶ 241.   The plaintiff here is suing the manufacturers of an ingredient in a finished product that caused injury because it was not utilized for its intended purpose. In *Collins,* the manufacturers made, marketed, and sold the final product to the consumer and thus had control over the end product. White lead carbonate manufacturers that did not also manufacture lead paint had no control over how much of their pigment was incorporated into the final product or whether it would be used for residential purposes. Paint manufacturers made the ultimate decision in regard to the types, combinations, and amounts to use in the formulation of their final paint product. Any given painter had a unique way of mixing paints depending on the purpose for which the paint was to be used. Further, none of these individuals could have controlled whether a child ingested paint chips. The raw material suppliers, therefore, did not have exclusive control over the *risk* of the product that allegedly injured Thomas;

as such, this case clearly does not fall within the theory of risk contribution originally formulated in *Collins*.

¶ 242. Yet another significant distinction between this case and *Collins* is that unlike DES, white lead carbonate is not fungible. As noted by the majority, majority op., ¶ 138, an important justification for adopting the risk-contribution theory was that "DES was, for the most part, produced in a 'generic' form." *Collins*, 116 Wis. 2d at 180. Furthermore, "DES was a fungible drug produced with a chemically identical formula." *Id.* As such, it was virtually impossible for the plaintiff to determine which DES manufacturer produced the DES that her mother ingested. *See id.* This commonality among DES forms was important because it assured that all DES manufacturers equally shared responsibility for the risk of injury posed by the drug.

¶ 243. As described previously, the defendants in this case have overwhelmingly demonstrated that lead paints and pigments were anything but generic, fungible, or chemically identical. To briefly restate, pigment manufacturers utilized different formulas for white lead carbonate that varied in terms of chemical composition, lead content, particle size, and hiding power. Further, the end product producers, the lead paint manufacturers, utilized different types and concentrations of white lead carbonate in different paint mixtures, depending upon the brand and the purpose for which the paint was to be applied. In other words, there was no single, identical formulation of white lead carbonate. These different formulas contained different amounts of lead, and hence, different levels of toxicity.

¶ 244. Thus, even if Thomas could provide scientific evidence that he ingested a white lead carbonate pigment, no uniform risk was presented among the varieties of white lead carbonate. As the different formulas contained different lead concentrations, they

361

posed different risks of harm. Obviously, a mixture with a high lead concentration posed a greater risk than a mixture with a low lead concentration.

¶ 245. The *Brenner* court recognized the importance of this distinction from the DES cases when it rejected market share liability in an action against manufacturers of white lead carbonate:

> All DES manufactured had an identical chemical composition. In contrast, lead-based paint is not a fungible product; it contains varying amounts of lead pigments, including white lead carbonate. Arguably, the white lead carbonate used as a raw material in some lead-based paint did not differ between manufacturers. However, paint manufacturers used differing amounts of white lead carbonate, or some other lead pigment, in their paints. Some lead-based paint contained 10% lead pigment, while other paint was more toxic, containing as much as 50% lead pigment. Not only did the amount of lead pigment vary, but so did the type of lead pigment used. Thus, unlike DES, the finished product that was used by consumers here, i.e., lead-based paint, was not fungible.

*Brenner,* 263 A.D.2d at 172. *See also Skipworth,* 690 A.2d at 173 (noting that unlike DES, which was "manufactured according to an identical formula and presented an identical risk of harm[,] . . . it is undisputed that lead pigments had different chemical formulations, contained different amounts of lead, and differed in potential toxicity"). Because neither white lead carbonate nor the lead-based paint into which these pigments were incorporated were generic or fungible, it would be inappropriate to apply the *Collins* risk-contribution theory here, as the defendants did not equally share responsibility for the risk posed by white lead carbonate, in contrast to the drug companies that manufactured and marketed DES.

362

¶ 246. The majority drastically lowers the threshold for fungibility articulated in *Collins* by concluding that all forms of white lead carbonate are fungible. The majority recognizes that white lead carbonate was made from three different chemical formulas, while DES was made from only one. Majority op., ¶ 139. Nevertheless, the majority concludes that fungibility does not require chemical identity. *Id.* The majority stresses that for the purposes of fungibility, it is the "common denominator in the formulas that counts: lead." *Id.,* ¶ 140. The majority goes on to state that "the formulas for both DES and the white lead carbonate are in a sense on the same footing as being inherently hazardous." *Id.* There is simply no basis in *Collins* or any of the cases from other jurisdictions, applying market share liability, for establishing such a low threshold for fungibility.

¶ 247. With this misconceived focus on a "common denominator," and an "inherently hazardous" formula, the majority has drastically expanded the intended parameters of *Collins*. The majority's reasoning is clearly flawed and virtually eliminates the fungibility requirement, as now all finished products containing a common raw material are fungible. As Sherwin-Williams indicates, under the majority's rationale, victims of a shooting who cannot identify a gun manufacturer could sue all steel companies, a person injured by a drain cleaner could sue all producers of sodium hydroxide, and one who is injured in a fire started by matches could sue all producers of sulfur.

¶ 248. Thus, under the majority's rationale, white lead carbonate could be considered fungible with other forms of lead pigment, lead sinkers for fishing poles, lead pencils, or lead pipes. Similarly, under the majority's rationale, all types of tires are fungible because they all

contain rubber. If all that is required is a "common denominator," then a plaintiff could sue the manufacturers of all these products because they are all, under the majority's rationale, "fungible" for the purposes of *Collins,* as they all contain a common offending ingredient.

¶ 249.   The majority cites to a California asbestos case, *Wheeler v. Raybestos-Manhattan,* 11 Cal. Rptr. 2d 109 (Cal. Ct. App. 1992), for support of its conclusion that the common denominator is what matters for purposes of fungibility. However, the *Wheeler* case is clearly the minority view:

> [O]ther authority finds market share liability inappropriate where the substance, such as asbestos, is not fungible as was DES, and had widely varying ranges of toxicity, depending upon its form and use. Nonfungibility between and among the several types of asbestos has generally precluded application of market share liability to claims for asbestos-related personal injury, although California courts have recognized that an exception might exist in asbestos-containing brake pad litigation. [*See Wheeler,* 11 Cal. Rptr. 2d 109.] *Thus, courts evaluating claims of asbestos-related injury have declined to extend market share liability because while "all of the asbestos products shared an important characteristic in that they all contained asbestos fibers, . . . they also possessed divergent characteristics, such as the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; and the percentage of asbestos used in the product."*

*Madden & Owen* § 24:7, at 662–63 (quoting *Mullen v. Armstrong World Indus., Inc.,* 246 Cal. Rptr. 32, 36 (Cal. Ct. App. 1988)) (footnotes omitted)(emphasis added).[14]

---

[14] *See Madden & Owen* § 24:7, at 662 n.6, for a list of cases precluding application of market share liability for asbestos-

¶ 250. Furthermore, the majority has overstated the holding of *Wheeler*. As correctly stated by the North Dakota Supreme Court:

> Although *Wheeler* recognized that non-identical products may give rise to market share liability if they contain roughly equivalent quantities of a single type of asbestos fiber, the court did not hold that all asbestos-containing friction brake products in all cases will be considered fungible. In fact, the court in *Wheeler* indicated that such products must carry a nearly equivalent risk of harm to support market share liability. Furthermore, *Wheeler* was a reversal of a nonsuit based upon an offer of proof made by the plaintiff. The court stressed its holding was narrow: the plaintiffs had not proven the elements of a market share case, but were merely being afforded the opportunity to prove it. Clearly, *Wheeler* does not serve as evidence of fungibility and equivalent risks of harm of the products in this case.

*Black v. Abex Corp.*, 603 N.W.2d 182, 190 (N.D. 1999)(internal citations omitted).

¶ 251. Notably, the *Wheeler* court reaffirmed its prior decision in *Mullen*, 246 Cal. Rptr. 32, in which the court refused to apply the market share theory of liability to a wide range of asbestos products manufac-

related cases because of nonfungibility: *Stevens v. Owens-Corning Fiberglas Corp.*, 57 Cal. Rptr. 2d 525, 540 (Cal. Ct. App. 1996) (noting "diversity of asbestos products"); *Celotex Corp. v. Copeland*, 471 So. 2d 533, 538–39 (Fla. 1985) (collecting cases that reject market share theory in asbestos cases); *Gaulding v. Celotex Corp.*, 748 S.W.2d 627 (Tex. App. 1988) (concluding that market share liability, among other theories, is not available in Texas for an asbestos-related injury; *Starling v. Seaboard Coast Line Ry. Co.*, 533 F. Supp 183 (S.D. Ga. 1982); *Vigiolto v. Johns Manville Corp.*, 643 F. Supp. 1454 (W.D. Pa. 1986) (holding that market share liability is not appropriate in an action based on an asbestos-related injury).

tured by the defendants because "[w]e noted there that asbestos, unlike DES, was not a single product but merely a generic name for an ingredient in a variety of products each of which posed a different risk of harm." *Wheeler*, 11 Cal. Rptr. 2d at 111. The *Wheeler* court distinguished *Mullen* because the brake pads at issue were comprised of a "single type of asbestos fiber, . . . and the amount of asbestos by weight in the pads varied within a limited range." *Id.* at 111.

¶ 252. In this case, there was no single type of white lead carbonate. Each formulation had different chemical compositions, contained different amounts of lead, and differed in potential toxicity. Furthermore, the amount of white lead carbonate contained in a particular lead paint varied greatly from mixture to mixture. As such, the rationale of *Mullen,* which focused on asbestos in general, is much more analogous to this case than the rationale of *Wheeler,* which focused on a particular asbestos fiber in a limited concentration range.

¶ 253. In *Black,* the North Dakota Supreme Court rejected market share liability in a suit against manufacturers of asbestos-containing products precisely because the products, although all containing asbestos, did not present equivalent risks of harm. *Black,* 603 N.W.2d at 189. "Market share liability is premised upon the fact that the defendants have produced identical (or virtually identical) defective products which carry *equivalent risks of harm." Id.* (emphasis added). The court further stated:

> The rationale underlying market share liability, as developed in *Sindell,* is that it did not matter which manufacturer's product the plaintiff's mother actually ingested; because all DES was chemically identical, the same harm would have occurred. Thus, any individual

> manufacturer's product would have caused the identical injury, and it was through mere fortuity that any one manufacturer did not produce the actual product ingested.

*Id.* at 190. The court then noted that the asbestos-containing "friction products" that the defendants produced contained between seven and seventy-five percent asbestos fibers. *Id.* "It seems obvious that a product which contains seventy-five percent asbestos would create a greater risk of harm than one which contains only seven percent." *Id.* at 191. Thus, the *Black* court held that the market share theory of liability did not apply because the defendants' products did not carry equivalent degrees of risk and were not fungible. *Id.*

¶ 254. Similarly, in *Sanderson v. International Flavors and Fragrances, Inc.,* 950 F. Supp 981, 991 (C.D. Cal. 1996), the court held that various perfumes and colognes were not fungible goods. "Just as the court of appeal in *Mullen* held that asbestos was not the 'simple equivalent[]' of DES, the fragrance products which plaintiff contends caused her injuries are not fungible goods made from an identical formula and therefore cannot be equated with the DES at issue in *Sindell.*" *Id.* The court further observed that "the only difference between DES manufactured by Eli Lilly and DES manufactured by Abbott was the return address on the package sent by the manufacturer to the pharmacy. Such is not the case here." *Id.* The district court then applied the rationale of *Mullen* to the facts before it and concluded that the "defendants' fragrance products all (at least allegedly) contain aldehydes, but each contains different types of aldehydes, with different physical properties, at different levels of concentration. It would therefore be contrary to *Mullen* to apply the

market-share theory in this case." *Id.* at 992. Furthermore, in its analysis the court determined that *Wheeler* was "highly distinguishable" and, therefore, not applicable. *Id.* at 992 n.10.

¶ 255.  Likewise, in *Doe v. Cutter Biological*, 852 F. Supp 909, 913 (D. Idaho 1994), the court determined that Factor VIII, a clotting agent, was not a fungible drug. As stated by the court:

> Unlike DES, Factor VIII is not a generic, fungible drug. Each processor prepares its Factor VIII concentrate by its own proprietary processes using plasma collected from its own sources. Each firm's Factor VIII concentrate is clearly distinguishable by brand name, package color, lot number, and number of units of Factor VIII per vial; each firm's Factor VIII concentrate is separately licensed by the Food and Drug Administration. There is no evidence that all Factor VIII products caused or were equally capable of causing HIV infection. *Thus, the risk posed by the different brands of Factor VIII is not identical.*

*Id.* (quoting *Smith v. Cutter Biological, Inc.,* 823 P.2d 717, 733 (Haw. 1991) (Moon, J., concurring in part, dissenting in part)). Thus, the court refused to apply the market share theory of liability against the providers of Factor VIII.

¶ 256.  Unfortunately for the defendants in this case, it is not obvious to the majority that the varieties of lead paint containing differing concentrations and compositions of white lead carbonate did not create equivalent risks of harm. Furthermore, a defendant like DuPont, which manufactured and marketed white lead carbonate for only seven years, did not create the same risk of harm as a defendant like Sherwin-Williams, which manufactured and marketed white lead carbonate for 37 years.

¶ 257. By ignoring or downplaying the significance of these factual distinctions and focusing solely on the policy articulated in *Collins* of allowing an injured plaintiff to recover, the majority casts a wide net that will ensnare numerous defendants and have drastic consequences for firms doing business in Wisconsin. Further, applying the *Collins* risk-contribution theory to a case such as this one—where the deficiencies in the plaintiff's proof are above and beyond the mere inability to identify the precise manufacturer of a generic, chemically identifiable, fungible product that was produced during a limited time frame—will have a profound effect on products liability law. Under the majority opinion, plaintiffs will be encouraged to sue entire industries rather than locate the defendant that manufactured the product that caused the injury. An individual defendant will have almost no ability to contest causation. Furthermore, "elimination of a causation requirement [will] render every manufacturer an insurer not only of its own products, but also of all generically similar products manufactured by its competitors." *Wehmeier v. UNR Indus., Inc.,* 572 N.E.2d 320, 336 (Ill. App. Ct. 1991) (quoting *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1483 (11th Cir. 1985)).

¶ 258. The Illinois Supreme Court articulated similar concerns when it too rejected all variants of market share liability in *Smith,* 560 N.E.2d 324.

> We have not in the past been hesitant to develop new tort concepts; however, in this instance we decline to do so because of the infirmities in the proposed theory. Furthermore, this is too great a deviation from a tort principle which we have found to serve a vital function in the law, causation in fact, especially when market

369

> share liability is a flawed concept and its application will likely be only to a narrow class of defendants.

*Id.* at 344–45.

¶ 259. For an example of the harsh consequences of the majority's decision, one need look no further than to the recent decision of *Haase v. Badger Mining Corp.,* 2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389. In *Haase,* the plaintiff sued the manufacturer that provided silica sand to the foundry where the plaintiff worked. *Id.,* ¶¶ 3–5. With the expansion of the *Collins* risk-contribution theory to the facts of this case, plaintiffs, such as those in *Haase,* can now sue the entire raw material industry and place the burden on each individual defendant to disprove their presumptive liability. Plaintiffs will have no incentive to locate the party that actually caused the injury. The majority's drastic expansion of the risk-contribution theory clearly distorts the original rationale behind the *Collins* decision and will have drastic consequences for business in this state.

¶ 260. *Collins* represented a departure from traditional principles of causation that was justified under the unique facts in that case. As detailed above, other than having a plaintiff who cannot identify which manufacturer's product injured him, this matter and *Collins* have little in common. As noted by the *Brenner* court, 263 A.D.2d at 173, "[t]he inability to identify a narrow time period in which to apply the market share theory, the absence of a fungible product, and the absence of a signature injury are among the reasons that other courts have refused to apply the market share theory in lead poisoning cases." Furthermore, the resounding weight of authority does not support such a fundamental change from conventional tort law principles, in any context outside of the DES scenario.

Indeed, "market share liability theory has been rejected in most other types of products liability cases including those involving asbestos, breast implants, vaccines, lead paint, and gasoline." *Madden & Owen* § 24:7, at 672 (collecting cases).

¶ 261. As it is clear that this case is entirely factually distinct from *Collins,* the majority's decision represents a radical expansion and not a mere application of *Collins.* By expanding the scope of *Collins* to this case, the majority has essentially adopted a version of risk-contribution theory explicitly rejected in *Collins.* In other words, the majority's opinion is unjustified, unprecedented, and unwise.

## IV

¶ 262. In sum, the majority opinion disregards the pertinent facts of this case, misconstrues our Article I, Section 9 jurisprudence, and ignores the numerous factual distinctions between this case and *Collins.* In so doing, the majority relaxes the traditional rules of causation beyond what was accomplished in *Collins* and eliminates any possibility that the defendants in this case will be able to present a defense. Thus, its decision amounts to no less than absolute liability for the manufacturers of a raw material that is later incorporated into a finished product that causes injury. This result is neither just, fair, nor grounded in the law. While it is understandable to feel saddened by the injuries suffered by the plaintiff, what is also tragic is that in its rush to condemn the entire lead paint industry, the majority ignores one of the most basic tenets of our justice system—an individual determination of wrongdoing.

¶ 263. I am authorized to state that Justice DAVID T. PROSSER joins this dissent.

¶ 264. DAVID T. PROSSER, J. (*dissenting*). Four years ago the City of Milwaukee filed suit against NL Industries, Inc. of Dallas, Texas, and Mautz Paint Company of Madison, alleging that the companies were responsible for creating a public nuisance in the City's old housing stock by marketing and selling substantial quantities of lead pigments and/or lead-based paint. *City of Milwaukee v. NL Indus., Inc.,* 2005 WI App 7, ¶¶ 2–4, 278 Wis. 2d 313, 691 N.W.2d 888.

¶ 265. The City asked the two defendants to pay the costs associated with its lead abatement program, which it estimated to be more than one hundred million dollars. *Id.,* ¶¶ 3, 5. More specifically, the City sought (1) compensatory and equitable relief for abatement of the toxic lead hazards in Milwaukee homes; (2) restitution for amounts expended by the City to abate the toxic lead hazards in Milwaukee homes; and (3) punitive damages.

¶ 266. The circuit court dismissed the City's claim for public nuisance, concluding that the City could not show that these particular defendants caused their lead-based paint to be applied to any of the specific buildings included in the alleged public nuisance. *Id.,* ¶¶ 1, 14–19. The court of appeals reversed. The matter is now awaiting a decision by this court in the present litigation.

¶ 267. In the meantime, Mautz Paint, a long-time Wisconsin corporation founded in 1892, sold its business to Ohio-based Sherwin-Williams in November 2001. The company cited financial pressure brought on by Milwaukee's lead paint lawsuit. All Madison-based Mautz manufacturing has ceased.

¶ 268. The City of Milwaukee's lead paint lawsuit provides us with a window to the future. When the court issues its decision in this case, every person under the age of 20 who claims a lead paint injury in Wiscon-

sin will have a cause of action in our courts. Every person in the United States who has a lead paint injury that could have come from a Wisconsin-based company and can survive the limitations periods in his own state may have a cause of action. Every municipality in this country that has a lead abatement program and can make a plausible argument that Wisconsin-made lead paint or white lead carbonate injured its residents may follow the City of Milwaukee and seek redress in this state. Wisconsin will be the mecca for lead paint suits. There is no statute of repose on products liability here, and this court has now created a remedy for lead paint poisoning so sweeping and draconian that it will be nearly impossible for paint companies to defend themselves or, frankly, for plaintiffs to lose.

¶ 269.   Because the majority opinion creates a cause of action that violates due process of law, equal protection of the law, and nearly every principle of sound public policy in tort cases, I dissent.

## FACTUAL BACKGROUND

¶ 270.   Steven Thomas, now 15, lived in several houses in Milwaukee during his formative years. These houses include (1) 2652 North 37th Street; (2) 2654 North 25th Street; and (3) 4736 North 37th Street. The first house at 2652 North 37th Street was built in 1905. The second house at 2654 North 25th Street was built in 1900.

¶ 271.   Thomas claims that he ingested lead paint at all three houses as a small child. The owner of the first house settled with him for $62,652. The owners of the second house settled for $261,520. The insurer of the owner of the third house prevailed on a motion for summary judgment.

¶ 272.   Plaintiff's expert did testing of paint chips at the first two houses. The expert found as many as 21

373

layers of paint on chips at the first house and 18 layers of paint on chips at the second house. Many of these layers contained white lead carbonate.

¶ 273.   For purposes of this discussion, we must accept as true that Thomas ingested white lead carbonate from paint chips or dust from all three houses. However, Thomas admits that he will not be able to prove which companies among the defendants, if any, supplied paint containing white lead carbonate to any of the three houses. The plaintiff will be unable to prove that, say, ConAgra Grocery Products, or one of its subsidiaries, *ever* supplied white lead carbonate that ended up in paint at 2652 North 37th Street, or, if it did, whether the white lead carbonate it supplied caused injury to Thomas.

¶ 274.   The gist of this majority opinion is to create a theory of tort liability for paint manufacturers that obviates any need for a plaintiff to provide such proof.

## ANALYSIS

¶ 275.   Normally, if Thomas proceeded on a negligence theory, he would have to prove four elements: duty, breach, *causation,* and damages. If he proceeded on a strict products liability theory, he would have to prove five elements: that the product was defective and unreasonably dangerous; that the product was defective when it left the possession or control of the seller; *that the defect in the manufacturer's product was a cause (substantial factor) of the plaintiff's injury;* that the seller was engaged in the business of selling such products; and that the product was one which the seller expected to and did reach the consumer without substantial change.

¶ 276.   Assessing these elements, it is apparent that Thomas could not succeed under existing theories of negligence or strict products liability. Indeed, he

acknowledges as much. Thomas's admitted inability to prove specific product causation would be fatal to his claim.

¶ 277.  The facts in this case do not fit the law. So, instead of simply applying the settled law, the majority changes the law to fit the facts.

¶ 278.  As to Thomas's negligence cause of action, the majority modifies the elements as follows: Thomas must prove (1) that he ingested white lead carbonate; (2) *that the white lead carbonate caused his injuries;* (3) that the "Pigment Manufacturer" defendants produced or marketed *the type of* white lead carbonate he ingested; and (4) that a Pigment Manufacturer's conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to Thomas. Majority op., ¶ 161.

¶ 279.  As to Thomas's strict products liability cause of action, the majority has modified the elements to the extent that Thomas need prove only that the white lead carbonate was (1) defective; and (2) unreasonably dangerous; (3) "that the defect[ive product] was a cause of Thomas's injuries or damages;" (4) that the manufacturer was engaged in the business of selling such products; and (5) that the product was one which the seller expected to and did reach the consumer without substantial change. Majority op., ¶ 162.

¶ 280.  Thus, the majority has broken the link between manufacturer and product. Under the majority's rule, Thomas need prove only that a general type of product caused his injury; not that a specific manufacturer's product caused his injury. A manufacturer is virtually powerless to show that its specific product did not cause the injury. To mount a successful defense, a manufacturer would have to disprove the presumed link that the plaintiff admittedly cannot prove

and need not prove. It goes without saying that DNA testing does not apply to paint chips or dust.

¶ 281. The majority's modification of the well-settled elements of negligence and strict products liability violates the defendants' constitutional rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution. This deprivation is underscored by the majority's departure from longstanding principles of tort liability.

## DUE PROCESS[1]

¶ 282. The Fourteenth Amendment provides in part that no "State [shall] deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

---

[1] Before reaching the merits of the defendants' due process arguments, it is necessary to address the majority's conclusory contention that "[t]hese constitutional issues are not ripe." Majority op., ¶ 166. "[T]he ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." *Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1153–54 (5th Cir. 1993).

I have no difficulty in concluding that the constitutional issues are ripe. The result the majority reaches in this case has immediate and dire consequences for the defendants, and impacts other cases awaiting the result of this case.

For the defendants, the majority opinion means that they will effectively be denied the chance to rely on ordinary tort theory to defeat the plaintiff's claim. Parties in other cases already filed and in cases yet to be filed will also note the majority's receptiveness to claims of this nature, and we may see a stampede to file lead paint suits before Congress or the Wisconsin Legislature can react. These issues should be addressed now.

¶ 283. The Supreme Court has repeatedly held that " '[d]ue process' has never been, and perhaps can never be, precisely defined."[2] However, both this court and federal courts have repeatedly characterized the immutable core of due process as "fair play."[3] The precepts laid out in the majority opinion are fundamentally unfair and at odds with traditional notions of fair play.[4]

¶ 284. The defendants' constitutional arguments could be construed as alleging violations of substantive

---

[2] *See, e.g., Lassiter v. Dep't of Soc. Servs. of Durham County, N.C.,* 452 U.S. 18, 24 (1981).

[3] *See, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998); *Carlson v. Green,* 446 U.S. 14, 46 n.12 (1980); *Tammie J.C. v. Robert T.R.,* 2003 WI 61, ¶ 14, 262 Wis. 2d 217, 663 N.W.2d 734; *Layton Sch. of Art and Design v. WERC,* 82 Wis. 2d 324, 363, 262 N.W.2d 218 (1978).

[4] It is true enough that, generally, claims of due process violations are raised as objections to the operation of statutes. *See, e.g., Lujan v. G&G Fire Sprinklers, Inc.,* 532 U.S. 189 (2001); *Matthies v. Positive Safety Mfg. Co.,* 2001 WI 82, ¶ 27, 244 Wis. 2d 720, 628 N.W.2d 842. In that sense, the "State" actor at issue is the state legislature. Yet courts, too, must bow to this constitutional mandate. *Ownbey v. Morgan,* 256 U.S. 94, 111 (1921) (The due process clause "restrains state action, *whether legislative, executive, or judicial,* within bounds that are consistent with the fundamentals of individual liberty and private property, *including the right to be heard where liberty or property is at stake in judicial proceedings.*") (emphasis added). Accordingly, a higher court is free to determine that a lower court's decision violated the due process rights of one or more of the parties. *See, e.g., Brinkerhoff-Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 682 (1930) (reversing state court's decision on due process grounds and noting "while it is for the state courts to determine the adjective as well as the substantive law of the State, they must, in so doing, accord the parties due process of law.").

due process or procedural due process. Substantive due process " 'protects against governmental actions that are arbitrary and wrong "regardless of the fairness of the procedures used to implement them." ' "[5] Procedural due process "addresses the fairness of the manner in which a governmental action is implemented."[6] The majority opinion violates the defendants' constitutional rights under both theories.

## A. Procedural Due Process

¶ 285. The defendants contend that they will be denied the opportunity to present a defense under well-settled tort theory: the defense that their products did not cause the plaintiff's injury. This argument is not aggressive or overreaching. It simply demands the right to be heard, implicating the "fairness of the procedures" by which liability is determined.

¶ 286. What process is due these defendants? " 'Due process is flexible and calls for such procedural protections as the particular situation demands.' "[7]

¶ 287. To determine the process due in a particular situation, the Supreme Court has often recited a three-factor balancing test.[8] The Court balances (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

---

[5] *Barbara B. v. Dorian H.*, 2005 WI 6, ¶ 18 n.14, 277 Wis. 2d 378, 690 N.W.2d 849 (citation omitted).

[6] *Id.*

[7] *Gilbert v. Homar,* 520 U.S. 924, 930 (1997) (citation omitted).

[8] *Wilkinson v. Austin,* ___ U.S. ___, 125 S. Ct. 2384, 2395 (2005); *Homar,* 520 U.S. at 931–32.

safeguards; and (3) the government's interest in the matter, including the governmental function involved and any fiscal or administrative burdens that additional or substitute procedural requirements would entail.[9] This tripartite formulation dates back at least as far as *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

¶ 288.  The majority opinion sets up an irrebutable presumption of causation: if the plaintiff can show that the defendant manufactured white lead carbonate sometime between 1900 and 1978, and that some form of white lead carbonate caused the plaintiff's injury, the defendant will be held liable. The defendant has no opportunity to show that its particular product did not cause the plaintiff's injury.[10] It is faced with no-fault liability.

¶ 289.  Given this inequity, the determining factor in the *Mathews* test is the second factor: the risk of *erroneous* liability inherent in the procedure the majority implements today. It completely tips the *Mathews* balance.

¶ 290.  The risk of error created by the majority opinion is enormous. Because Thomas cannot prove which of multiple layers of paint injured him, the defendants cannot show that they did not produce, or more precisely, could not have produced, the white lead carbonate in that layer.

---

[9] *Id.*

[10] On several occasions, the United States Supreme Court has struck down statutes on the grounds that the statutes created an irrebutable presumption in violation of the due process clause. *See, e.g., Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632 (1974); *United States Dep't of Agriculture v. Murry,* 413 U.S. 508 (1973); *Vlandis v. Kline,* 412 U.S. 441 (1973); *Stanley v. Illinois,* 405 U.S. 645 (1972); *Bell v. Burson,* 402 U.S. 535 (1971).

¶ 291. The plaintiff need *not* show the evidence that is normally most critical in tort cases: that the defendant's product injured the plaintiff. The plaintiff need not show that a defendant produced white lead carbonate during a particular time span (except a time period (1900–1978) of more than three quarters of a century), or that the defendant produced a type of white lead carbonate with an identical chemical formula to the product that injured the plaintiff, or even that a particular defendant's products *could have* injured the plaintiff.

¶ 292. This is true even though many of the defendants produced white lead carbonate for only a small fraction of the 78–year period during which paint containing white lead carbonate could have been applied to the walls of Thomas's three residences.

¶ 293. To illustrate, DuPont manufactured white lead carbonate for only seven years (1917–24). SCM manufactured white lead carbonate for 34 years (1924–1958). Sherwin-Williams manufactured white lead carbonate for 37 years (1910–47). Under the majority opinion, a plaintiff may just as easily recover from a defendant such as DuPont (which made the product for seven years) as another defendant that produced it for eleven times seven years. There is no rhyme or reason to such a result.

¶ 294. DuPont, for example, would have no way to prove that it did not manufacture the white lead carbonate that injured the plaintiff, because the plaintiff could not prove when the white lead carbonate he ingested was used in paint, when that paint was applied to his multiple residences, or which of multiple layers of paint in three residences (or the dust therefrom) allegedly injured him. These shortcomings in the majority's reasoning illustrate why this case is very different from

*Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), in which the plaintiff could point to a nine-month span in which she could have been injured, and in which many similarly situated plaintiffs could identify distinguishing characteristics about the DES pills they took.[11]

¶ 295. These shortcomings are the reason that no other court has ever adopted any form of market share liability in lead paint cases. "The public policy reasons favoring the use of market share do not control where there is a possibility that the defendants did not cause the harm in question."[12] The shortcomings are the reason that learned commentators advise that "[t]he greater the span of time within which the potentially injury-causing product was sold, the less suited market share liability will be."[13] They are probably the reason

[11] In *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 198, 342 N.W.2d 37 (1984), the court noted that innocent defendants could exculpate themselves by showing that their products "could not have reached the plaintiff's mother." With respect to DES, this could have been done by showing that a particular manufacturer did not produce DES pills of a particular color or style. Perhaps because its net is so broad, the majority offers no such guidance here.

[12] *Santiago v. Sherwin-Williams Co.*, 782 F. Supp. 186, 193 (D. Mass. 1992). *See also City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 126 (3d Cir. 1993); *Lewis v. Lead Indus. Ass'n, Inc.*, 793 N.E. 2d 869, 875 (Ill. Ct. App. 2003) (Accepting the plaintiffs' theory would essentially make particular defendants "insurers of their industry," and a product manufacturer's "duty is not so broad as to extend to anyone who uses or might be injured by a like kind product supplied by another"); *Skipworth v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 172–73 (Pa. 1997).

[13] 2 David G. Owen, M. Stuart Madden, et al., *Madden & Owen on Products Liability* § 24:7 at 663 (2000).

why, despite calling Wisconsin the "last hope" for lead paint plaintiffs, even a prominent member of the plaintiffs' bar commented, "I just don't see it happening," when asked about the plaintiff's chance of success in this case.[14]

¶ 296.  As another court stated in rejecting an identical claim, "application of the market share theory to this situation would virtually ensure that certain pigment manufacturers *would be held liable where they could not possibly have been a potential tortfeasor.*"[15]

¶ 297.  The majority opinion raises the very real possibility that innocent defendants will be held liable for wrongs they did not commit. To avoid the risk of erroneous verdicts, Thomas should have to show specific product causation and the defendants should be allowed a fair chance to show that their products did not injure Thomas. Neither principle is consistent with the majority opinion.

## B.   Substantive Due Process

¶ 298.   The majority's complete disregard for longstanding principles of tort liability certainly "shocks the conscience," thus violating substantive due process.[16]

¶ 299.   In effect, the majority opinion imposes ex post facto liability on the defendants for activities long past. In this regard, the majority opinion is directly

---

[14] Molly McDonough, *Risky Business: Wisconsin Court's Risk Analysis May Be Last Hope for Lead Paint Plaintiffs,* ABA Journal (Feb. 14, 2005).

[15] *Skipworth v. Lead Indus. Ass'n, Inc.,* 690 A.2d 169, 172 (Pa. 1997) (emphasis added).

[16] *See, e.g., Chavez v. Martinez,* 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part) (collecting cases).

contrary to the principles expressed in Justice Anthony Kennedy's concurrence in *Eastern Enterprises v. Apfel,* 524 U.S. 498 (1998).

¶ 300. In *Apfel,* the petitioner, a corporation formerly engaged in coal mining, challenged the Coal Industry Retiree Health Benefit Act of 1992 on the grounds that it violated the due process and takings clauses of the constitution by retroactively imposing liability based on the corporation's activities between 1946 and 1965.[17] A plurality of the Court concluded that the law violated the takings clause because it "improperly places a severe, disproportionate, and extremely retroactive burden on Eastern."[18]

¶ 301. Justice Kennedy concurred, arguing that "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership."[19] As Justice Kennedy pointed out, "[b]oth stability of investment and confidence in the constitutional system . . . are secured by due process restrictions against severe retroactive legislation."[20] Accordingly, Justice Kennedy would have held the law unconstitutional on due process grounds. *Id.* at 550 (Kennedy, J., concurring).

¶ 302. Here, it is not a statute, but the majority's decision, that imposes retroactive and severe liability based on "transactions long closed." The principles articulated by Justice Kennedy are no less forceful when applied here; and the majority's decision, which will have the unerring consequence of imposing retro-

---

[17] *E. Enters. v. Apfel,* 524 U.S. 498, 532 (1998).

[18] *Id.* at 538.

[19] *Id.* at 548 (Kennedy, J., concurring).

[20] *Id.* at 549 (Kennedy, J., concurring).

active liability, is just as unconstitutional as if the same action had been taken by the state legislature.

## EQUAL PROTECTION

¶ 303. The equal protection clause "creates no substantive rights," but embodies the general rule that the government "must treat like cases alike."[21] The majority's rule does not "treat like cases alike."

¶ 304. Assume for a moment that the year is 1960, and consider two Wisconsin paint manufacturers. Under the majority opinion, each would be equally culpable, assuming they both produced lead-based paint. Assume further that the first company was a small division of a larger company with minimal contacts in Wisconsin and sold only a small volume of paint in Wisconsin. Assume that the other company was based in Wisconsin, did most of its business here, and operated here for the majority of the time in question.

¶ 305. Assume now that today, the first company is still in business as a large, profitable corporation, and the second company is defunct.[22] Despite the fact that the company that has gone out of business was, in this hypothetical, the most culpable tortfeasor, it escapes all liability. The first company, on the other hand, will bear a disproportionate share of the liability. This is not "treating like cases alike."

## PUBLIC POLICY

¶ 306. The majority's disregard for the type of "fair play" guaranteed by the due process and equal

---

[21] *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

[22] As examples of this class, O'Neil Duro Company began operation in 1925 and ceased operation in 1988. Similarly, Hager Paint Products began operation in 1925 and ceased operation in 1979. Both were based in Wisconsin.

protection clauses is illuminated by a review of the six public policy factors this court has identified as tending to preclude liability even when negligence exists.

¶ 307.   The six factors are: (1) Whether the injury is too remote from the negligence; (2) Whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor; (3) Whether it appears in retrospect too extraordinary that the negligence should have brought about the harm; (4) Whether allowance of recovery would place an unreasonable burden on the tortfeasor; (5) Whether allowance of recovery would be too likely to open the way to fraudulent claims; and (6) Whether allowance of recovery would enter a field that has no sensible or just stopping point.[23]

¶ 308.   Even if we were to assume, arguendo, that Thomas could prove causation and thus negligence, all these factors would weigh against attaching liability. First, the alleged injury here is too remote from the negligence. The white lead carbonate at issue may have been produced as much as 100 years ago. It is almost impossible to defend against alleged negligence that no living person can remember.

¶ 309.   Second, the injury is wholly out of proportion to the defendants' culpability. The recent negligence of a landlord in allowing the paint to deteriorate seems greater than the negligence of the manufacturer of one of the raw materials used to make the paint perhaps a half century ago.

¶ 310.   Third, in retrospect it appears too extraordinary that the negligence should have brought about the harm. It is not enough for the majority to allege, in its presentation of the facts, some sort of industry-wide

---

[23] *Miller v. Wal-Mart Stores, Inc.,* 219 Wis. 2d 250, 264–65, 580 N.W.2d 233 (1998).

knowledge on the part of lead paint suppliers. The plaintiff should have to show that each defendant had knowledge of the dangers of white lead carbonate, not lead paint.

¶ 311.   Fourth, allowance of recovery would place an unreasonable burden on the defendant. As stated above, it is nearly impossible to defend a suit alleging negligence 50 to 100 years in the past. Even if a defendant had insurance during the entire time it was involved with white lead carbonate, it might have changed insurers, none of whom will now be eager to step forward with coverage. How will a defendant prove coverage? Even if coverage could be proved, how will 1930s insurance pay for 21st century damages?

¶ 312.   Fifth, allowance of recovery would be too likely to open the way to fraudulent claims. In erasing the causation requirement, the majority kicks out one of the legs supporting conventional principles of tort liability. These time-honored standards have been designed to ensure that meritorious claims are rewarded and fraudulent claims are rejected. The majority's action tilts the balance to substantially increase the possibility of fraudulent claims.

¶ 313.   Sixth, the principles in the majority opinion have no sensible or just stopping point. As Justice Wilcox's dissent (which I wholeheartedly join) points out, the majority discards the principle of fungibility underpinning the *Collins* rationale. The reasoning in the majority opinion could be adapted to cover other raw materials. Further, under the majority opinion, plaintiffs injured in other states have the option to come to our courts and sue Wisconsin raw material manufacturers for harm that occurred elsewhere.

¶ 314.   By illustrating the fundamental unfairness worked by the majority opinion, these six factors pro-

vide additional evidence that the majority opinion violates the core due process right of "fair play," as well as the defendants' right to equal protection of the law. Given the near-unanimous rejection of this theory by other courts, this invasion is as unexpected as it is unwarranted.

## CONCLUSION

¶ 315.  The consequences of the majority opinion may be staggering for Wisconsin industry and commerce. When Mautz Paint, a home-grown Wisconsin company, faced a similar suit, it was forced to sell out to an out-of-state company. The new owner quickly moved all manufacturing jobs out of state.

¶ 316.  The harmful effects that this decision could visit on Wisconsin commerce render the majority decision unwise. The presumptions in the majority opinion that contradict the defendants' rights of due process and equal protection render the majority decision unconstitutional.

¶ 317.  For the foregoing reasons, I respectfully dissent.

¶ 318.  I am authorized to state that Justice JON P. WILCOX joins this opinion.